NITISH S. BANGALORE, individually,
and as representative of a Class of
Participants and Beneficiaries, on Behalf
of the Froedtert Health, Inc. 403(b) Plan,

        Plaintiff,

        v.

FROEDTERT HEALTH, INC.,

        and

THE BOARD OF DIRECTORS OF
FROEDTERT HEALTH, INC.,

        and

FROEDTERT HEALTH, INC.
BENEFIT PLAN COMMITTEE,

        Defendants

Case No. 20-cv-893

**CLASS ACTION COMPLAINT
FOR CLAIMS UNDER
29 U.S.C. § 1132(a)(2)**

---

## COMPLAINT

---

COMES NOW Plaintiff, Nitish S. Bangalore, individually and as representative of a Class

of Participants and Beneficiaries on behalf of the Froedtert Health, Inc. 403(b) Plan (the

"Plan"),[1] by his counsel, WALCHESKE & LUZI, LLC, as and for a claim against Defendants,

alleges and asserts to the best of his knowledge, information and belief, formed after an inquiry

reasonable under the circumstances, the following:

---

[1] The Plan is a legal entity that can sue and be sued. 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather pursuant to 29 U.S.C. § 1109(a), and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

# INTRODUCTION

1.      The essential remedial purpose of the Employee Retirement Income Security Act ("ERISA") is "to protect the beneficiaries of private pension plans." *Nachwalter v. Christie*, 805 F.2d 956, 962 (11th Cir. 1986).[2]

2.      The law is settled that ERISA fiduciaries have a duty to evaluate fees and expenses when selecting investments *as well as* a continuing duty to monitor fees and expenses of selected investments and remove imprudent ones. *Tibble v. Edison Int'l,* 135 S. Ct. 1823, 1828 (2015); 29 U.S.C. §1104(a)(1)(A) (fiduciary duty includes "defraying reasonable expenses of administering the plan;" 29 C.F.R. § 2250.404a-1(b)(i) (ERISA fiduciary must give "appropriate consideration to those facts and circumstances" that "are relevant to the particular investment." It is for good reason that ERISA requires fiduciaries to be cost-conscious:

> Expenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Tibble,* 135 S. Ct. at 1826, by decreasing its immediate value, and by depriving the participant of the prospective value of funds that would have continued to grow if not taken out in fees.

*Sweda v. Univ. of Pa*., 923 F.3d 320, 328 (3d Cir. 2019).

3.      Defendants Froedtert Health, Inc. ("Froedtert"), the Board of Directors of Froedtert Health, Inc. ("Board Defendants"), the Froedtert Health, Inc. Benefit Plan Committee ("Benefit Plan Committee") (collectively, "Defendants"), are ERISA fiduciaries as they exercises discretionary authority or discretionary control over the 403(b) defined contribution pension plan - known as the Froedtert Health, Inc. 403(b) Plan ("The Plan") - that it sponsors and provides to its employees**.**

4.      Plaintiff alleges that during the putative Class Period (June 12, 2014 through the date of judgment), Defendants, as fiduciaries of the Plan, as that term is defined under ERISA,

---

[2] Unless indicated otherwise, cited and quoted cases are omitted.

29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiff, and to the other participants of the Plan by, among other things: (1) authorizing the Plan to pay unreasonably high fees for recordkeeping; (2) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost; and (3) maintaining certain funds in the Plan despite the availability of identical or similar investment options with lower costs, and/or better performance histories.

5. In addition, for mutual funds share classes available within the Plan, the same issuer offered a different share class from that selected by the Plan that charged lower fees, and consistently achieved higher returns. Defendants, however, inexplicably failed to select these lower fee-charging and better-return producing share classes. The Plan also generally chose more costly "actively managed funds" rather than "index funds" that offered equal or better performance as substantially lower cost. Additionally, the administrative fees charged to Plan participants were consistently greater than the fees of most comparable 403(b) plans, when fees are calculated as cost per participant.

6. These investment options and unreasonable fees cannot be justified. Defendants' failure to monitor and improve investment options confirms more than simply sloppy business practice. Defendants' failures breached the fiduciary duties they owed to Plaintiff, Plan participants and beneficiaries. Prudent fiduciaries of 403(b) plans continuously monitor administrative fees against applicable benchmarks and peer groups to identify unreasonable and unjustifiable fees.

7. To remedy, Plaintiff brings this action on behalf of the Plan under 29 U.S.C. § 1132(a)(2) to enforce Defendants' liability under 29 U.S.C. § 1109(a) to make good to the Plan all losses resulting from their breaches of fiduciary duty. Plaintiff also brings party in interest

prohibited transaction claims based on dealings between the Defendants and investment advisors and consultants to the Plan.

<strong><u>JURISDICTION AND VENUE</u></strong>

8.     This Court has subject matter jurisdiction in this ERISA matter under 28 U.S.C. § 1331 and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001 et seq.

9.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and have significant contacts with this District, and because ERISA provides for nationwide service of process.

10.     Venue is appropriate in this district because the Defendants and Plaintiff may be found in this judicial district within the meaning of 29 U.S.C. § 1132(e)(2).

11.     In conformity with 29 U.S.C. §1132(h), Plaintiff served the original Complaint by certified mail on the Secretary of Labor and the Secretary of the Treasury.

<strong><u>PARTIES</u></strong>

12.     Plaintiff, Nitish S. Bangalore, is a resident of the State of Wisconsin and currently resides in Grafton, Wisconsin, and during the Class Period, was a participant in the Plan under 29 U.S.C. § 1002(7).

13.     Plaintiff has standing to bring this action on behalf of the Plan because he participated in the Plan and was injured by Defendants' unlawful conduct. Plaintiff is entitled to receive benefits in the amount of the difference between the value of his account as of the time his account was distributed, and what his account is or would have been worth, but for Defendants' breaches of fiduciary duty as described within this Complaint.

14.     The named Plaintiff and all participants in the Plan suffered financial harm as a result of the imprudent or unreasonable investment and fee options in the Plan. Defendants' selection and retention of these options resulted in higher administrative fees than the Plan and its participants and beneficiaries should have paid, as well as poorer net investment performance, had Defendants satisfied their fiduciary obligations. All participants and the Plan continue to be harmed by the ongoing inclusion of these investment options.

15.     Froedtert Health, Inc. ("Froedtert") is a company with its principal headquarters located at 400 Woodland Prime, Suite 302, N74 W12501 Leatherwood Court, Menomonee Falls, Wisconsin 53051. Froedtert is a citizen of the State of Wisconsin. In this Complaint, "Froedtert" refers to the named defendant and all parent, subsidiary, related, predecessor, and successor entities to which these allegations pertain. Froedtert is the Plan sponsor of the Froedtert Health, Inc. 403(b) Plan.

16.      Froedtert is part of a network that operates eastern Wisconsin's only academic medical center and adult Level I Trauma Center at Froedtert Hospital, Milwaukee, an internationally recognized training and research center engaged in thousands of clinical trials and studies. The Froedtert & MCW health network, which includes five hospitals, nearly 2,000 physicians and more than 40 health centers and clinics, draws patients from throughout the Midwest and the nation.[3]

17.     Froedtert acted through its officers, including the Board Defendants, Benefit Plan Committee, and their members to perform Plan-related fiduciary functions in the course and scope of their business.  Froedtert appointed other Plan fiduciaries, including the Benefit Plan Committee, and accordingly had a concomitant fiduciary duty to monitor and supervise those

---

[3] https://www.froedtert.com/about

appointees. For these reasons, Froedtert is a fiduciary of the Plan, within the meaning of 29 U.S.C. § 1002(21)(A).

