## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN
## MILWAUKEE DIVISION

NITISH S. BANGALORE, *et al.*,

          Plaintiff,

    v.

FROEDTERT HEALTH, INC., THE BOARD
OF DIRECTORS OF FROEDTERT HEALTH,
INC., and FROEDTERT HEALTH, INC.
BENEFIT PLAN COMMITTEE,

          Defendants.

Case No. 2:20-cv-00893

Hon. Pamela Pepper

---

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................... 1

BACKGROUND ...................................................................................................... 2

ARGUMENT ........................................................................................................... 4

I.  PLAINTIFF'S FIDUCIARY BREACH CLAIMS SHOULD BE DISMISSED
    (COUNT I)........................................................................................................ 5

    A.  Plaintiff's Duty of Prudence Claim Should Be Dismissed ................................... 5

        1.  Plaintiff's Recordkeeping Fee Allegations Are Subject to
            Dismissal .......................................................................................... 6

            a.  Plaintiff's allegations regarding Defendants' failure to
                monitor the recordkeeping fees lack sufficient substance to
                state a claim ...................................................................... 6

            b.  Plaintiff's allegations regarding the structure of the
                recordkeeping arrangement directly conflict with Seventh
                Circuit law ........................................................................ 8

            c.  Plaintiff's guess work regarding the amount of the
                recordkeeping fees is woefully deficient ..................................... 9

        2.  Plaintiff's Allegations Regarding the Plan's Investment Options
            Are Subject to Dismissal..................................................................... 12

            a.  Plaintiff lacks standing to challenge investment options in
                which he did not invest .......................................................... 12

            b.  Plaintiff's challenges to the Plan's investment options do
                not allege action that was objectively unreasonable ..................... 13

                (1)  Plaintiff's allegations that the investment options
                     were "too expensive" collide head on with this
                     Circuit's precedent ...................................................... 15

                (2)  Plaintiff's allegations that the Plan wrongly
                     included actively-managed investments have
                     routinely been rejected ................................................. 18

                (3)  Plaintiff's allegations related to the Plan's stable
                     value funds are disconnected and confused ....................... 20

                (4)  Plaintiff's allegations related to the Plan's share
                     classes disregard a critical component of share
                     classes ..................................................................... 21

    B.  Plaintiff's "Duty of Loyalty" Claim Lacks Any Requisite Facts ........................ 23

II.  PLAINTIFF'S DUTY TO MONITOR CLAIM SHOULD BE DISMISSED
     (COUNT II) ................................................................................................... 24

III.    THE COMPLAINT FAILS TO STATE A PROHIBITED TRANSACTION
CLAIM (COUNT III).................................................................................25

CONCLUSION........................................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amgen Inc. v. Harris*,
    136 S. Ct. 758 (2016) ............................................................. 5

*Amron v. Morgan Stanley Inv. Advisors, Inc.*,
    464 F.3d 338 (2d Cir. 2006) ................................................. 16, 17

*Ashcroft v. al-Kidd*,
    563 U.S. 731 (2011) ............................................................... 2

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .................................................... 4, 5, 6, 25

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .................................................... 5, 14, 25

*Bilow v. Much Shelist Freed Denenberg Ament & Eiger, P.C.*,
    67 F. Supp. 2d 955 (N.D. Ill. 1999) .................................... 13

*Braden v. Wal-Mart Stores, Inc.*,
    588 F.3d 585 (8th Cir. 2009) ............................................... 5

*Brock v. Robbins*,
    830 F.2d 640 (7th Cir. 1987) ............................................... 6

*Daniels-Hall v. Nat'l Educ. Ass'n.*,
    629 F.3d 992 (9th Cir. 2010) ............................................. 17

*Daugherty v. Univ. of Chicago*,
    2017 WL 4227942 (N.D. Ill. Sept. 22, 2017) ...................... 23

*Davis v. Washington Univ.*,
    960 F.3d 478 (8th Cir. 2020) ...................................... 18, 19, 20

*DeBruyne v. Equitable Life Assurance Soc'y of the United States*,
    920 F.2d 457 (7th Cir. 1990) ............................................. 19

*Del Castillo v. Cmty. Child Care Council of Santa Clara County, Inc.*,
    2019 WL 6841222 (N.D. Cal. Dec. 16, 2019) ...................... 8

*Dezelan v. Voya Ret. Ins. and Annuity Co.*,
    2017 WL 2909714 (D. Conn. July 6, 2017) ........................ 21

*Divane v. Northwestern Univ.*,
  2018 WL 2388118 (N.D. Ill. May 25, 2018), *aff'd*, 953 F.3d 980 ............................ 18, 22, 27

*Divane v. Northwestern Univ.*,
  953 F.3d 980 (7th Cir. 2020) ........................................................................ *passim*

*Fifth Third Bancorp v. Dudenhoeffer*,
  573 U.S. 409 (2014) ................................................................................................ 4

*Hecker v. Deere & Co.*,
  556 F.3d 575 (7th Cir. 2009) ....................................................................... *passim*

*Hecker v. Deere & Co.*,
  569 F.3d 708 (7th Cir. 2009) ................................................................................ 10

*Howell v. Motorola, Inc.*,
  633 F.3d 552 (7th Cir. 2011) ................................................................................ 24

*In re Unisys Sav. Plan Litig.*,
  74 F.3d 420 (3d Cir. 1996) ................................................................................... 13

*Leimkuehler v. American United Life Ins. Co.*,
  713 F.3d 905 (7th Cir. 2013) .......................................................................... 21, 22

*Lockheed Corp. v. Spink*,
  517 U.S. 882 (1996) .............................................................................................. 25

*Loomis v. Exelon Corp.*,
  658 F.3d 667 (7th Cir. 2011) ......................................................................... *passim*

*Marks v. Trader Joe's Co.*,
  2020 WL 2504333 (C.D. Cal. Apr. 24, 2020) ................................................... 8, 10

*Marshall v. Northrop Grumman Corp.*,
  2019 WL 4058583 (C.D. Cal. Aug. 14, 2019).................................................... 26

*Martin v. CareerBuilder, LLC*
  2020 WL 3578022 (N.D. Ill. July 1, 2020).................................................. *passim*

*Marvin v. Mercy Health Corp.*,
  No. 3:20-cv-50293 (N.D. Ill., filed Aug. 6, 2020) ................................................. 1

*Meiners v. Wells Fargo & Co.*,
  898 F.3d 820 (8th Cir. 2018) ................................................................... 11, 16, 17

*Neil v. Zell*,
  677 F. Supp. 2d 1010 (N.D. Ill. 2009), *as amended* (Mar. 11, 2010) ................... 24

*Patterson v. Morgan Stanley*,
  2019 WL 4934834 (S.D.N.Y. Oct. 7, 2019) .................................................. 12, 16, 19

*PBGC ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv.*
  *Mgmt. Inc.*, 712 F.3d 705 (2d Cir. 2013) .................................................................. 5

*Ramos v. Banner Health*,
  2020 WL 2553705 (D. Colo. May 20, 2020) ......................................................... 25

*Sacerdote v. New York Univ.*,
  2017 WL 3701482 (S.D.N.Y. Aug. 25, 2017) .................................................... 23, 26

*Sacerdote v. New York Univ.*,
  328 F. Supp. 3d 273 (S.D.N.Y. 2018) ............................................................... 7, 21

*Scott v. Aon Hewitt Fin. Advisors, LLC*,
  2018 WL 1384300 (N.D. Ill. Mar. 19, 2018) ......................................................... 26

*Sellers v. Anthem Life Ins. Co.*,
  316 F. Supp. 3d 25 (D.D.C. 2018) ........................................................................ 25

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016) ......................................................................................... 12

*Sweda v. Univ. of Penn.*,
  923 F.3d 320 (3d Cir. 2019) ................................................................................. 25

*Thole v. U.S. Bank N.A.*,
  --- U.S. ---, 140 S. Ct. 1615 (2020) ............................................................... 12, 13