18.     The Plan administrator of the Plan is the Froedtert Health, Inc. Benefit Plan Committee ("Benefit Plan Committee"). It has its principal headquarters located at 400 Woodland Prime, Suite 302, N74 W12501 Leatherwood Court, Menomonee Falls, Wisconsin 53051. The Plan Committee is a citizen of the state of Wisconsin.

19.     The Plan Committee is a fiduciary with day-to-day administration and operation of the Plan under 29 U.S.C. § 1002(21)(A). The Plan Committee has authority and responsibility for the control, management, and administration of the Plan in accord with 29 U.S.C. § 1102(a). The Plan Committee has exclusive responsibility and complete discretionary authority to control the operation, management, and administration of the Plan, with all powers necessary to properly carry out such responsibilities.

20.     The Benefit Plan Committee and members of the Committee during the Class Period, are collectively referred to herein as the "Committee Defendants."

21.     To the extent that there are additional officers and employees of Froedtert who are/were fiduciaries of the Plan during the Class Period, or other individuals who were hired as investment managers for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiff, Plaintiff reserves the right, once their identities are ascertained, to seek leave to join them to the instant action. Thus, without limitation, Froedtert officers and employees are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period.

22.     The Plan is a "defined contribution" pension plan under 29 U.S.C. § 1102(2)(A) and 1002(34), meaning that Froedtert's contribution to the payment of Plan costs is guaranteed

but the pension benefits are not. In a defined contribution plan, the value of participants' investments is "determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 135 S. Ct.at 1826. Thus, the employer has no incentive to keep costs low or to closely monitor the Plan to ensure every investment remains prudent, because all risks related to high fees and poorly-performing investments are borne by the participants.

23. The Plan has at least $800,000,000 in assets entrusted to the care of the Plan's fiduciaries. The Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments. Defendants, however, did not try to reduce the Plan's expenses or exercise appropriate judgment to monitor each investment option to ensure it was a prudent choice.

## ERISA'S FIDUCIARY STANDARDS

24. ERISA imposes strict fiduciary standards of loyalty and prudence on Defendants as a Plan fiduciaries. 29 U.S.C. § 1104(a)(1) provides in relevant part:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
>
> (A) for the exclusive purpose of:
>
> > (i) providing benefits to participants and their beneficiaries; and
> > (ii) defraying reasonable expenses of administering the plan; [and]
>
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

25. With certain exceptions not relevant here, 29 U.S.C. § 1103(c)(1) provides in relevant part:

[T]he assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

26. 29 U.S.C. § 1109 provides in relevant part:

Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

27. Under ERISA, fiduciaries that exercise any authority or control over plan assets, including the selection of plan investments and service providers, must act prudently and for the exclusive benefit of participants in the plan, and not for the benefit of third parties including service providers to the plan such as recordkeepers and those who provide investment products. Fiduciaries must ensure that the amount of fees paid to those service providers is no more than reasonable. DOL Adv. Op. 97-15A; DOL Adv. Op. 97-16A; *see also* 29 U.S.C. §1103(c)(1) (plan assets "shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan").

28. "[T]he duty to conduct an independent investigation into the merits of a particular investment" is "the most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litig.,* 74 F.3d 420, 435 (3d Cir. 1996); *Katsaros v. Cody*, 744 F.2d 270, 279 (2nd Cir. 1984) (fiduciaries must use "the appropriate methods to investigate the merits" of plan investments). Fiduciaries must "initially determine, and continue to monitor, the prudence of each investment option available to plan participants." *DiFelice v. U.S. Airways, Inc*., 497 F.3d 410, 423 (4th Cir. 2007); (emphasis original); 29 C.F.R. § 2550.404a-1; DOL Adv. Opinion 98-

04A; DOL Adv. Opinion 88-16A. Thus, a defined contribution plan fiduciary cannot "insulate itself from liability by the simple expedient of including a very large number of investment alternatives in its portfolio and then shifting to the participants the responsibility for choosing among them." *Hecker v. Deere & Co.*, 569 F.3d 708, 711 (7th Cir. 2009). Fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble,* 135 S. Ct. at 1828-29.

29.     "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act § 7.

30.     29 U.S.C. § 1132(a)(2) authorizes plan participants to bring a civil action for appropriate relief under 29 U.S.C. § 1109.

## THE PLAN

31.     Started on February 1, 2001, the Plan has had more than 10,000 participants and assets exceeding $600,000,000 since the year 2014. At the end of 2018, the Plan had approximately 15,420 participants and approximately $806,272,830 in assets. At different times, the Plan offered about 20 different investment choices to its participants.

32.     At all relevant times, the Plan's fees were excessive when compared with other comparable 403(b) plans offered by other sponsors that had similar numbers of plan participants, and similar amounts of money under management. The excessive fees led to lower net returns than participants enjoyed in comparable 403(b) plans.

33.     During the Class Period, Defendants breached their duties owed to the Plan, to Plaintiff and all other Plan participants, by: (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in

terms of cost, and (2) maintaining certain funds in the Plan despite the availability of identical or similar investment options with lower costs and/or better performance histories. Defendants failed to use the lowest cost share class for many of the mutual funds within the Plan.

34.     Defendants' mismanagement of the Plan, to the detriment of Plan participants and beneficiaries, breached the fiduciary duties of prudence and loyalty in violation of 29 U.S.C. § 1104.

A.     **Excessive Plan Expenses**

35.     There are commercially available programs commonly used by financial advisors and plan fiduciaries to analyze plans' performance, comparative costs and other key indicators.

36.      The commercially available programs require validated information because financial information submitted to the federal government, in the 5500 Form, is often incomplete or contains errors. The program used for the analysis below contains validated financial information from more than 55,000 financial plans of all types. The benchmarking analysis is of the type employed by fiduciaries and financial advisors to determine the productivity and efficiency of financial programs and is appropriately used here.

37.     Despite the overwhelming evidence that expenses matter and that a fiduciary is obligated to consider expenses in making investment decisions, Defendants did not have a viable methodology for monitoring the expenses of the funds in its Plan. Not only did Defendants maintain a menu of high-fee funds, but Defendants also excluded low-fee index funds.

38.     Both recordkeepers during the Class Period, Transamerica Retirement Solutions ("Transamerica") and Lincoln Financial Group ("Lincoln Financial"), are well known as high cost recordkeepers, and administrators and tend to have platforms that encourage higher fee funds. In many cases, recordkeepers like Transamerica and Lincoln Financial also act as

consultants. Especially in their selection of their own proprietary stable value funds, it is evident that Transamerica and Lincoln Financial had considerable influence on fund selection.

39.     During the Class Period (from June 12, 2014 through the date of judgment), Defendants maintained an investment platform that contained two different stable value funds, 12 to 15 active mutual funds, and a handful of index mutual funds.

40.     The following chart identifies the funds selected by the Benefit Plan Committee under the influence of the Transamerica from 2014-2018, when it was the recordkeeper to the Plan, and then by Lincoln Financial from 2018 to the present, when it was the recordkeeper to the Plan. The chart also illustrates the broad market indices for the investment options. An appropriate low-cost index fund from Vanguard for the same index is included, which can be used to benchmark the fees and performance of the Defendants' funds.

41.     The Plan Fees that follow are expressed as a percentage of assets under management, or "expense ratio." For example, if the mutual fund share class deducts 1% of fund assets each year in fees, the fund's expense ratio would be 1%, or 100 basis points (or bps). (One basis point is equal to 1/100th of one percent (or 0.01%). The fees deducted from a mutual fund's assets reduce the value of the shares owned by fund investors. The expense ratios of each fund are recognized by Morningstar as the single most important consideration in fund selection, which is the starting point for analyzing the prudence of Defendants' fund selection process.