*Tussey v. ABB, Inc.*,
  746 F.3d 327 (8th Cir. 2014) .................................................................................. 9

*United Transp. Union v. Gateway W. Ry. Co.*,
  78 F.3d 1208 (7th Cir. 1996) ................................................................................ 13

*White v. Chevron Corp.*,
  2016 WL 4502808 (N.D. Cal. Aug. 29, 2016) .......................................... 7, 10, 19

*White v. Chevron Corp.*,
  2017 WL 2352137 (N.D. Cal. May 31, 2017), *aff'd* 752 F. App'x 453 (9th
  Cir. 2018) ...................................................................................................... 14, 22

*Wilcox v. Georgetown Univ.*,
  2019 WL 132281 (D.D.C. Jan. 8, 2019) ............................................................... 12

*Young v. Gen. Motors Inv. Mgmt. Corp.*,
  325 F. App'x 31 (2d Cir. 2009) ............................................................................ 10

**Statutes and Regulations**

ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B) .................................................................. 1, 20

ERISA § 406(a), 29 U.S.C. § 1106(a)........................................................................ 4, 25, 26

ERISA § 408(b)(2), 29 U.S.C. § 1108(b)(2) ................................................................... 26

26 U.S.C. § 403(b) ........................................................................................................ 2, 17

29 C.F.R. § 2550.408b-2(b) ......................................................................................... 26

**Other Authorities**

Fed. R. Civ. P. 12(b)(1).................................................................................................. 12

Fed. R. Civ. P. 12(b)(6)................................................................................................... 4

Dan M. McGill et al., *Fundamentals of Private Pensions* (8th ed. 2005).................................. 18

Vanguard's Approach to Target-Date Funds (March 2019), *available at*
    https://personal.vanguard.com/pdf/ISGTDF.pdf ...................................................... 19

# INTRODUCTION

There is more than one way to structure a retirement plan. Some plan sponsors offer no-frills plans designed to minimize costs (and services) along with limited investment choices. Other plan sponsors offer full-service plans with additional services designed to help plan participants to prepare for retirement, as well as a vast array of investment options. All such plans are governed by the Employee Retirement Income Security Act of 1974 (ERISA). ERISA does not dictate the level of services or scope of investments to be provided by a retirement plan. It leaves that decision to the plan's fiduciaries, who are invested with the discretion to make such decisions on participants' behalves.

In this putative class action lawsuit, Plaintiff Nitish S. Bangalore alleges that Froedtert Health, Inc. ("Froedtert"), its Board of Directors ("Froedtert Directors"), and its Benefit Plan Committee ("Committee") (collectively, "Defendants") could have made different decisions in administering the Froedtert Health, Inc. 403(b) Plan ("Plan") to reduce the Plan's recordkeeping and investment fees, and violated ERISA by not doing so.[1] Insofar as it goes, Plaintiff's core theory—that it was *possible* to cut fees—states a truism. It is always possible to cut corners in furtherance of the proverbial race-to-the-bottom. But ERISA certainly does not require that approach, which frequently undermines the actual interests of plan participants. The Seventh

---

[1] This is one of at least nine virtually identical lawsuits filed by plaintiff's counsel since June. *See Albert v. Oshkosh Corp.*, 20-cv-901-WCG (E.D. Wis., filed June 16, 2020); *Soulek v. Costco Corp.*, No. 1:20-cv-937-WCG (E.D. Wis., filed June 23, 2020); *Cotter v. Matthews Int'l Corp.*, No. 1:20-cv-1054-WCG (E.D. Wis., filed July 13, 2020); *O'Driscoll v. Plexus Corp.*, No. 1:20-cv-1065-WCG (E.D. Wis., filed July 14, 2020); *Nohara v. Prevea Clinic, Inc.*, No. 2:20-cv-1079-LA (E.D. Wis., filed July 16, 2020); *Marvin v. Mercy Health Corp.*, No. 3:20-cv-50293 (N.D. Ill., filed Aug. 6, 2020); *Lange v. Infinity Healthcare Physicians, S.C.*, No. 3:20-cv-737 (W.D. Wis., filed Aug. 7, 2020); *Glick v. Thedacare, Inc.*, 1:20-cv-1236-WCG (E.D. Wis., filed Aug. 12, 2020); *Woznicki v. Aurora Health Care, Inc.*, No. 2:20-cv-1246-PP (E.D. Wis., filed Aug. 14, 2020). Given that ERISA's standard of prudence requires that fiduciary conduct be judged by comparison to a person "acting in a like capacity" and engaged "in the conduct of an enterprise of a like character and with like aims," 29 U.S.C. § 1104(a)(1)(B), plaintiff's counsel's widespread targeting of Wisconsin healthcare organization plans undermines the plausibility of their claims.

Circuit has thus repeatedly affirmed the dismissal of complaints making the same sorts of allegations that Plaintiff makes here. *See, e.g.*, *Divane v. Northwestern Univ.*, 953 F.3d 980 (7th Cir. 2020); *Loomis v. Exelon Corp.*, 658 F.3d 667 (7th Cir. 2011); *Hecker v. Deere & Co.*, 556 F.3d 575 (7th Cir. 2009). In accordance with this controlling precedent, this Court should dismiss Plaintiff's complaint.

## BACKGROUND[2]

Plaintiff is a participant in the Plan, which is an individual account defined contribution plan organized under section 403(b) of the Internal Revenue Code, 26 U.S.C. § 403(b). ECF No. 1 ("Compl."), ¶ 3. So-called "403(b) plans" bear certain similarities to the more commonly known 401(k) plans, in that they both permit participants to choose how to invest their own retirement accounts, but the plans have different historical origins and are subject to different statutory and regulatory requirements.

The Plan's participants have individual accounts, which are funded through a combination of employee salary deferrals and employer contributions made by Froedtert. *Id.* ¶ 22. Participants invest their accounts in one or more of the Plan's various investment options. *Id.* ¶ 39. Although certain investment options changed over the course of the class period, at any given time the Plan offered approximately 20 different investments. *Id.* ¶ 39, pp. 12-15. These investments included (i) approximately 15 mutual funds managed by a variety of fund providers, (ii) a "balanced fund" that invests in stocks and bonds, (iii) a "stable value fund" characterized by a guaranteed rate of return, and (iv) a full complement of "target date funds" (TDFs) that provide a diversified blend

---

[2] Defendants' recitation of the factual background is based on the allegations set forth in the complaint. Although numerous complaint allegations regarding the Plan and how it was administered are factually inaccurate, Defendants assume that the complaint's allegations are true for the limited purpose of the instant motion. *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011) (In evaluating "a motion to dismiss, [the court] accept[s] as true the factual allegations in [the] complaint.").

of investments whose asset allocations follow a glide path that becomes more conservative as investors approach their target retirement date. *Id.* at pp. 12-15. The Plan's investment lineup included funds that are actively managed, which means that an investment manager is actively trying to outperform the market, as well as funds that are passively managed, which seek to match a market index. *Id.* (e.g., "Vanguard Institutional Index" and "Vanguard Small Cap Index"). The Plan offered funds providing access to large- and small-cap equities, and to foreign and domestic securities. *Id.* The Plan also included multiple "low-cost" investment options, including some that charge less than 10 basis points (0.10%) per year. *Id.* Finally, throughout the class period, the Plan has offered a self-directed brokerage account option for those participants who would like the ability to invest in a wide array of funds that are not in the Plan's regular lineup. *See, e.g.*, **Ex. 1**, 2014 Plan Form 5500, at Independent Auditors' Report p. 7; **Ex. 2**, 2018 Plan Form 5500, at Independent Auditors' Report p. 15.