**UNDER TRANSAMERICA AS RECORDKEEPER (YEARS 2014-2018)**

| Plan Fund | Defendants' Plan Fee (bps) | Identical lower-cost available share classes | Identical lower-cost share class fee (bps) | Defendants' Plan's Excessive Fees (%) |
|---|---|---|---|---|
| Transamerica Money Market (TFGXX) | 50 | Vanguard Prime Money Market Fund Admiral Shares (VMRXX) | 10 | **400%** |
| Transamerica Stock Index R4 (TSTFX) | 30 | Fidelity 500 Index Fund (FXAIX) | 2 | **1400%** |
| Transamerica Asset Allocation (TAAFX) | 90 | Vanguard Balanced Index Fund Admiral Shares (VBIAX) | 7 | **1186%** |
| T. Rowe Price Balanced (PARIX) | 77 | Vanguard Balanced Index Fund Admiral Shares (VBIAX) | 7 | **1000%** |
| Target Date T. Rowe Price Retirement 2015 Adv (TRRGX) | 56 | Vanguard Target Retirement 2015 (VTXVX) | 13 | **331%** |
| Target Date T. Rowe Price Retirement 2020 Adv (PARBX) | 86 | Vanguard Target Retirement 2020 (VFORX) | 14 | **514%** |
| Target Date T. Rowe Price Retirement 2025 Adv (TRRHX) | 59 | Vanguard Target Retirement 2025 (VTTVX) | 13 | **354%** |
| Target Date T. Rowe Price Retirement 2030 Adv (PARCX) | 92 | Vanguard Target Retirement 2030 (VTHRX) | 14 | **557%** |
| Target Date T. Rowe Price Retirement 2035 Adv (TRRIX) | 70 | Vanguard Target Retirement Income 2035 (VTTHX) | 14 | **400%** |

| | | | | |
|---|---|---|---|---|
| Target Date T. Rowe Price Retirement 2040 Adv (PARDX) | 97 | Vanguard Target Retirement 2040 (VFORX) | 14 | **593%** |
| Target Date T. Rowe Price Retirement 2045 Adv (TRRKX) | 71 | Vanguard Target Retirement 2045 (VTIVX) | 15 | **373%** |
| Target Date T. Rowe Price Retirement 2050 Adv (PARFX) | 97 | Vanguard Target Retirement 2050 (VFIVX) | 15 | **547%** |
| American Funds EuroPacific Growth R5 (RERGX) | 53 | Vanguard International Dividend Appreciation Index Fund ETF Shares (VIGI) | 20 | **165%** |
| Columbia Small Cap Value (NSVAX) | 104 | SPDR Portfolio High Yield Bond ETF (SPHY) | 15 | **593%** |
| Meridian Small Cap Growth (MSGAX) | 146 | Vanguard Small-Cap Growth Index Fund Admiral Shares (VSGAX) | 7 | **1986%** |
| Dodge & Cox Stock (DODGX) | 52 | Vanguard Mega Cap Value Index Fund Institutional Shares(VMVLX) | 7 | **643%** |
| Vanguard Institutional Index (VINIX) | 4 | Schwab S&P 500 Index Fund (SWPPX) | 2 | **100%** |
| Fidelity Spartan International Index (FSPNX) | 5 | Fidelity SAI U.S. Large Cap Index Fund (FLCPX) | 2 | **150%** |
| Vanguard Small Cap Index (VSISX) | 9 | Vanguard Small-Cap Index Fund Institutional Shares (VSCIX) | 4 | **125%** |

* Disclaimer: Awaiting further documentation and confirmation as far as the ticker symbols for Transamerica funds for 2014-2018
Source:
https://www.sec.gov/Archives/edgar/data/787623/000119312515068890/d875288d497k.htm

**UNDER LINCOLN FINANCIAL AS RECORDKEEPER (YEARS 2018-PRESENT)**

| Plan Fund | Defendants' Plan Fee (bps) | Identical lower-cost available share classes | Identical lower-cost share class fee (bps) | Defendants' Plan's Excessive Fees (%) |
|---|---|---|---|---|
| Metropolitan West Total Return Bd 1 (MWTIX) | 44 | SEI Core Fixed Income A (SIIT) (SSAFX) | 3 | **1367%** |
| Fidelity Contrafund K (FCNKX) | 73 | TIAA-CREF Large Cap Gr Index Instl (TILIX) | 5 | **1360%** |
| American Funds Fundamental Invs R6 (RFNGX) | 30 | Vanguard S&P 500 Admiral | 4 | **650%** |
| American Funds Europacific Growth R6 (RERGX) | 49 | Vanguard International Dividend Appreciation (VIGI) | 20 | **145%** |
| Columbia Small Cap Value Fund II Institutional Class A (NSVAX) | 110 | Columbia Small Cap Value Fund II Institutional 3 Class (CCRYX) | 84 | **31%** |
| T. Rowe Price Instl. Mid-Cap Equity Gr. (PMEGX) | 61 | Vanguard Mid-Cap Growth ETF (VOT) | 7 | **771%** |
| Dodge & Cox Income (DODIX) | 42 | State Street Aggregate Bond Index (SSAFX) | 3 | **1300%** |
| JP Morgan Mid Cap Value (FLMVX) | 75 | Vanguard Mid-Cap Value Index Fund Admiral Shares (VMVAX) | 7 | **986%** |
| Oakmark Institutional (OANMX) | 74 | Fidelity SAI US Low Volatility Idx (FSUVX) | 12 | **517%** |

| Ivy Mid Cap Growth Fund Class I (IYMIX) | 100 | Ivy Mid Cap Growth Fund Class N (IGRFX) | 79 | **27%** |
|---|---|---|---|---|
| Dodge & Cox International Stock (DODFX) Retirement 2045 Adv (TRRKX) | 63 | Vanguard FTSE All-World ex-US Index Fund (VFWSX) | 8 | **688%** |
| American Fund American Balanced R6 (RLBGX) | 28 | Vanguard Balanced Index Fund Institutional (VBAIX) | 6 | **367%** |

42.     The above is for illustrative purposes only and is not all-inclusive, especially for pre-2018 funds. The plan expense ratios were significant multiples of what they should have been given the bargaining power available to the Plan fiduciaries.

**B.     Stable Value Funds**

43.     During the Class Period, Defendants switched between proprietary stable value funds managed and owned by their recordkeeper at the time. Up until the years 2018, Defendants held the Transamerica Guaranteed Pool fund. From the years 2018 on, the Plan held the Lincoln Stable Value Account fund.

44.     Stable value funds are fairly common in 403(b) plans. In most cases, stable value products make use of special guaranteed investment contracts known as "GIC" or "wraps" that have their own risk and return characteristics. Stable value funds are not offered as mutual funds and typically are structured as: (i) an insurance company general account; (ii) an insurance company separate account; or (iii) a synthetic GIC-based fund, typically in a Collective Investment Trust ("CIT").  The differences between the different types of funds are critical from a fiduciary standpoint.

45.     A stable value account in a DC retirement plan is similar to a money market fund in that it provides liquidity and principal protection, and similar to a bond fund in that it provides consistent returns over time.  It differs from both in that it seeks to generate returns greater than a money market and equivalent to a short – intermediate – term bond fund.  Stable value funds are able to do this because participant behavior is such that the amount of money invested in the account is relatively stable over time. This enables fund providers to offer better crediting rates (the rate of return) and to guarantee participants will not lose money by guaranteeing the fund transacts at book value.  Stable value accounts also "stabilize" the returns through the use of an imbedded formula which is part of the contract with the plan that smooths out the volatility of the fund resulting from fluctuations in interest rates associated with funds.[4]

46.     There are several different types of stable value accounts in the 403(b) marketplace.  Large plans overwhelmingly offer "synthetic" stable value funds, which are the least risky, because principal is guaranteed by multiple "wrap providers" and the fund owns the assets of the underlying funds.  The 403(b) market has been slower to accept synthetic-based stable value funds due to some regulatory interpretations, but one major provider has this option for 403(b) plans like Froedtert's. Separate account products, where the assets of the underlying funds are held in the separate account of an insurance carrier, are riskier because there is only one "wrap" provider.  As a result, they offer higher crediting rates.  General account products, where the funds are held unrestricted in the general account of the insurance carrier, are the riskiest type of stable value funds and consequently should offer the highest rates.