Although the Committee is the formal "plan administrator," Compl. ¶ 18, the Plan's day-to-day and routine administrative services are outsourced to a third-party service provider or "recordkeeper." *Id.* ¶¶ 52-53. From 2014 to mid-2018, the Plan's recordkeeper was Transamerica Retirement Solutions; since then, it has been Lincoln Financial Group. *Id.* ¶ 40. The Plan's recordkeeper is paid for the services it provides to the Plan out of the Plan's assets, which included an arrangement known as "revenue sharing." *Id.* ¶¶ 62, 65; *see also* **Ex. 2**, 2018 Plan Form 5500. In a revenue sharing arrangement, the recordkeeper is paid from the fees collected by the investment managers, rather than with a direct debit to participant accounts. *Id.* ¶¶ 62, 65.

In his complaint, Plaintiff asserts three separate causes of action. In Count I, Plaintiff alleges that Defendants breached their fiduciary duties of loyalty and prudence with respect to their administration of the Plan. *Id.* ¶¶ 135-142. Plaintiff's allegations and theories fall into two

3

categories: (i) those related to the Plan's recordkeeping arrangement and (ii) those related to the Plan's investment lineup. With respect to the recordkeeping arrangement, Plaintiff alleges that Defendants failed to properly monitor the Plan's recordkeeping expenses, should not have used revenue sharing to pay those expenses, and allowed the recordkeepers to collect "unreasonable" compensation for their services. *Id.* ¶¶ 52-67. As for the investment lineup, Plaintiff alleges that the Plan's investment options were too expensive, *id.* ¶¶ 35-42, should not have included actively managed funds, *id.* ¶¶ 85-95, did not include the lowest-cost share class for each investment, *id.* ¶¶ 68-84, and included imprudent "stable value funds." *Id.* ¶¶ 43-51.

Counts II and III are ancillary to Count I. In Count II, Plaintiff alleges that two of the defendants—Froedtert and the Froedtert Directors—failed to fulfill their fiduciary duty to monitor the performance of the Committee and failed to remove committee members whose performance was allegedly inadequate. *Id.* ¶¶ 143-149. Count III alleges that Defendants engaged in transactions prohibited by ERISA § 406(a)(1)(C) when they used Plan assets to pay for services provided by two of the Plan's investment advisors, LaSalle Investment Advisors, Inc. and "Veritas Financial Services."[3] *Id.* ¶¶ 150-159. For the reasons set forth below, Plaintiff has failed to plausibly allege any actionable claim under ERISA and the complaint should be dismissed.

## ARGUMENT

In ERISA cases, a motion to dismiss is an "important mechanism for weeding out meritless claims" for fiduciary breach. *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 424 (2014). As elsewhere, a court should not "unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). Rather, to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a claim must be "plausible," meaning that it

---

[3] *See infra* p. 25 n. 10.

raises "more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679. In making that determination, the Court must accept well-pleaded allegations as true and draw reasonable inferences in the plaintiff's favor, but it "need not accept as true statements of law or unsupported conclusory factual allegations." *Divane*, 953 F.3d at 987. Although a plaintiff need not provide detailed factual allegations, mere conclusions and a "formulaic recitation of the elements of a cause of action" will not suffice. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## I.    PLAINTIFF'S FIDUCIARY BREACH CLAIMS SHOULD BE DISMISSED (COUNT I)

Plaintiff's first claim for relief alleges that Defendants breached ERISA's fiduciary duties of prudence and loyalty. But the complaint is devoid of facts plausibly supporting either allegation.

### A.    Plaintiff's Duty of Prudence Claim Should Be Dismissed

To survive a motion to dismiss, an ERISA plaintiff "must plausibly allege action that was objectively unreasonable." *Divane*, 953 F.3d at 988. Under that standard, a plaintiff must show that "a prudent fiduciary in the same position could not have concluded that the alternative action would do more harm than good"—that is, the path not taken must have been unambiguously better. *Id.* (quoting *Amgen Inc. v. Harris*, 136 S. Ct. 758, 760 (2016)). To plausibly state a claim, an ERISA plaintiff must either (i) identify specific procedural deficiencies that deviated from industry standards or (ii) set forth well-pleaded "circumstantial factual allegations" from which the Court may "reasonably 'infer … that the process was flawed.'" *PBGC ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718, 727 (2d Cir. 2013) (quoting *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 596 (8th Cir. 2009)). Plaintiff's complaint fails on both counts.

### 1.    *Plaintiff's Recordkeeping Fee Allegations Are Subject to Dismissal*

Plaintiff's recordkeeping fee claim is based on three overarching allegations: (1) that despite transitioning to a new recordkeeper in 2018, Defendants were not monitoring the Plan's recordkeeping fees; (2) that the Plan imprudently relied on revenue sharing to pay the Plan's recordkeeping fees; and (3) that, although he does not *actually know* what the Plan paid for recordkeeping during any of the six years at issue, the Plan surely paid too much. *E.g.*, Compl. ¶¶ 52-67. Plaintiff's allegations, whether taken individually or collectively, do not describe any plausible failure of the fiduciary process. Rather, they describe a universe in which plan fiduciaries need to make choices—any of which could be subject to second-guessing. But the ability to second-guess a decision does not make every decision a plausible fiduciary breach.

### a.    Plaintiff's allegations regarding Defendants' failure to monitor the recordkeeping fees lack sufficient substance to state a claim

First, Plaintiff's complaint is devoid of allegations about the process that Defendants used to evaluate the Plan's recordkeeping fees. To state a claim for fiduciary breach, Plaintiff must allege facts sufficient to support a finding that the Plan's fees were attributable to Defendants' failure to follow a prudent process. *See Brock v. Robbins*, 830 F.2d 640, 647-48 (7th Cir. 1987) (distinguishing between the prudence of a fiduciary's process in agreeing to a fee and the reasonableness of the fee itself). Without any cognizable theory as to what Defendants supposedly did wrong, Plaintiff relies on generalities. He simply alleges that Defendants did not "pay close attention" to the recordkeepers' compensation and failed to "identify all fees." Compl. ¶¶ 59-60. Plaintiff provides no bases for these conclusory assertions, let alone proffers any details about Defendants' supposedly deficient process. His assertions are too vague and conclusory to support a class-action lawsuit. *Iqbal*, 556 U.S. at 678 (complaint must offer more than "naked assertions devoid of further factual enhancement").

Plaintiff's suggestion that Defendants were effectively "asleep at the switch" is particularly puzzling given Plaintiff's admission that the Plan changed recordkeepers and its investment lineup during the class period. Compl. ¶¶ 40, 43, 72 (describing a "major overhaul" of the investment options in connection with the change in recordkeepers)). As Plaintiff concedes, in 2018, the Plan's fiduciaries terminated the Plan's relationship with Transamerica and retained Lincoln National as the Plan's recordkeeper. *Id.* The process for transitioning a large retirement plan to a new recordkeeper is a complex, years-long administrative feat. *See Sacerdote v. New York Univ.*, 328 F. Supp. 3d 273, 295-96 (S.D.N.Y. 2018) (discussing process of changing recordkeepers as "complex and time-consuming"). The fact that Defendants undertook such a task is incompatible with Plaintiff's vague allegations that Defendants were inattentive or lax in monitoring the Plan's recordkeeping fees. *See, e.g.*, *White v. Chevron Corp.*, 2016 WL 4502808, at *14 (N.D. Cal. Aug. 29, 2016) (holding that changes to the plan's investments undercut the plausibility of allegations that fiduciaries were failing to monitor those investments).

Plaintiff also alleges that Defendants should have, but did not, use a "competitive bid process for recordkeeping services" for a "significant period of time." Compl. ¶ 63. However, that conclusory allegation—which is based on "information and belief" and assumes, incorrectly, that there was no competitive bid process—is too vague to state a plausible claim. *Id.* And without proffering any detail as to what constitutes a "significant period of time," Plaintiff's allegation says nothing about the prudence of the process Defendants employed. This is particularly true since Defendants *changed recordkeepers* in 2018. *Id.* ¶ 40.