47.     The Lincoln Financial and Transamerica stable value funds are a general account product established pursuant to a contract between them and Defendants. The investment funds

---

[4]  The key difference between a GIC and a wrap contract is that under a wrap contract the associated invested assets are usually owned outright by the plan in a synthetic GIC structure, or segregated in the plan's name in an insurance separate account wrap.

were deposited by the insurance companies in its general account, which enabled the insurance companies to earn a "spread" equal to the difference between the crediting rate and the returns earned by the insurance companies from general account funds. Lincoln Financial and Transamerica can basically set their own rates arbitrarily. In another case like this one, Principal was found to be a fiduciary in that capacity.

48. The insurance companies GIC is subject to the single entity credit risk of the insurance companies, the issuer of the contract. The crediting rate, set in advance by the insurance companies and reset from time to time in the insurance companies' sole discretion, is not tied to the performance of a diversified pool of assets in which the investors in the fund have an interest. There is also substantial liquidity risk since there is no outside market in these contracts.

49. Thus, Defendants had the opportunity and duty to evaluate the investment in advance; this is not a case of judging an investment with the benefit of hindsight. As an ERISA fiduciary, Defendants had an obligation to monitor the fees and performance of the insurance companies' GIC and to remove or replace it where a substantially identical investment option could be obtained from the same provider at a lower cost. *See, e.g., Tibble v. Edison Int'l*, 843 F.3d 1187, 1198 (9th Cir. 2016) ("[A] trustee cannot ignore the power the trust wields to obtain favorable investment products, particularly when those products are substantially identical – other than their lower cost – to products the trustee has already selected.").

50. Defendants did not have a viable methodology for monitoring the costs or performance of the insurance companies GIC. Not only were comparable products available from other providers with higher crediting rates, but it is likely that identical product was available from the insurance companies with higher crediting rates and lower spread fees. In fact,

the insurance companies' GIC consistently charged the Froedtert employees around 100 basis points more and, consequently, returned 100 basis points less than the very same type of fund offered by competitive insurance companies to other similarly situated retirement plans.[5]

51. Insurance company profits in both fees and spreads most likely exceeded 200 basis points in this period. Fixed annuity insurance products have some of the highest fees of any option in defined contribution plans.

C. **Failure to Monitor the Plan's Recordkeeping Expenses**

52. The Plan's recordkeepers during the Class Period were Lincoln Financial and Transamerica. The term "recordkeeping" is a catchall term for the administrative services typically provided to a defined contribution plan by the plan's "recordkeeper."

53. Beyond simple provision of account statements to participants, it is quite common for the recordkeeper to provide a broad range of services, including claims processing, trustee services, participant education, managed account services, participant loan processing, preparation of disclosures, self-directed brokerage accounts, investment consulting, and general consulting services. Nearly all recordkeepers in the marketplace offer this range of services, and defined contribution plans have the ability to customize the package of services they receive and have the services priced accordingly. Many of these services can be provided by recordkeepers at very little cost. In fact, several of these services, such as managed account services, self-directed brokerage, and loan processing, are often a profit center for recordkeepers.

54. The market for recordkeeping is highly competitive. As a result of such competition, vendors vigorously compete for business by offering the best price.

---

[5] Based on a March 2020 comparison between Lincoln Financial's 2.5% rate of return versus a similar type of fund, TIAA CREF RC, which had a 3.5% rate of return.

55.     The cost of providing recordkeeping services depends on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.

56.     Recordkeeping expenses can be paid by the plan sponsor (the employer) directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both or by a plan sponsor). Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide. Best practice is for the Plan to pay for the expenses directly like they do in a defined benefit plan.

57.     Although utilizing a revenue sharing approach is not *per se* imprudent, unchecked, it could be devastating for Plan participants. "At worst, revenue sharing is a way to hide fees. Nobody sees the money change hands, and very few understand what the total investment expense pays for. It's a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of). In some cases, employers and employees believe the plan is 'free' when it is in fact expensive." Justin Pritchard, "Revenue Sharing and Invisible Fees" available at http://www.cccandc.com/p/revenue-sharingand-invisible-fees (last visited May 17, 2020).

58.     Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs. *Tussey v. ABB, Inc.,* 746 F.3d 327, 336 (8th Cir. 2014) (holding that fiduciaries of a 401(k) plan "breach[] their fiduciary duties" when they "fail[] to

monitor and control recordkeeping fees" incurred by the plan); *George v. Kraft Foods Glob.*, Inc., 641 F.3d 786, 800 (7th Cir. 2011) (explaining that defined contribution plan fiduciaries have a "duty to ensure that [the recordkeeper's] fees [are] reasonable").

59. First, a plan fiduciary must pay close attention to the recordkeeping fees being paid by the plan. A prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

60. Second, to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper. To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

61. Defendants failed to prudently manage and control the Plan's recordkeeping and administrative costs by failing to undertake any of these steps. There is no evidence that Defendants negotiated to lower recordkeeping costs. The total amount of recordkeeping fees paid throughout the Class Period on a per participant basis was unreasonable.

62. Disclosures from the Form 5500 from when Transamerica was the recordkeeper identified that recordkeeping fees that rose 75% from $494,838, or $49 per participant in the year 2014, to $863,743, or $64 per participant, in the year 2018. Although these costs on the surface

are already unreasonable, these costs could actually be higher due to revenue sharing arrangements.

63.    In recent defined contribution plan excessive fee litigation, *Ramos v. Banner Health*, 2020 WL 2553705 (D. Colo. May 20, 2020) (bench trial), the Court found it "highly significant" that Defendant went nearly twenty years without soliciting competitive bids for recordkeeping services through a request for proposal. The Court also agreed with plan participants that the plan's prior recordkeeping arrangement—in which the plan paid uncapped, asset-based fees to Fidelity through a contract with no termination date—warranted closer scrutiny by the Defendant's plan committee. In that case, the Plan committee "never assessed the reasonableness of fees using any form of a competitive bid process, RFP or otherwise." Upon information and belief, Defendants did not use a competitive bid process for recordkeeping services either during a significant period of time.

64.    In a recent Complaint, it was stated that for plans over $100,000,000, $54.00 per participant was excessive. We are seeing even lower fees as plans become larger. A 1998 DOL Study suggests that plans over 1,000 participants can expect record keeping costs of $34 a head. A recent 2016 competitive bid by Nike with over 25,000 participants was $21.00 per person. *See also Spano v. Boeing*, Case 06-743, Doc. 466, at 26 (S.D. Ill. Dec. 30, 2014) (plaintiffs' expert opined market rate of $37.00 to $42.00).

65.    According to audited financial statements filed with the Department of Labor on Form 5500, in the year 2018, Lincoln Financial received compensation directly from the Plan of $364,665 for recordkeeping services and Transamerica received compensation directly from the Plan of $87,041 for recordkeeping services. However, due to the existence of revenue sharing, it is impossible to determine how excessive the fees are without further discovery.