Moreover, as a number of courts have recently instructed, nothing in ERISA compels competitive bidding *at all*, much less at any particular intervals. *See, e.g.*, *White*, 2016 WL 4502808, at *14 ("[N]othing in ERISA compels periodic competitive bidding."). A competitive

bidding process (sometimes known as a request for proposal, or RFP) is just one of many ways to negotiate a contract with a vendor. Indeed, earlier this year, the Seventh Circuit affirmed the dismissal of an ERISA fiduciary breach action in which "plaintiffs alleged that [the defendants] should have solicited competitive bids for a fixed per-capita fee." *Divane*, 953 F.3d at 990; *accord Del Castillo v. Cmty. Child Care Council of Santa Clara County, Inc.*, 2019 WL 6841222, at *5 (N.D. Cal. Dec. 16, 2019) ("[the] absence of competitive bidding . . . without more, does not support Plaintiffs' allegations that the [defendants] acted imprudently"); *Marks v. Trader Joe's Co.*, 2020 WL 2504333, at *7 (C.D. Cal. Apr. 24, 2020) (same).

> b. <u>Plaintiff's allegations regarding the structure of the recordkeeping arrangement directly conflict with Seventh Circuit law</u>

Unable to plead any non-conclusory facts concerning Defendants' process for monitoring the Plan's recordkeeping fees, Plaintiff turns to the *structure* of the Plan's recordkeeping arrangement—specifically, the use of revenue sharing to cover costs. Compl. ¶¶ 56-57. Plaintiff begins by contending that, when it comes to recordkeeping fees, the "[b]est practice is for the Plan to pay for the expenses directly like they do in a defined benefit plan." *Id.* ¶ 56. The Seventh Circuit, however, has explicitly held that the decision of whether to pay expenses from the Plan directly is a matter of plan design, not administration. *Loomis*, 658 F.3d at 671 ("[Plaintiffs] press an argument that was not presented to the panel in *Hecker*: that the Plan should have paid the expenses directly, allowing participants to reap the gross rather than the net return. But whether to cover these expenses is a question of plan design, not of administration.").

Continuing with his structural arguments, Plaintiff apparently believes that a plan is always better off negotiating a flat, per-participant fee, because revenue sharing can result in increased fees as a plan gets larger. *Id.* ¶¶ 55-57. Plaintiff's revenue sharing theory, however, is foreclosed by binding precedent. In a 403(b) plan, recordkeeping fees "need not be individually allocated or

based on any specific fee structure." *Divane*, 953 F.3d at 990 (affirming dismissal of challenge to revenue sharing). A revenue sharing arrangement "violates no statute or regulation," *Hecker*, 556 F.3d at 585, and can offer benefits over a "flat" or "per participant" arrangement, *Loomis*, 658 F.3d at 672-73 ("A flat-fee structure might be beneficial for participants with the largest balances, but, for younger employees and others with small investment balances, a capitation fee could work out to more[.]"). Other courts have likewise rejected the notion that reliance on revenue sharing to pay plan fees is somehow indicative of imprudence. *See, e.g.*, *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) (explaining that revenue sharing is "common and acceptable").

c.    <u>Plaintiff's guess work regarding the amount of the recordkeeping fees is woefully deficient</u>

Finally, Plaintiff turns his attention to the *amount* of the Plan's recordkeeping fees, which he labels "excessive" and "unreasonable." Compl. ¶¶ 62, 65. To state a plausible claim based on allegedly excess recordkeeping fees, Plaintiff must credibly allege, at a minimum, (i) how much the Plan paid, (ii) the services it was paying for, and (iii) how the Plan's fees for those services fail to reflect market pricing. *See infra* at 9-11. Plaintiff fails to meaningfully allege any of these things.

To begin, Plaintiff concedes that he *does not know* how much the Plan paid for recordkeeping. *See, e.g.*, Compl. ¶ 65 ("[D]ue to the existence of revenue sharing it is impossible to determine how excessive the fees are without discovery."). He nonetheless alleges, in conclusory fashion, that the Plan paid $49 per participant in 2014 and $64 per participant in 2018. Compl. ¶ 62. Plaintiff's complaint is silent about the Plan's fees in the other years at issue, and his calculation of the Plan's 2018 fees is internally inconsistent.[4]

---

[4] Plaintiff's assertion that the Plan paid $64 per participant in 2018 is inconsistent with his allegation in paragraph 65 that the Plan's recordkeepers were paid $451,706 that year. Compl. ¶ 65 ("[I]n the year 2018, Lincoln Financial received compensation directly from the Plan of $364,665 for recordkeeping services and Transamerica received compensation directly from the Plan of $87,041 for recordkeeping services.").

Plaintiff then speculates that the Plan's fees in 2014 and 2018 "could actually be higher" because of revenue sharing, *id.* ¶ 62, but he simultaneously acknowledges that the Plan may also have received rebates. *Id.* ¶ 82. All told, Plaintiff's allegations regarding the Plan's recordkeeping fees are nothing more than the kind of "guess-work" that courts regularly reject out of hand. *Marks*, 2020 WL 2504333, at *6 ("Plaintiffs' guess that the Plan pays $140 per participant for recordkeeping fees has 'no factual basis,' and Plaintiffs admit they do not actually know how much the recordkeeping fees are."); *White v. Chevron Corp.*, 2016 WL 4502808, at *18 (same).

In addition, not only are Plaintiff's allegations regarding the Plan's recordkeeping fees lacking, the complaint is devoid of any information regarding the services that Transamerica and Lincoln National provided to the Plan during the class period. As Plaintiff acknowledges, recordkeepers "provide a broad range of services" and plans "have the ability to customize the package of services they receive." Compl. ¶ 53. Yet Plaintiff fails to provide any information regarding "the package of services" that he, and the other Plan participants, received during the class period. Without alleging any facts regarding the services the recordkeepers provided, Plaintiff cannot plausibly allege that their compensation was "excessive" or "unreasonable." *Hecker v. Deere & Co.*, 569 F.3d 708, 711 (7th Cir. 2009) (denying petition for rehearing and affirming the dismissal of the excessive fee claims was appropriate because "the complaint is silent about the services . . . participants received"); *Young v. Gen. Motors Inv. Mgmt. Corp.*, 325 F. App'x 31, 33 (2d Cir. 2009) (affirming dismissal where plaintiffs "fail[ed] to allege that the fees were excessive relative to the services rendered").

---

On a per-participant basis, $451,706 is less than $45.00 per participant. *See id.* ¶ 31 ("[T]he Plan has had more than 10,000 participants . . . since the year 2014").

Finally, Plaintiff fails to proffer any "sound basis for comparison" by which to judge the reasonableness of the Plan's recordkeeping fees. *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 822 (8th Cir. 2018). Plaintiff does not allege that the Plan could have negotiated a materially better deal with its current recordkeeper; nor does he allege that a competitor would have agreed to provide the same services for a fee so low that any prudent fiduciary would have been compelled to switch recordkeepers. *Divane*, 953 F.3d at 988 (explaining that a plaintiff must show that no hypothetical prudent fiduciary would have made the same choice as the defendant). Rather, Plaintiff simply compares the Plan's alleged fees to other plans that paid different vendors different amounts for different services. Compl. ¶ 64. For example, Plaintiff invokes another lawsuit in which a plaintiff merely *alleged* in his complaint that $54 per participant for a different plan was excessive. *Id.* ¶ 64. Similarly suspect is Plaintiff's unsupported contention that Nike Inc.'s plan—which is a 401(k) plan and over twice the size of Froedtert's 403(b) plan—received a $21 per participant bid from an unidentified recordkeeper to provide unspecified administrative services. *Id.* Plaintiff's self-serving and unsupported allegations create no plausible inference that Defendants failed to negotiate proper recordkeeping fees for the Plan that was within their control.