66.     In addition, Veritas Advisors received $38,466 in fees from Plan Participants for "investment advisor services" in the year 2018. The 2017 Investment Advisor was LaSalle Investment Advisors and they were paid $5,960. It is highly likely that these advisors received additional undisclosed compensation for recommending mutual funds and stable value funds related to revenue sharing practices.

67.     Upon information and belief, Transamerica and Lincoln Financial both received multiple income streams for recordkeeping from the Plan for selecting mutual funds and stable value funds that paid excessive revenue sharing fees.

D.     **The Plan Paid Unreasonably High Fees for Share Classes**

68.     Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors. Generally, more expensive shares are targeted at small investors with less bargaining power, while lower cost shares are targeted at larger investors with greater assets. There is no material difference between share classes other than costs – the funds hold identical investments and have the same manager.

69.     Larger defined contribution plans such as the Plan have sufficient assets to qualify for lower cost share classes. Even when a plan does not meet the investment minimum to qualify for the cheapest available share class, it is well known among institutional investors that mutual fund companies will waive those investment minimums for a larger plan adding the fund in question as an investment alternative.

70.     Fiduciaries to large defined contribution plans, such the Plan, can and should use its asset size and negotiating power to invest in the cheapest share class available. For this reason, prudent plan fiduciaries will search for and select the lowest-priced share class available.

71.     "Because the institutional share classes are otherwise identical to the retail share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary. Thus, the manner that is reasonable and appropriate to the particular investment action and strategies involved … would mandate a prudent fiduciary – who indisputably has knowledge of institutional share classes and that such share classes provide identical investments at lower costs – to switch share classes immediately." *Tibble v. Edison International,* 2017 U.S. Dist. LEXIS 130806, *40 (C.D. Cal. Aug. 16, 2017).

72.     Froedtert made a major overhaul of investment options during the year 2018, including changing their Target Date fund structure, which is important in that it is usually one of the largest options. There are significant share class violations primarily in the Target Date funds from the year 2014-2018. In the 2018-2020 lineup, there are two share class violations: Columbian Small Cap Value II (NSVAZ) at 110bps, while there is a lower cost version, Columbia Small Cap Value Fund II Institutional 3 Class (CRRYX) available at 84bps; and Ivy Mid Cap Growth Class I (IYMIX) listed at 100bps has a lower cost version, Ivy Mid Cap Growth Class N (IGRFX) at 79 bps.

73.     In February 2013, the Department of Labor issued guidance for the selection of target date funds in a publication titled, "Target Date Retirement Funds – Tips for ERISA Plan Fiduciaries."[6] Fiduciaries were given specific guidance to: (i) establish a process for comparing and selecting TDFs; (ii) establish a process for the periodic review of TDFs; (iii) understand the fund's investments – the allocation in different asset classes (stocks, bonds, cash), individual investments, and how these will change over time; (iv) inquire about whether a custom or non-

---

[6]     https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/fact-sheets/target-date-retirement-funds.pdf

proprietary target date fund would be a better fit for your plan; and (v) develop effective employee communications.

74.     The Department of Labor gave a very specific warning about the importance of keeping costs under control: "A difference of just one percentage point in fees (1.5% as compared with 0.5%) over 35 years dramatically affects overall returns. If a worker with a 401(k)-account balance of $25,000 averages a seven percent return, the worker will have $227,000 at retirement with the lower fee and $163,000 with the higher fee, assuming no further contributions."[7]

75.     Froedtert's Target date selection from the years 2018 to present seems to be a custom target date fund.  Further discovery will be necessary to evaluate the fees associated with these custom funds.

76.     Froedtert's target date fund selection from the years 2014 to 2018 featured many T. Rowe Price target date funds. T. Rowe Price funds have been the subject of numerous excessive fee cases. Of the three (3) main target date providers in the United States (Vanguard, Fidelity, and T. Rowe Price), T. Rowe has by far the highest fees overall. There have been periods of time where T. Rowe has outperformed Vanguard and Fidelity, but this has mostly been due to T. Rowe taking more risk by having a higher allocation to equities than Vanguard or Fidelity.

77.     Even if one believes it is possible to justify outperformance by T. Rowe's active target date strategies, it is still necessary to maximize returns by minimizing fees within this strategy.  T. Rowe Price has at least five mutual fund share classes, which is confusing not only to participants, but also to plans.

---

[7] U.S. Department of Labor, Employee Benefits Security Administration, A Look At 401(k) Plan Fees, at http://www.dol.gov/ebsa/publications/401k_employee.html

78.     T. Rowe Price also has Collective Investment Trusts ("CITs") for plans with as little as $5,000,000 in assets and have an even cheaper asset class for plans with over $100,000,000.

79.     Defendants chose some of the highest fee versions of the T. Rowe Price target date funds available. From the 5500 Form, the particular version Defendants chose had revenue sharing of 38bps, so it is possible to know this is one of the higher fee versions.   For example, T. Rowe Price Target Date 2040 is most likely TRRDX which has a fee of 72 basis points or TRHRX which has a fee of 70 basis points.   There are identical lower cost mutual funds: TRPDX at 58bps and TRXRX at 56 basis points.

80.     Defendants with over $100,000,000 in total target date funds qualify for the identical investment in a CIT series F for 43 bps.

81.     It is expected that there will be a significant underperformance parallel to the damages in fees. *Brotherston v. Putnam Investments*, LLC, 907 F.3d 17 (1st Cir. 2018), has put the burden on the Plan to document persistent long-term, over-performance given higher fee funds to justify their inclusion.

82.     Higher share class funds were selected by Defendants because they provided higher revenue to the funds, including the Stable Value Fund owned by the Plan's recordkeeper, at the expense of Plan participants. Any rebate amounts used to partially offset recordkeeping fees were smaller than the incremental cost of the more expensive plans.

83.     At all times during the Class Period, Defendants knew or should have known about the existence of cheaper share classes and should have immediately recognized the prudence of transferring the Plan funds into these alternative investments. A prudent fiduciary conducting an impartial review of the Plan's investments would have conducted such a review

on at least a quarterly basis, would have identified the cheaper share classes available and transferred the Plan's investments into institutional shares at the earliest opportunity.

84.     There is no good faith explanation for using high-cost share classes when lower-cost share classes are available for the same investment. The Plan did not receive any additional services or benefits based on its use of more expensive share classes; the only consequence was higher cost for Plan participants.

E.     **Failure to Use Lower-Cost, Passively Managed Funds**

85.     As noted above, ERISA is derived from trust law. *Tibble*, 135 S. Ct. at 1828. Accordingly, appropriate investments for a fiduciary to consider are "suitable index mutual funds or market indexes (with such adjustments as may be appropriate)." Restatement (Third) of Trusts § 100 cmt. b(1).

86.     While higher-cost mutual funds may outperform a less-expensive option, such as a passively managed index fund, over the short term, they rarely do so over a longer term. *See* Jonnelle Marte, *Do Any Mutual Funds Ever Beat the Market? Hardly*, The Washington Post, available at https://www.washingtonpost.com/news/get-there/wp/2015/03/17/do-any-mutualfunds-ever-beat-the-market-hardly/ (citing a study by S&P Dow Jones Indices that looked at 2,862 actively managed mutual funds, focused on the top quartile in performance and found most did not replicate performance from year to year); *see also* Index funds trounce actively managed funds: Study, available at http://www.cnbc.com/2015/06/26/index-funds-trounce-activelymanaged-funds-study.html ("long-term data suggests that actively managed funds "lagged their passive counterparts across nearly all asset classes, especially over the 10-year period from 2004 to 2014.")