Indeed, courts have held that recordkeeping fees much higher than those alleged here were insufficient to support a fiduciary breach claim. The Seventh Circuit, for example, held in *Divane* that fees nearly three times as high as the fees alleged here did not support an inference of imprudence. *See Divane*, 953 F.3d at 984 (holding that an allegation that the plan paid between $153-$213 per participant failed to state a claim). Similarly, the district court in *Martin v. CareerBuilder, LLC* recently held that allegations that the plan paid $131-$222 per participant were insufficient to state a claim. 2020 WL 3578022, at *4 (N.D. Ill. July 1, 2020). If

recordkeeping fees ranging from $131-$222 cannot plausibly state a fiduciary breach claim under controlling Seventh Circuit law, neither can the Plan's alleged fees of $49-$64 per participant.

**2.    *Plaintiff's Allegations Regarding the Plan's Investment Options Are Subject to Dismissal***

a.    <u>Plaintiff lacks standing to challenge investment options in which he did not invest</u>

Plaintiff's challenges to the Plan's investment options are similarly defective. As a threshold matter, Plaintiff's allegations with respect to the majority of the investment options identified in the complaint can be dismissed pursuant to Fed. R. Civ. P. 12(b)(1) for want of jurisdiction. For this Court to have jurisdiction over Plaintiff's claims, Plaintiff must demonstrate that he has Article III standing, which requires that he allege a particularized injury that would be redressed by the requested judicial relief. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016). Absent an individualized injury in fact, a plan participant cannot assert representative standing based on injuries to the plan. *Thole v. U.S. Bank N.A.*, --- U.S. ---, 140 S. Ct. 1615, 1620 (2020). Where a plaintiff challenges the prudence of investments included in a defined contribution plan, he can only plausibly allege a "particularized injury" with respect to those investments in his individual plan account. *Wilcox v. Georgetown Univ.*, 2019 WL 132281, at *8-10 (D.D.C. Jan. 8, 2019). ("Since Mr. Wilcox did not invest in the TIAA Real Estate Account, he has no standing to complain about its performance because he [] has no injury to show."); *Patterson v. Morgan Stanley*, 2019 WL 4934834, at *5 (S.D.N.Y. Oct. 7, 2019) ("Losses incurred by funds in which Plaintiffs did not invest cannot have impaired the value of Plaintiffs' individual accounts").

Here, Plaintiff identifies dozens of the different investment options offered to participants over the class period as imprudent for one reason or another, but Plaintiff personally invested in

just eight of the more than 30 investment options that he is now challenging.[5] Notably, despite spilling much ink over the purportedly high cost and poor performance of the Plan's target date funds, Compl. ¶¶ 72-79, Plaintiff, however, was not—and could not have been—injured by those funds because he never invested in them. *See* **Ex. 3**, Plaintiff's Account Statements and Investment Allocations. Because the outcome of Plaintiff's challenge to investment options he did not invest in will have no effect on the balance of his individual account, Plaintiff lacks Article III standing to challenge those investment options. *Thole*, 140 S. Ct. at 1622 ("Winning or losing this suit would not change the plaintiffs' monthly pension benefits. The plaintiffs have no concrete stake in this dispute and therefore lack Article III standing.").

> b. Plaintiff's challenges to the Plan's investment options do not allege action that was objectively unreasonable

In addition to his standing barrier, Plaintiff's conclusory process-based allegations and his various "circumstantial" allegations related to the Plan's investment lineup do not support a plausible inference that Defendants breached their duty of prudence. As explained above, a claim that a defendant acted imprudently in violation of ERISA is a "process-based" claim that focuses on "a fiduciary's conduct in arriving at an investment decision, not on its results," and asks "whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment." *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 434 (3d Cir. 1996). Stated

---

[5] Specifically, Plaintiff's account statements show that he invested only in the following funds being challenged: Transamerica Money Market Account (TFGXX), Vanguard Institutional Index (VINIX), Columbia Small Cap Value Fund (NSVAX), American Funds EuroPacific Growth R5 Fund (RERGX), Metropolitan West Total Return Bond Fund (MWTIX), Fidelity Contrafund (FCNKX), TFLIC Guaranteed Pooled Fund, and Lincoln Stable Value Account. *Id.* "Such evidence [addressed to the jurisdictional question] is properly considered at the dismissal stage when the question raised is one of subject matter jurisdiction." *United Transp. Union v. Gateway W. Ry. Co.*, 78 F.3d 1208, 1210 (7th Cir. 1996); *Bilow v. Much Shelist Freed Denenberg Ament & Eiger, P.C.*, 67 F. Supp. 2d 955, 960 (N.D. Ill. 1999) ("[W]hen considering a motion to dismiss for lack of subject matter jurisdiction, we may entertain evidentiary materials addressed to the jurisdictional question.").

another way, a plaintiff "must plausibly allege *action* that was objectively unreasonable." *Divane*, 953 F.3d at 988 (emphasis added).

Here, Plaintiff makes little effort to allege how Defendants' process for selecting and monitoring the Plan's investments was deficient or how he was harmed as a result. Where Plaintiff's allegations do relate to process, they are too bare bones and conclusory to support a claim. For example, Plaintiff alleges that Defendants "did not have a viable methodology for monitoring the expenses of the funds." Compl. ¶ 37. However, he says nothing about what a "viable methodology" is or how Defendants' methodology was allegedly deficient. Without proffering the requisite "factual enhancement," *Twombly*, 550 U.S. at 557, Plaintiff is simply alleging that Defendants lacked a "prudent" methodology. Such vague and conclusory allegations are insufficient to state a plausible ERISA claim. *See, e.g.*, *White v. Chevron Corp.*, 2017 WL 2352137, at *14 (N.D. Cal. May 31, 2017) (dismissing claim for failure to plead "facts regarding [the] process for choosing funds [or] facts relating to investigations into the appropriateness of various funds"), *aff'd* 752 F. App'x 453 (9th Cir. 2018).

Unable to allege an actual procedural defect, Plaintiff resorts to circumstantial allegations regarding the composition of the Plan's investment lineup. Specifically, Plaintiff alleges that Defendants' imprudence can be inferred because the Plan's investment lineup: (1) included certain "high-fee" investments and excluded other "low-fee" funds, Compl. ¶¶ 35-42; (2) included "actively-managed" investment options, *id.* ¶¶ 85-95; (3) included allegedly imprudent stable value funds, *id.* ¶¶ 43-51; and (4) did not include the lowest cost share class for each of the Plan's investments. *Id.* ¶¶ 68-84. As explained below, none of Plaintiff's four theories pass muster.

(1)     Plaintiff's allegations that the investment options were "too expensive" collide head on with this Circuit's precedent


Plaintiff's first objection—that the Plan's lineup included "high fee" investment options and excluded purportedly "low fee" alternatives, *id.* ¶ 37—runs headlong into binding precedent. First, in *Hecker*, the Seventh Circuit rejected claims that some of the plan's investment options should have been swapped out for lower-cost alternatives on the ground that the existence of lower cost alternatives was "beside the point." 556 F.3d at 586. Then, in *Loomis*, the Seventh Circuit held that plaintiffs' "paternalistic" efforts to protect plan participants from "high-expense" investment options were incompatible with ERISA. 658 F.3d at 673. And, earlier this year, the Seventh Circuit reaffirmed the principles in *Hecker* and *Loomis* and held in *Divane*, that a fiduciary's decision to include "high fee" investment options on a retirement plan's investment lineup was not indicative of imprudence. 953 F.3d at 989 ("Rather than compare Northwestern's actions to those of a 'hypothetical prudent fiduciary,' plaintiffs criticize what may be a rational decision for a business to make (and, indeed, several do) when implementing an employee benefits program."). Against this controlling legal backdrop, Plaintiff's challenge to the Plan's investment fees rings hollow.