87. Funds with high fees on average perform worse than less expensive funds, even on a pre-fee basis. Javier Gil-Bazo & Pablo Ruiz-Verdu, When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds, 67 J. Econ. Behav. & Org. 871, 873 (2009) (hereinafter "When Cheaper is Better"); see also Jill E. Fisch, Rethinking the Regulation of Securities Intermediaries, 158 U. Pa. L. Rev. 1961, 1967-75 (2010) (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

88. During the Class Period, Defendants failed to consider materially similar but cheaper alternatives to the Plan's investment options. The chart below demonstrates that the expense ratios of the Plan's investment options between the years 2014 to 2018 were more expensive by significant multiples of comparable passively managed and actively managed alternative funds in the same investment style. A reasonable investigation would have revealed the existence of these lower-cost alternatives. The chart below uses 2019 expense ratios to demonstrate how much more expensive the Plan's funds were than their alternative fund counterparts.

**TRANSAMERICA FUNDS (THE YEARS 2014-2018)**

| Plan Fund | Defendants' Plan Fee (bps) | Identical lower-cost available share classes | Identical lower-cost share class fee (bps) | Defendants' Plan's Excessive Fees (%) |
|---|---|---|---|---|
| Target Date T. Rowe Price Retirement 2015 Adv (TRRGX) | 56 | Vanguard Target Retirement 2015 (VTXVX) | 13 | **331%** |
| Target Date T. Rowe Price Retirement 2020 Adv (PARBX) | 86 | Vanguard Target Retirement 2020 (VFORX) | 14 | **514%** |

| | | | | |
|---|---|---|---|---|
| Target Date T. Rowe Price Retirement 2025 Adv (TRRHX) | 59 | Vanguard Target Retirement 2025 (VTTVX) | 13 | **354%** |
| Target Date T. Rowe Price Retirement 2030 Adv (PARCX) | 92 | Vanguard Target Retirement 2030 (VTHRX) | 14 | **557%** |
| Target Date T. Rowe Price Retirement 2035 Adv (TRRIX) | 70 | Vanguard Target Retirement Income 2035 (VTTHX) | 14 | **400%** |
| Target Date T. Rowe Price Retirement 2040 Adv (PARDX) | 97 | Vanguard Target Retirement 2040 (VFORX) | 14 | **593%** |
| Target Date T. Rowe Price Retirement 2045 Adv (TRRKX) | 71 | Vanguard Target Retirement 2045 (VTIVX) | 15 | **373%** |
| Target Date T. Rowe Price Retirement 2050 Adv (PARFX) | 97 | Vanguard Target Retirement 2050 (VFIVX) | 15 | **547%** |

89.     The above is for illustrative purposes only. The Plan expense ratios were multiples of what they should have been given the bargaining power available to the Plan fiduciaries.

90.     The Plan's fiduciaries cannot justify selecting actively managed funds over passively managed ones. As noted above, while higher-cost mutual funds may outperform a less-expensive option such as a passively-managed index fund over the short term, they rarely do so over a longer term. With regard to this action in particular, there is objective evidence that selection of actively managed funds over passively managed ones with materially similar characteristics was unjustified.

91.     Comparing the three-year returns of some of the Plan's actively managed funds with those of comparable index (passively managed) funds with lower fees demonstrates that accounting for fees paid, the actively managed funds usually significantly underperformed, and never significantly outperformed, the index funds. The chart below compare three year returns of Defendants' Transamerica managed funds and alternative indexed funds:

| Plan Fund | 3-year return as of May 14, 2020 | Alternate Fund | Alternative 3-year return as of May 14, 2020 |
|---|---|---|---|
| Target Date T. Rowe Price Retirement 2015 Adv (TRRGX) | 3.45% | Vanguard Target Retirement 2015 (VTXVX) | 4.55% |
| Target Date T. Rowe Price Retirement 2020 Adv (PARBX) | 3.57% | Vanguard Target Retirement 2020 (VFORX) | 4.00% |
| Target Date T. Rowe Price Retirement 2025 Adv (TRRHX) | 3.58% | Vanguard Target Retirement 2025 (VTTVX) | 4.45% |
| Target Date T. Rowe Price Retirement 2030 Adv (PARCX) | 3.66% | Vanguard Target Retirement 2030 (VTHRX) | 4.32% |
| Target Date T. Rowe Price Retirement 2035 Adv (TRRIX) | 3.75% | Vanguard Target Retirement Income 2035 (VTTHX) | 4.18% |
| Target Date T. Rowe Price Retirement 2040 Adv (PARDX) | 3.73% | Vanguard Target Retirement 2040 (VFORX) | 4.00% |

*Burden is on Defendants to prove performance was worth excessive fees

92.     Defendants' failure to investigate lower cost alternative investments (both actively and passively managed funds) during the Class Period cost the Plan and its participants millions of dollars.

93.     Plaintiff had no knowledge of Defendants' process for selecting investments and monitoring them to ensure they remained prudent.  Plaintiff also had no knowledge of how the fees charged to and paid by the Plan participants compared to any other funds. Nor did Plaintiff know about the availability of lower-cost and better-performing (and other essentially identical) investment options that Defendants did not offer because Defendants provided no comparative information to allow Plaintiff to evaluate and compare Defendants' investment options.

94.     Plaintiff did not individually select funds for his 403(b) Plan, but instead selected an approach based on risk and then his portfolio was constructed by Defendants, with the help of the recordkeeper and/or consultants.

95.     By selecting and retaining the Plan's unreasonably expensive cost investments while failing to adequately investigate the use of lower cost share classes, offered by the same investment companies, or superior, lower-cost mutual funds from other fund companies that were readily available to the Plan, Defendants caused Plan participants to lose millions of dollars of their retirement savings through unreasonable fees and poorly performing investments.

F.     **The Investment Advisors/Consultants**

96.     The selection and retention of the investment consultant is one of most import fiduciary duties of a 403(b) committee. Tim Jenkinson, "Picking Winners? Investment Consultants' Recommendations of Fund Managers," *Journal of Finance* (September 2014) ("As it is, plan sponsors are making appointments partly uninformed, and some may be naïve about the actual ability of consultants' recommendations.").

97.     Defendants do not appear to have an independent investment consultant or investment advisor from the years 2014 through 2015. Transamerica appears to have played that role as both consultant and custodian during this period.  In 2019, the SEC fined Transamerica Financial Advisors $6,000,000 for breaching their fiduciary duty in charging and hiding excessive fees. Transamerica settled a lawsuit with its own employees over their excessive 401(k) fees in their own plan for $3,800,000 in the year 2016.[8]

98.     In the 5500 Forms filed during the years 2016 and 2017, local Wisconsin advisor LaSalle Investment Advisors appeared to be the consultant. John Maresh, the President and Owner of LaSalle, was, at the time, a registered brokers and insurance salesperson with Freedom Investors Corporation. This was a firm fined by FINRA in the year 2012 for bad practices.[9]

99.     In the 5500 Forms filed during the year 2018, Defendants had another consultant, Veritas Advisors, operating out of Missouri by a broker named Edward Barfield. Veritas has a website, but does not appear to be registered with the SEC.[10]

100.    Barfield is registered as an advisor with Summit Financial Group and as a broker with the Cetera Advisor Network. Barfield has a troubled history as a Registered Investment Advisor ("RIA") and broker with eight disclosures.[11] The SEC has sought to fine Cetera on fraud and other issues.[12]

101.    Based on SEC documents, both consultants from Veritas and LaSalle are dual-registered RIAs, meaning that the firms received compensation from direct fees from the plan and some fees or commissions from money managers and/or insurance providers.