Plaintiff's challenge of the Plan's allegedly "high fee" investments also fails given the prudent range of investment alternatives available in the Plan. *See Loomis*, 658 F.3d at 670 (discussing *Hecker* and noting that, "[b]y offering a wide range of options . . . Deere's plan complied with ERISA's fiduciary duties."). As discussed above, the Plan offered over a dozen mutual funds, a stable value fund, a money market fund, and a full complement of target date funds. *See supra*, at 2-3. The Plan's lineup included investment options with fees below 0.10% per year as well as multiple index or passively managed options. *Id.* In addition, participants had access to hundreds of other investments through a self-directed brokerage account. *Id.* The Seventh

Circuit has repeatedly held that investment lineups strikingly similar to the Plan's are incompatible with an inference of imprudence. *See Divane*, 953 F.3d at 992 (decision to include actively-managed funds alongside index funds was not evidence of imprudence); *Loomis*, 658 F.3d at 673-74 (fiduciary does not act imprudently by providing a range of options and then "leav[ing] choice to the people who have the most interest in the outcome"); *Hecker*, 556 F.3d at 586 (no breach of fiduciary duty where plan participants could choose to invest in 26 investment options and more than 2,500 mutual funds through a brokerage window). If Plaintiff had wanted to invest in only "low cost" funds—as appears to be his preference based on the complaint allegations—he had multiple options to choose from and was not "forced to stomach an unappetizing menu." *Divane*, 953 F.3d at 991.

Nor does Plaintiff's attempt to compare the Plan's investment fees to his cherry-picked alternatives demonstrate a fiduciary breach. *See* Compl., pp. 12-15. For a comparison of an investment's fees to plausibly suggest imprudence, the investment must be compared to a "meaningful benchmark." *See, e.g.*, *Meiners*, 898 F.3d at 822. Plaintiff's comparisons are woefully deficient.

First, with respect to each of the Plan's allegedly "high cost" funds, Plaintiff identifies a *single* purportedly lower-cost alternative. *See* Compl., pp. 12-15. The mere fact that Plaintiff was able to scour the marketplace and identify at least one lower-cost fund says nothing about whether the Plan's investments were reasonable, much less the prudence of its fiduciaries in selecting and monitoring those investments. *See Meiners*, 898 F.3d at 823 ("[T]he existence of a cheaper fund does not mean that a particular fund is too expensive *in the market generally* or that it is otherwise an imprudent choice."); *Amron v. Morgan Stanley Inv. Advisors, Inc.*, 464 F.3d 338, 345 (2d Cir. 2006); *Patterson*, 2019 WL

4934834, at *12. As the Seventh Circuit has clearly stated, plan fiduciaries are under no

obligation to "scour the market to find and offer the cheapest possible fund (which might,

of course, be plagued by other problems)." *Hecker*, 556 F.3d at 586.

Plaintiff also fails to offer any explanation for why his handpicked alternative funds are appropriate benchmarks. On their face, Plaintiff's alternative funds are clearly inapt. For example, Plaintiff purports to compare the Plan's actively managed small-cap equities mutual fund (Columbia Small Cap Value) to an exchange-traded high yield *bond fund* (SPDR Portfolio High Yield Bond ETF). *See* Compl., p. 13. Not only are these entirely different investments, the regulations governing 403(b) plans prohibit them from even offering ETFs.[6] In addition, several of Plaintiff's proposed alternatives have been explicitly rejected by courts as unreliable. *See Meiners*, 2017 WL 2303968, at *3 (Vanguard's target date funds were not reliable comparators for assessing investment costs); *Amron*, 464 F.3d at 345 ("That a mutual fund has an expense ratio higher than Vanguard, a firm known for its emphasis on keeping costs low, raises little suspicion . . . ."). And still others have expense ratios that are nearly indistinguishable from the Plan funds to which they are compared.[7] *E.g.*, Compl., p. 13 (comparing Vanguard Institutional Index (0.04%) to Schwab S&P 500 Index (0.02%)). Plaintiff cannot rest a plausible fiduciary breach claim on comparisons of apples-to-oranges (*e.g.*, TDF funds), apples-to-anchovies (*e.g.*, ETFs), or apples-to-apples that are the same price (*e.g.*, index funds).

---

[6] *See* 26 U.S.C. § 403(b)(7) (permitting 403(b) plans to offer annuities and mutual funds); *see also Daniels-Hall v. Nat'l Educ. Ass'n.*, 629 F.3d 992, 996 n.2 (9th Cir. 2010) (referring to DOL guidance stating that "[u]nder a 403(b) plan, employers may purchase for their eligible employees annuity contracts or establish custodial accounts invested only in mutual funds for the purpose of providing retirement income.") (quoting DOL Field Assistance Bulletin No. 2007-02 (July 24, 2007)).

[7] Plaintiff's attempt to compare the various investments' expense ratios is further undermined by his admission that he does not know which share classes the Plan offered for many of the funds. *See* Compl., p. 13.

Plaintiff's contention that Defendants breached their fiduciary duties by selecting and retaining actively managed mutual funds is foreclosed by binding Seventh Circuit precedent. The Seventh Circuit has long held that a fiduciary does not breach its fiduciary duties by including actively managed investments in a diversified fund lineup. *See Loomis*, 658 F.3d at 673 (holding that actively-managed investments are appropriate options to include in investment lineup); *accord Divane v. Northwestern Univ.*, 2018 WL 2388118, at *6 (N.D. Ill. May 25, 2018), *aff'd*, 953 F.3d 980.Where a fiduciary includes a participant's preferred investment on a diversified fund lineup, as Defendants did here, he does not breach his fiduciary duty by also including additional alternative investment options. *See Divane*, 953 F.3d at 991 ("[T]he types of funds plaintiffs wanted (low-cost index funds) were and are available to them, eliminating any claim that plan participants were forced to stomach an unappetizing menu."); *Martin*, 2020 WL 3578022, at *6 ("Defendants' failure to offer every index fund under the sun is not, in and of itself, imprudent.").

The courts' rejection of this argument makes good sense. Actively and passively managed funds have materially different management approaches. Actively managed funds involve professional investment managers who try to beat the market through the selection of individual investments. *Davis v. Washington Univ.*, 960 F.3d 478, 485 (8th Cir. 2020). Passively managed funds, on the other hand, simply try to mimic a market index. *Id.*; *see also Loomis*, 658 F.3d at 670. While Plaintiff apparently believes that passive management is always better, "analysts continue to debate whether active or passive management is a better approach. *See Davis*, 960 F.3d at 485 (citing Dan M. McGill et al., *Fundamentals of Private Pensions*, 788–89 (8th ed. 2005)). As the Eighth Circuit succinctly explained, "it is not imprudent for a fiduciary to provide both [active and passive] investment options. They have different aims, different risks, and different

18

potential rewards that cater to different investors. Comparing apples and oranges is not a way to show that one is better or worse than the other." *Id.* (internal citation omitted).

Plaintiff's attempt to compare the performance of certain of the Plan's actively managed funds to passively managed Vanguard target date funds does not help his claim.[8] As discussed above, this is an apples-to-oranges comparison. Moreover, it is well established that different investment strategies have cycles of outperformance and underperformance. Identifying a single cycle of alleged underperformance with the benefit of hindsight will always be possible. It is not, however, evidence of imprudence. *Divane*, 953 F.3d at 992 ("[T]he ultimate outcome of an investment is not proof of imprudence) (quoting *DeBruyne v. Equitable Life Assurance Soc'y of the United States*, 920 F.2d 457, 465 (7th Cir. 1990)); *White*, 2016 WL 4502808, at *17 ("[A] fiduciary may—and often does—retain investments through a period of underperformance as part of a long-range investment strategy."); *Patterson*, 2019 WL 4934834, at *10-11 (collecting cases).

Plaintiff's performance comparisons also fail to plausibly suggest a fiduciary breach because they are nonsensical. For example, Plaintiff inexplicably compares the performance of the T. Rowe Price and Vanguard funds as of May 2020, Compl. ¶ 91, while acknowledging that Defendants *replaced* the Plan's T. Rowe Price funds with *custom* target date funds in *2018*. Compl. ¶ 75. The alleged underperformance of a fund two years after it was removed from the Plan does not, and cannot, support an inference of imprudence.