---

[8]     https://www.investmentnews.com/transamerica-settles-401k-excessive-fee-lawsuit-with-its-employees-for-3-8-million-68262

[9] https://files.adviserinfo.sec.gov/IAPD/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=602018

[10] http://www.veritasadvisors.net/team

[11] https://adviserinfo.sec.gov/individual/summary/4257082

[12]    SEC Cetera on Fraud https://www.sec.gov/litigation/litreleases/2019/lr24643.htm; Admin fine: https://www.sec.gov/litigation/admin/2019/ia-5371.pdf

102.     Dr. Nicole Boysen of Northeastern University, using data from the 2019 SEC fines of Wells Fargo and others, has written a paper which shows that RIAs that both charge fees and commissions (dual registration) use higher-fee, lower-performing mutual fund families that kick back the most in "revenue sharing."

103.     Dr. Boyson created a list of high fee, underperforming mutual funds preferred by dual registered RIAs. Names include the American Funds, JP Morgan, Columbia, and Transamerica.[13]

104.     From the years 2014 to 2018, it is not coincidence that Defendants had four fund choices from these high fee families. From the years 2018 to present, Defendants had five choices from these high fee families.

105.     Broker consultants or dual registered RIAs have an inherent conflict of interest to recommend what pays them the most.[14] Defendants' as a fiduciary should have been aware of these possible conflicts with both LaSalle and Veritas.

106.     Lasalle and Veritas are parties in interest under 29 U.S.C. § 1002(14) as they provide services to the Plan. Defendants, as fiduciaries to the Plan, thus also engaged in prohibited transactions under 29 U.S.C. § 1106(a)(1)(C), as it caused the Plan knowingly to engage in a transaction constituting a direct or indirect furnishing of goods or services between the Plan and parties in interest using assets of the Plan.  These transactions do not qualify for a statutory exemption under 29 U.S.C. § 1108(b)(2) as reasonable compensation for plan service providers, 29 C.F.R. § 2250.408c-2, as the fees charged were high and unreasonable.

---

[13] https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3360537
[14] "Blind reliance on a [broker] whose livelihood [is] derived from commissions he is able to garner is the anti-thesis of [a fiduciary's duty to conduct an] independent investigation." *Liss v. Smith*, 991 F.Supp.2d 297, 300 (S.D.N.Y 1998); *Gregg v. Transportation Workers of America Intern.*, 343 F.3d 833, 841 (6th Cir. 2003).

## THE OVERCHARGES BREACHED
## DEFENDANTS' FIDUCIARY OBLIGATIONS TO THE PLAN

107.    The administrative fees of the investment offerings were paid for by the Plan participants. Defendants, as fiduciaries, were responsible for ensuring that these administrative fees were reasonable.

108.    A plan's fiduciaries have control over defined contribution plan expenses. The fiduciaries have exclusive control over the menu of investment options to which participants may direct the assets in their accounts. Those selections each have their own fees, which are deducted from the returns that participants receive on their investments.

109.    At retirement, employees' benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses. Accordingly, unreasonable fees can impair the value of a participant's account. Over time, even small differences in fees and performance can result in large differences in the amount of savings available at retirement.

110.    Prudent fiduciaries exercising control over administration of a plan and the selection and monitoring of designated investment alternatives will take steps to minimize plan expenses by hiring low-cost service providers and by curating a menu of low-cost investment options. *See,* Restatement (Third) of Trusts § 90 cmt. b ("[C]ost-conscious management is fundamental to prudence in the investment function. . . .").

111.    Additional fees of between .2% to .4%, as an example, can significantly affect a participant's investment over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble*, 843

F.3d 1187, 1190 (9th Cir. 2016); *id.* at 1198 (stating that, "It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks…").

112.    The duty of prudence imposed under 29 U.S.C. § 1104(a)(1)(B) is a codification of the common law prudent investor rule found in trust law.

113.    Given the significant variation in total plan fees attributable to plan size, the reasonableness of administrative expenses and investment management expenses should be determined by comparison to other similarly-sized plans. 29 U.S.C. § 1104(a)(1)(B) (requiring ERISA fiduciaries to discharge their duties in the manner "that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character").

114.    A fiduciary must initially determine, and continue to monitor, the prudence of each investment option available to plan participants. A plan fiduciary cannot assume that an investment that began as a prudent one will remain so, particularly when the original circumstances change, or the investment reveals itself to be deficient. An ERISA fiduciary's investment decisions also must account for changed circumstances and a trustee who simply ignores changed circumstances that have increased the risk of loss to the trust's beneficiaries is imprudent.

115.    As illustrated above, the Plan's administrative fees could in many cases be significantly reduced simply by electing a different share class offered by the same issuer, or substantially identical fund from a different issuer, and are consistently well above its comparator peers, regardless whether the comparison is based on cost per participant or percentage of assets.

116.     Prudent fiduciaries of large defined contribution plans must conduct an analysis to determine whether investments will outperform their benchmark net of fees. Prudent fiduciaries then make a reasoned decision as to whether it is in participants' best interest to offer specific funds or share classes for the particular investment style and asset class.

117.     Prudent fiduciaries of defined contribution plans continuously monitor the investment performance of plan options against applicable benchmarks and peer groups to identify underperforming investments. Based on this process, prudent fiduciaries replace those imprudent investments with better-performing and reasonably priced options.

118.     The fiduciary task of evaluating investments and investigating comparable alternatives in the marketplace is made much simpler by the introduction of independent research companies such as Morningstar, which sort mutual funds of all categories "based on the underlying securities in each portfolio… We place funds in a given category based on their portfolio statistics and compositions over the past three years." www.morningstar.com/InvGlossary/Morningstar_category.aspx.

119.     Defendants are not a prudent fiduciary of the Plan because they did not make a reasoned decision to offer specific funds or share classes to the Plan participants as described herein.

120.     Defendants are not a prudent fiduciary because they failed to continuously monitor the investment performance of its plan options against applicable benchmarks and peer groups, and they failed to identify and replace underperforming investments with better-performing and reasonably priced options.

121.     Investment options should not favor the fund provider over the Plan's participants. Yet here, to the detriment of the Plan and its participants and beneficiaries,

Defendants included and retained in the Plan many mutual fund investments that were more expensive than necessary and otherwise not justified based on their economic value to the Plan.

122.    Based on reasonable inferences from the facts set forth herein, during the Class Period Defendants failed to have an independent system of review in place to ensure that the Plan participants were charged appropriate and reasonable fees for the Plan's investment options. Additionally, Defendants failed to leverage the size of the Plan to negotiate lower expense ratios for certain investment options maintained and/or added to the Plan during the Class Period.

## CLASS ACTION ALLEGATIONS

123.    29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

124.    In acting in this representative capacity, Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiff seeks to certify, and to be appointed as representatives of, the following Class:

> All participants and beneficiaries of the Froedtert Health, Inc. 403(b) Plan beginning six years before the commencement of this action and running through the date of judgment, excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan.

125.    The Class includes more than 15,420 members and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

126.    There are questions of law and fact common to this Class pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owed fiduciary duties to the Plan and took the actions and omissions alleged as the Plan and not as to any individual participant. Common questions of law and fact include but are not limited to the following:

- Whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

- Whether Defendants breached their fiduciary duties to the Plan;

- Whether Defendants engaged in prohibited transactions with the Plan service providers;

- What are the losses to the Plan resulting from each breach of fiduciary duty; and

- What Plan-wide equitable and other relief the Court should impose in light of Defendants' breach of duty.

127.    Plaintiff's claims are typical of the claims of the Class pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiff was a participant during the time period at issue and all participants in the Plan were harmed by Defendants' misconduct.

128.    Plaintiff will adequately represent the Class pursuant to Federal Rule of Civil Procedure 23(a)(4), because they are participants in the Plan during the Class Period, have no interest that conflicts with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent lawyers to represent the Class.