---

[8] Contrary to Plaintiff's assertion, the Vanguard target date funds he identifies as comparators are not "passively managed" and are not "index funds." Target date funds, by design, must include actively managed components. *See* Vanguard's Approach to Target-Date Funds (March 2019), *available at* https://personal.vanguard.com/pdf/ISGTDF.pdf, p. 16 ("There is no such thing as a purely passive TDF because glide-path construction and sub-allocation decisions are active choices."). There is no such thing as a "target date index."

Despite Plaintiff's lengthy disquisition on stable value funds generally, Compl. ¶¶ 43-48, he notably does *not* allege that stable value funds are *per se* imprudent investment options for 403(b) plans.[9] Rather, Plaintiff simply alleges, without any factual support, that the Plan's stable value funds were allegedly imprudent. Compl. ¶ 50.

First, the majority of Plaintiff's stable value fund allegations are simply unsupported conclusions. Plaintiff's contention that Defendants "did not have a viable methodology for monitoring the costs or performance" of the Plan's stable value funds is not a well-pleaded factual allegation; it is simply another way of saying that Defendants allegedly failed to employ a "prudent" process. Compl. ¶ 50. While Plaintiff alleges "comparable products" with higher crediting rates were available "from other [unidentified] providers" and "it is likely that identical product[s]" were available from unidentified "insurance companies" with higher crediting rates, *id.*, this is pure speculation. It is telling that Plaintiff does not proffer any facts to establish the existence of "comparable" or "identical" stable value fund products that were more prudent than the Plan's funds.

In fact, Plaintiff's sole attempt to provide a comparator stable value fund is his allegation that the TIAA Traditional Annuity (which Plaintiff refers to as "TIAA-CREF RC") had a crediting rate of "around 100 points more" than the Plan's stable value fund as of March 2020. *Id.* This is yet another "apples-to-oranges" comparison insufficient to state a claim. *See Davis*, 960 F.3d at 485; *Loomis*, 658 F.3d at 671-72. As a threshold matter, the Plan could *not* have offered the TIAA Traditional Annuity because TIAA's annuities are only available to participants in retirement plans

_____

[9] Indeed, Plaintiff notes that stable value funds are "common in 403(b) plans," Compl. ¶ 44, and therefore are presumptively prudent. *See* 29 U.S.C. § 1104(a)(1)(B).

where TIAA serves as the recordkeeper. *See Sacerdote*, 328 F. Supp. 3d at 302 (discussing TIAA annuities and noting "the only firm that record-keeps TIAA annuities . . . is TIAA"). Moreover, an annuity is not an appropriate comparator to a stable value fund. While annuities may provide higher crediting rates, they lack the liquidity of stable value funds. TIAA's annuity policies, for example, typically provide that money cannot be withdrawn immediately but only over a ten-year period. *Id.* at 301 (discussing TIAA annuity withdrawal restrictions). Stable value funds, by contrast, allow participants to move in and out of the fund without incurring surrender charges or other fees. *Dezelan v. Voya Ret. Ins. and Annuity Co.*, 2017 WL 2909714, at *1 (D. Conn. July 6, 2017) ("A key feature of the stable value fund [for] an investor is that she can withdraw from the fund at any time and receive the book value of her investment, even if its market value would be lower."). Because many investors value liquidity, Plaintiff's myopic comparison of annuities' and stable value funds' crediting rates is inapt and provides no plausible indication of imprudence.

> (4)   Plaintiff's allegations related to the Plan's share classes disregard a critical component of share classes

Plaintiff also alleges that Defendants breached their fiduciary duties because the Fund's investment lineup did not always include the lowest cost share class available with respect to each investment offered by the Plan. This theory does not stand up to scrutiny.

When an investment company offers mutual funds, it sometimes will offer the same fund with different share classes. For example, one share class might collect revenue to be shared with the recordkeeper to offset administrative expenses, whereas another share class might collect no such revenue, thereby requiring a separate, out-of-pocket payment by the plan participants for administrative expenses. For Plaintiff to plausibly allege that Defendants breached their fiduciary duties by offering the wrong share classes, he must plausibly account for the differences associated with the different share classes. Plaintiff fails to do so. *See Leimkuehler v. American United Life*

*Ins. Co.*, 713 F.3d 905, 912 (7th Cir. 2013) ("True, some share classes are more expensive than others, but the cheapest option may not inevitably be the best option. There is also no particular reason to think [the defendants] would not seek to make up the revenue it missed by offering cheaper share classes by charging higher direct fees[.]").

Similar to his other investment claims, Plaintiff offers a half-baked challenge that is long on conclusions and short on facts. Of the Plan's dozens of investment options over the time period at issue, Plaintiff specifically identifies only two for which a lower cost share class was available: (i) Columbian Small Cap Value II mutual fund and (ii) Ivy Mid Cap Growth Class I mutual fund. Compl. ¶ 72. Not only does Plaintiff limit his share class challenge for these investments to the 2018-2020 timeframe, he offers no allegation to account for the service disparities between the two sets of offerings. *Leimkuehler*, 713 F.3d at 912 (discussing relationship between services provided to plan and fees generated by revenue sharing). With respect to the 2014-2018 time period, Plaintiff simply alleges—without factual support—that there were "significant share class violations primarily in the Target Date funds." Compl. ¶ 72. Moreover, Plaintiff concedes that he does not know which share classes the Plan actually offered. *See id.* ¶ 79, pp. 13. This is insufficient to state a claim.

At bottom, Plaintiff's share class allegations are simply a repackaged way of claiming that the Plan did not offer the lowest cost share class at every turn. The Seventh Circuit and its district courts have repeatedly rejected such an argument. *See Loomis*, 658 F.3d at 671-72; *Divane*, 2018 WL 2388118, at *3 (observing that "retail expense ratios" often "cover record-keeping" costs), *aff'd* 953 F.3d 980; *Martin*, 2020 WL 3578022, at *4 ("*Divane* clarified that a fund's failure to invest in institutional as opposed to retail funds does not give rise to an inference of imprudence when a plan offers cheaper alternatives."). Other courts have followed suit. *See White*, 2017 WL

2352137, at *14 ("[A]mple authority holds that merely alleging that a plan offered retail rather than institutional share classes is insufficient to carry a claim for fiduciary breach."). As all of these courts have recognized, there are sound reasons to include retail share classes on an investment lineup, and these reasons are incompatible with an inference of imprudence. *Divane*, 2018 WL 238118, at *3 (observing that retail share classes are used to cover recordkeeping costs).

### B.      Plaintiff's "Duty of Loyalty" Claim Lacks Any Requisite Facts

The Court should also dismiss Count I to the extent it is premised on a purported violation of ERISA's duty of loyalty. It is well established that ERISA's duty of loyalty is separate and distinct from the duty of prudence, and allegations related to the latter cannot be repackaged and repleaded under the guise of the former. *See Martin*, 2020 WL 3578022, at *6 (collecting cases). To state a plausible breach of the duty of loyalty, a plaintiff must set forth separate and distinct allegations of actual self-dealing or disloyal conduct. *See*, *e.g.*, *Loomis*, 658 F.3d at 671 (dismissing duty of loyalty claim where complaint failed to allege facts sufficient to support showing that defendant selected investments "to enrich itself at participants' expense"); *Martin*, 2020 WL 3578022, at *6 (same); *Daugherty v. Univ. of Chicago*, 2017 WL 4227942, at *9 (N.D. Ill. Sept. 22, 2017) (same). Plaintiff's complaint is devoid of any allegation that Defendants engaged in self-dealing or conduct that was intended to benefit anyone other than the Plan's beneficiaries. Because Plaintiff's duty of loyalty claim merely piggybacks on his allegations of imprudence, it should be dismissed. *See Sacerdote v. New York Univ.*, 2017 WL 3701482, at *5 (S.D.N.Y. Aug. 25, 2017) ("[A] plaintiff must do more than simply recast purported breaches of the duty of prudence as disloyal acts.").