129.    Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant concerning its discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

130.    Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

131.    Plaintiff's attorney is experienced in complex ERISA and class litigation and will adequately represent the Class.

132.    The claims brought by the Plaintiff arise from fiduciary breaches as to the Plan in its entirety and do not involve mismanagement of individual accounts. The claims asserted on behalf of the Plans in this case fall outside the scope of any exhaustion language in individual participants' plans. Exhaustion is intended to serve as an administrative procedure for participants and beneficiaries whose claims have been denied and not where a participant or beneficiary brings suit on behalf of a plan for breaches of fiduciary duty.

133.    Under ERISA, an individual "participant" or "beneficiary" are distinct from an ERISA plan. A participant's obligation – such as a requirement to exhaust administrative remedies – does not, by itself, bind the plan.

134.    Moreover, any administrative appeal would be futile because the entity hearing the appeal (the Plan Administrator) is the same Plan Administrator that made the decisions that are at issue in this lawsuit. Policy supporting exhaustion of administrative remedies in certain circumstances – that the Court should review and where appropriate defer to a plan administrator's decision – doesn't exist here because courts will not defer to plan administrator's legal analysis and interpretation.

## FIRST CLAIM FOR RELIEF – BREACH OF DUTIES OF LOYALTY AND PRUDENCE

135. Plaintiff restates the above allegations as if fully set forth herein.

136. Defendants are a fiduciary of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1). They are responsible for selecting prudent investment options, ensuring that those options charge only reasonable fees, and taking any other necessary steps to ensure that the Plan's assets are invested prudently. Defendants had a continuing duty to evaluate and monitor the Plan's investments on an ongoing basis and to "remove imprudent ones" regardless of how long a fund has been in the plan. *Tibble I,* 135 S. Ct. at 1829.

137. 29 U.S.C. § 1104 imposes fiduciary duties of prudence and loyalty upon Defendants in their administration of the Plan. The scope of the fiduciary duties and responsibilities of Defendants include managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, defraying reasonable expenses of administering the Plan, and acting with the care, skill, diligence, and prudence required by ERISA. These duties further required Defendants to independently assess whether each option was a prudent choice for the Plan. *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 423 (4th Cir. 2007); *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 590, 595–96 (8th Cir. 2009).

138. Defendants were directly responsible for ensuring that the Plan's fees were reasonable, selecting investment options in a prudent fashion in the best interest of Plan participants, prudently evaluating and monitoring the Plan's investments on an ongoing basis and eliminating funds or share classes that did not serve the best interest of Plan participants, and taking all necessary steps to ensure that the Plan's assets were invested prudently and appropriately.

139. Defendants failed to employ a prudent and loyal process by failing to critically or objectively evaluate the cost and performance of the Plan's investments and fees in comparison to other investment options. Defendants selected and retained for years as Plan investment options mutual funds with high expenses relative to other investment options that were readily available to the Plan at all relevant times.

140. Defendants failed to engage in a prudent process for monitoring the Plan's investments and removing imprudent ones within a reasonable period. This resulted in the Plan continuing to offer unreasonably expensive funds and share classes compared to equivalent and/or comparable low-cost alternatives that were available to the Plan. Through these actions and omissions, Defendants failed to discharge its duties with respect to the Plan in violation of its fiduciary duty of loyalty under 29 U.S.C. § 1104(a)(1)(A).

141. Defendants failed to discharge its duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. § 1104(a)(1)(B).

142. Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the breaches, to restore to the Plan any profits defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(3).

## SECOND CLAIM FOR RELIEF – FAILURE TO ADEQUATELY MONITOR OTHER FUDICIARIES

143. Plaintiff restates the above allegations as if fully set forth herein.

144. Defendants had the authority to appoint and remove members of the Benefit Plan Committee and were aware that the Benefit Plan Committee had critical responsibilities as fiduciaries of the Plan.

145. In light of this authority, Froedtert had a duty to monitor the Benefits Plan Committee to ensure that the Benefits Plan Committee was adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Benefits Plan Committee were not fulfilling those duties.

146. Froedtert also had a duty to ensure that the Benefits Plan Committee possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Froedtert.

147. Froedtert breached its fiduciary duties by, among other things:

a. Failing to monitor and evaluate the performance of the Benefits Plan Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of unreasonably high expenses, choices of fund's class of shares, and inefficient fund management styles that adversely affected the investment performance of the funds' and their participants' assets as a result of the Benefits Plan Committee imprudent actions and omissions;

b.	Failing to monitor the process by which Plan investments were evaluated, failing to investigate the availability of lower-cost share classes, and failing to investigate the availability of lower-cost collective trust vehicles; and

c.	Failing to remove Benefits Plan Committee members whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, and caused the Plan to pay excessive recordkeeping fees, all to the detriment of the Plan and Plan participants' retirement savings.

148.	As the consequences of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses. Had Froedtert complied with their fiduciary obligations, the Plan would not have suffered the losses, and Plan participants would have had more money available to them in retirement.

149.	Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Froedtert is liable to restore to the Plan  all loses caused by their failure to adequately monitor the Benefits Plan Committee. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

## THIRD CLAIM FOR RELIEF – PARTY IN INTEREST PROHIBITED TRANSACTION

150.	Plaintiff restates the above allegations as if fully set forth herein.

151.	Investment advisors and consultants Lasalle and Veritas are parties in interest under 29 U.S.C. § 1002(14) as they provide services to the Plan.

152.	Defendants, as fiduciaries to the Plan, thus also engaged in prohibited transactions under 29 U.S.C. § 1106(a)(1)(C), as it caused the Plan knowingly to engage in transactions

constituting a direct and indirect furnishing of goods or services between the Plan and parties in interest using assets of the Plan.

153. These transactions do not qualify for a statutory exemption under 29 U.S.C. § 1108(b)(2), as reasonable compensation for plan service providers under 29 C.F.R. § 2250.408c-2, because the fees charged were high and unreasonable because of the conflicts of interest that Lasalle and Veritas had.

154. As the consequence of the foregoing prohibited transactions, the Plan suffered millions of dollars of losses in high and unreasonable investment, management, and administrative fees. Had Defendants complied with their fiduciary obligations, and ensured the compensation paid to service providers was reasonable, the Plan would not have suffered the losses, and Plan participants would have had more money available to them in retirement.

155. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all loses caused by party in interest prohibited transaction. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

**WHEREFORE**, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.  A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B.  Designation of Plaintiff as Class Representative and designation of Plaintiff's counsel as Class Counsel;

C.  A Declaration that the Defendants have breached their fiduciary duties under ERISA;

D.      An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, including restoring to the Plan all losses resulting from imprudent investment of the Plan's assets, restoring to the Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligation;

E.      An Order requiring the Defendant Froedtert to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against Froedtert as necessary to effectuate said relief, and to prevent Froedtert's unjust enrichment;

F.      An Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

G.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

H.      An award of pre-judgment interest;

I.      An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.      Such other and further relief as the Court deems equitable and just.

        Dated this 12th day of June, 2020

                                        WALCHESKE & LUZI, LLC
                                        Counsel for Plaintiff

                                        s/ *Paul M. Secunda*
                                        James A. Walcheske, State Bar No. 1065635
                                        Scott S. Luzi, State Bar No. 1067405
                                        Paul M. Secunda, State Bar No. 1074127

WALCHESKE & LUZI, LLC
15850 W. Bluemound Rd., Suite 304
Brookfield, Wisconsin 53005
Telephone: (262) 780-1953
Fax: (262) 565-6469
E-Mail: jwalcheske@walcheskeluzi.com
E-Mail: sluzi@walcheskeluzi.com
E-Mail: psecunda@walcheskeluzi.com