## II. PLAINTIFF'S DUTY TO MONITOR CLAIM SHOULD BE DISMISSED (COUNT II)

Plaintiff has also failed to plead a viable claim that Froedtert or the Froedtert Directors breached their duty to monitor. As a threshold matter, it is settled law that a duty to monitor claim is derivative of a fiduciary breach claim. Without an underlying breach by the agent or appointee subject to monitoring, there can be no failure to monitor. *Howell v. Motorola, Inc.*, 633 F.3d 552, 572-73 (7th Cir. 2011); *Martin*, 2020 WL 3578022, at *6. Because Plaintiff has failed to plausibly allege any actionable breach of fiduciary duty, *see supra,* his duty to monitor claim necessarily fails.

Even assuming Plaintiff could plead an actionable breach of fiduciary duty—he cannot—his failure to monitor claim should still be dismissed. As the Seventh Circuit has explained, a plan fiduciary does not violate its duty to monitor simply because it failed to prevent an alleged breach of fiduciary duty. *Id.* (explaining that the duty to monitor does not "require every appointing Board member to review all business decisions of Plan administrators"). Rather, a monitoring fiduciary must simply exercise the appropriate degree of oversight warranted under the circumstances. *Id.* Thus, to state a valid monitoring claim, a plaintiff must identify some defect in the monitoring process and show that the defect resulted in harm. Vague allegations "only in the most general terms that the [defendants] breached their duty to monitor" fail to state a claim. *Neil v. Zell*, 677 F. Supp. 2d 1010, 1024 (N.D. Ill. 2009), *as amended* (Mar. 11, 2010).

Plaintiff fails to plead any facts plausibly suggesting a deficient monitoring process or a resulting harm. Plaintiff simply alleges that "Defendants" (apparently, Froedtert Health and the Froedtert Directors) had the authority to appoint and remove members of the Committee and a duty to monitor their performance. Compl. ¶ 147. He then alleges in conclusory fashion—and without proffering any well-pleaded facts—that Defendants "[f]ail[ed] to monitor and evaluate the

performance of the [Committee] or have a system in place for doing so" and "[f]ail[ed] to monitor the process by which Plan investments were evaluated." *Id*. Such allegations, which simply recite the basic elements of a duty to monitor claim, fail to satisfy *Twombly* and *Iqbal*.

## III. THE COMPLAINT FAILS TO STATE A PROHIBITED TRANSACTION CLAIM (COUNT III)

Finally, Plaintiff claims that Defendants engaged in prohibited transactions under ERISA § 406(a), which prohibits transactions between a plan and a "party-in-interest." Compl. ¶¶ 150-155. Plaintiff contends that LaSalle Investment Advisors and Veratis Advisors (who Plaintiff mistakenly identifies) were parties-in-interest because they provided investment advisory services to the Plan, and therefore engaged in prohibited transactions when they were paid for those services.[10] *Id.* ¶¶ 151-152. Courts have rejected this theory of liability time-and-again because it is premised on "circular reasoning"—*i.e.*, that "transactions were prohibited because [the service provider] was a party in interest, and [the service provider] was a party in interest because it engaged in the prohibited transactions." *Sellers v. Anthem Life Ins. Co.*, 316 F. Supp. 3d 25, 34 (D.D.C. 2018). These types of transactions—*i.e.*, paying ordinary investment advisors for services negotiated at arm's length—are not the sort of deals "struck with plan insiders" that ERISA aims to prohibit. *Id.* at 36 (citing *Lockheed Corp. v. Spink*, 517 U.S. 882, 893 (1996)). As the Third Circuit has explained, to hold otherwise would be "absurd" and "non-sensical" because it "would expose fiduciaries to liability for every transaction whereby services are rendered to the plan." *Sweda v. Univ. of Penn.*, 923 F.3d 320, 337 (3d Cir. 2019); *see also Ramos v. Banner Health*, 2020

---

[10] Plaintiff's complaint contains various allegations related to the "troubled history" of a "Veritas Advisors" based in Missouri and one of its brokers. Compl. ¶¶ 99-100. Notably, however, these allegations relate to an entirely different investment advisory firm. As the employer identification number associated with the "Veritas Advisors" disclosed in the Form 5500 for the Plan establishes, the actual name of the company that received the $38,466 in fees referenced in the complaint is "Veratis Advisors, Inc.," which is based in Cary, North Carolina, and not the Veritas Advisors based in Missouri.

WL 2553705, at *54 (D. Colo. May 20, 2020); *Marshall v. Northrop Grumman Corp.*, 2019 WL 4058583, at *12 (C.D. Cal. Aug. 14, 2019); *Sacerdote v. New York Univ.*, 2017 WL 3701482, at *13 (S.D.N.Y. Aug. 25, 2017). Because Plaintiff's prohibited transaction claim is nothing more than an attack on the routine and necessary plan-service provider relationship, he fails to state a plausible prohibited transaction claim.

Even if Plaintiff had plausibly alleged a prohibited transaction, Count III should still be dismissed because it plainly falls within one of ERISA § 406(a)'s exemptions. ERISA § 408(b)(2) explicitly provides that transactions with a party-in-interest are not prohibited if the transactions are for "services necessary for the establishment or operation of the plan" and "no more than reasonable compensation is paid therefor." 29 U.S.C. § 1108(b)(2). Here, the Plan's arm's length transactions with LaSalle and Veratis satisfy both requirements.[11] With respect to the requirement that the services must be "necessary for the establishment or operation of the plan," LaSalle and Veratis provided investment advisory services to the Plan. Compl. ¶ 66. Investment advisory services are among the core services necessary to administer a retirement plan. *See* 29 C.F.R. § 2550.408b-2(b) ("A service is necessary . . . if the service is appropriate and helpful to the plan obtaining the service in carrying out the purposes for which the plan is established or maintained"); *see also Scott v. Aon Hewitt Fin. Advisors, LLC*, 2018 WL 1384300, at *10-12 (N.D. Ill. Mar. 19, 2018) (dismissing prohibited transaction claim challenging fees for investment advisory services).

As for the second requirement, Plaintiff alleges that LaSalle was paid only $5,960 in 2017 and Veratis just $38,466 in 2018 for their investment advisory services to the Plan. Compl. ¶ 66. Given the number of participants in the Plan (over 10,000), the amount those participants have

---

[11] Although the Seventh Circuit has held that the applicability of this exemption is an affirmative defense, it also recognized that where, as here, a complaint pleads the elements of the exemption, a prohibited transaction claim is subject to dismissal. *Divane*, 935 F.3d at 986.

collectively invested (over $800,000,000), and the "major overhaul" to the Plan's investment options in 2018, *id.* ¶ 72, this Court can conclude as a matter of law that LaSalle and Veratis received "no more than reasonable compensation." *See, e.g.*, *Divane*, 2018 WL 2388118, at *10 (holding that administrative fees alleged in the complaint were "reasonable as a matter of law" in finding that ERISA § 408 exemption applied to prohibited transaction claims).

## CONCLUSION

For the above reasons, Defendants move the Court to dismiss Plaintiff's complaint with prejudice.

Dated: September 4, 2020                    Respectfully submitted,

                                            */s/ Nancy G. Ross*
                                            Nancy G. Ross
                                            Richard E. Nowak
                                            Mayer Brown LLP
                                            71 South Wacker Drive
                                            Chicago, Illinois 60606
                                            (312) 782-0600
                                            nross@mayerbrown.com
                                            rnowak@mayerbrown.com

                                            *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on September 4, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which shall send notification of such filing to all counsel of record.

*/s/ Nancy G. Ross*
Nancy G. Ross