# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN
### MILWAUKEE DIVISION

NITISH S. BANGALORE, *et al.*,

      Plaintiff,

      v.

FROEDTERT HEALTH, INC., THE BOARD
OF DIRECTORS OF FROEDTERT HEALTH,
INC., and FROEDTERT HEALTH, INC.
BENEFIT PLAN COMMITTEE,

      Defendants.

Case No. 2:20-cv-00893

Hon. Pamela Pepper

---

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

BACKGROUND .................................................................................................................. 2

ARGUMENT ....................................................................................................................... 5

I.      PLAINTIFF'S CLAIMS THAT DEFENDANTS BREACHED THEIR
FIDUCIARY DUTY OF PRUDENCE SHOULD BE DISMISSED (COUNTS I
AND II) ..................................................................................................................... 5

           1.     Plaintiff's Recordkeeping Fee Allegations Are Subject to
Dismissal ...................................................................................................... 6

                 a.     Plaintiff's allegations regarding Defendants' process fail to
state a claim for breach of the duty of prudence. ........................... 6

                 b.     Plaintiff's claims that the Plan's recordkeeping fees were
"excessive" or "unreasonable" are implausible and fail to
support a an inference of imprudence .......................................... 10

           2.     Plaintiff's Allegations Regarding the Plan's Investment Options
Are Subject to Dismissal ............................................................................ 14

                 a.     Plaintiff lacks standing to challenge investment options in
which he did not invest ................................................................ 15

                 b.     Plaintiff's challenge to the Plan's share classes fails to state
a claim ......................................................................................... 16

                 c.     Plaintiff's allegations that the Plan improperly included
actively-managed investments fail to state a claim....................... 20

                 d.     Plaintiff's allegations that the Plan improperly included
investment options that were more expensive than
purported comparators fails to state a claim ............................... 21

II.     PLAINTIFF'S "DUTY OF LOYALTY" CLAIMS LACKS ANY REQUISITE
FACTS (COUNTS I AND II) .................................................................................. 25

III.    PLAINTIFF'S DUTY OF DISCLOSURE CLAIMS SHOULD BE DISMISSED
(COUNTS I AND II) ............................................................................................... 25

IV.    PLAINTIFF'S CLAIMS AGAINST FROEDTERT AND THE FROEDTERT
DIRECTORS SHOULD BE DISMISSED (COUNTS I-IV) ......................................... 28

      A.    Plaintiff Fails to State a Duty of Prudence or Loyalty Claim Against
Froedtert or the Froedtert Directors (Counts I and II) ......................................... 28

      B.    Plaintiff Fails to State a Claim for Breach of the Duty to Monitor (Counts
III and IV) ............................................................................................................ 29

CONCLUSION .......................................................................................................... 30

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Amgen Inc. v. Harris*,
  136 S. Ct. 758 (2016) ........................................................................................5

*Ashcroft v. al-Kidd*,
  563 U.S. 731 (2011) ..........................................................................................2

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ...............................................................................4, 5, 7, 30

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ....................................................................................5, 8, 30

*Bilow v. Much Shelist Freed Denenberg Ament & Eiger, P.C.*,
  67 F. Supp. 2d 955 (N.D. Ill. 1999) ...............................................................16

*Braden v. Wal-Mart Stores, Inc.*,
  588 F.3d 585 (8th Cir. 2009) ...........................................................................5

*Daugherty v. Univ. of Chicago*,
  2017 WL 4227942 (N.D. Ill. Sept. 22, 2017) ...............................................24

*Davis v. Salesforce.com, Inc.*,
  2020 WL 5893405 (N.D. Cal. Oct. 5, 2020)...................................................22

*Davis v. Washington Univ. in St. Louis*,
  960 F.3d 478 (8th Cir. 2020) ..........................................................................20

*Del Castillo v. Cmty. Child Care Council of Santa Clara County, Inc.*,
  2019 WL 6841222 (N.D. Cal. Dec. 16, 2019) .................................................9

*Divane v. Northwestern Univ.*,
  953 F.3d 980 (7th Cir. 2020), *pet. for cert. filed sub nom. Hughes v.
  Northwestern Univ.*, No. 19-1401 (U.S. filed June 19, 2020) ........................ *passim*

*Ferguson v. Ruane Cunniff & Goldfarb, Inc.*,
  2019 WL 4466714 (S.D.N.Y. Sept. 18, 2019).................................................8

*Fifth Third Bancorp v. Dudenhoeffer*,
  573 U.S. 409 (2014)...........................................................................................4

*Hecker v. Deere & Co.*,
  496 F. Supp. 2d 967 (W.D. Wis. 2007) ..........................................................26

*Hecker v. Deere & Co.*,
556 F.3d 575 (7th Cir. 2009) .......................................................................... *passim*

*Howell v. Motorola, Inc.*,
633 F.3d 552 (7th Cir. 2011) ...................................................................................29

*Jacobs v. Verizon Communications, Inc.*,
2017 WL 8809714 (S.D.N.Y. Sept. 28, 2017)........................................................26

*Kannapien v. Quaker Oats Co.*,
507 F.3d 629 (7th Cir. 2007) ...............................................................................5, 27

*Kong v. Trader Joe's Company*,
2020 WL 5814102 (C.D. Cal Sept. 24, 2020) ...........................................................9

*Leber v. Citigroup 401(k) Plan Inv. Comm. (Leber II)*,
129 F. Supp. 3d 4 (S.D.N.Y. 2015) ...........................................................................6

*Leimkuehler v. American United Life Ins. Co.*,
713 F.3d 905 (7th Cir. 2013) ......................................................................18, 19, 22

*Lingis v. Motorola, Inc.*,
649 F. Supp. 2d 861 (N.D. Ill. 2009) ......................................................................29

*Loomis v. Exelon Corp.*,
658 F.3d 667 (7th Cir. 2011) .......................................................................... *passim*

*Marks v. Trader Joe's Co.*,
2020 WL 2504333 (C.D. Cal. Apr. 24, 2020) ......................................................9, 11

*Martin v. CareerBuilder, LLC*
2020 WL 3578022, at *4 (N.D. Ill. July 1, 2020).......................................... *passim*

*Meiners v. Wells Fargo & Co.*,
898 F.3d 820 (8th Cir. 2018) ............................................................................12, 22

*Neil v. Zell*,
677 F. Supp. 2d 1010 (N.D. Ill. 2009), *as amended* (Mar. 11, 2010).....................29

*Patterson v. Morgan Stanley*,
2019 WL 4934834 (S.D.N.Y. Oct. 7, 2019) ............................................................15

*Pegram v. Herdrich*,
530 U.S. 211 (2000)..................................................................................................28

*Ramos v. Banner Health*,
2020 WL 2553705 (D. Colo. May 20, 2020)...........................................................13

*Roth v. Sawyer-Cleator Lumber Co.*,
  16 F.3d 915 (8th Cir. 1994) ...................................................................................10

*Sacerdote v. New York Univ.*,
  2017 WL 3701482 (S.D.N.Y. Aug. 25, 2017) ........................................................25

*Sacerdote v. New York Univ.*,
  328 F. Supp. 3d 273 (S.D.N.Y. 2018) .................................................................7, 13

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016) ..........................................................................................15

*PBGC ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv.*
  *Mgmt. Inc.*,
  712 F.3d 705 (2d Cir. 2013) ....................................................................................5

*Terraza v. Safeway, Inc.*,
  241 F. Supp. 3d 1057 (N.D. Cal. 2017) ................................................................26

*Thole v. U.S. Bank N.A.*,
  140 S. Ct. 1615 (2020) .....................................................................................15, 16

*Troudt v. Oracle Corp.*,
  2019 WL 1006019 (D. Colo. Mar. 1, 2019) ............................................................9

*United Transp. Union v. Gateway W. Ry. Co.*,
  78 F.3d 1208 (7th Cir. 1996) .................................................................................15

*West Michigan Debt Collection, Inc. v. Weber*,
  2018 WL 454069 (N.D. Ill. January 17, 2018) ......................................................28

*White v. Chevron Corp.*,
  2016 WL 4502808 (N.D. Cal. Aug. 29, 2016) ..........................................7, 8, 11, 21

*White v. Chevron Corp.*,
  2017 WL 2352137 (N.D. Cal. May 31, 2017), aff'd, 752 F. App'x 453 (9th
  Cir. 2018) ..............................................................................................................18

*White v. Marshall & Ilsley Corp.*,
  714 F.3d 980 (7th Cir. 2013), *abrogated on other grounds by Fifth Third*
  *Bancorp v. Dudenhoeffer*, 573 U.S. 409 (2014) ..................................................17

*Wilcox v. Georgetown Univ.*,
  2019 WL 132281 (D.D.C. Jan. 8, 2019) ................................................................15

*Young v. Gen. Motors Inv. Mgmt. Corp.*,
  325 F. App'x 31 (2d Cir. 2009) .............................................................................13

Case 2:20-cv-00893-PP   Filed 10/26/20   Page 6 of 39   Document 23

**Statutes**

26 U.S.C. § 403(b) ................................................................................................2

29 U.S.C. § 1104(a)(1)(C) ..................................................................................21

29 U.S.C. § 1104(c) ............................................................................................25

ERISA ........................................................................................................ *passim*

**Other Authorities**

71 Fed. Reg. 41,392, 41, 393-94 (July 21, 2006) ........................................26

75 Fed. Reg. 64,910, 64,914 n.8 (Oct. 20, 2010) ........................................25

Dan M. McGill et al., *Fundamentals of Private Pensions* (8th ed. 2005) ..................20

Fed. R. Civ. P. 12(b)(1) ......................................................................................15

Fed. R. Civ. P. 12(b)(6) ........................................................................................4

Case 2:20-cv-00893-PP   Filed 10/26/20   Page 7 of 39   Document 23

Administration of a retirement plan is a complex undertaking that requires plan sponsors to coordinate the delivery of benefits to diverse workforces with thousands of employees. The ministerial and recordkeeping requirements associated with the administration of such plans are significant and require trained internal staff working in concert with multiple third-party service providers. Plan administration is made exponentially more complex by the fact that plan administrators are responsible for selecting, monitoring, and replacing the investment options available to plan participants, each of whom may have different investment objectives, risk tolerances, and investment strategies.

Recognizing the complexity involved in administering large defined-contribution retirement plans, and the difficulty inherent in accommodating the varying objectives and preferences of diverse groups of plan participants, the Seventh Circuit has time-and-again rejected attempts by individual participants to second-guess plan fiduciaries' administrative decisions and to impose their personal preferences on other participants. *See, e.g.*, *Divane v. Northwestern Univ.*, 953 F.3d 980 (7th Cir. 2020), *pet. for cert. filed sub nom. Hughes v. Northwestern Univ.*, No. 19-

---

[1] This is one of at least eleven virtually identical lawsuits filed by plaintiff's counsel since June. *See Albert v. Oshkosh Corp.*, 20-cv-901-WCG (E.D. Wis., filed June 16, 2020); *Soulek v. Costco Corp.*, No. 1:20-cv-937-WCG (E.D. Wis., filed June 23, 2020); *Cotter v. Matthews Int'l Corp.*, No. 1:20-cv-1054-WCG (E.D. Wis., filed July 13, 2020); *O'Driscoll v. Plexus Corp.*, No. 1:20-cv-1065-WCG (E.D. Wis., filed July 14, 2020); *Nohara v. Prevea Clinic, Inc.*, No. 2:20-cv-1079-LA (E.D. Wis., filed July 16, 2020); *Marvin v. Mercy Health Corp.*, No. 3:20-cv-50293 (N.D. Ill., filed Aug. 6, 2020); *Lange v. Infinity Healthcare Physicians, S.C.*, No. 3:20-cv-737 (W.D. Wis., filed Aug. 7, 2020); *Glick v. Thedacare, Inc.*, 1:20-cv-1236-WCG (E.D. Wis., filed Aug. 12, 2020); *Woznicki v. Aurora Health Care, Inc.*, No. 2:20-cv-1246-PP (E.D. Wis., filed Aug. 14, 2020) ; *Laabs v. Faith Technologies, Inc.*, No. 1:20-cv-01534 (E.D. Wis. filed Oct. 2, 2020); *Guyes v. Nestle USA, Inc.*, No. 20-cv-1560 (E.D. Wis. filed Oct. 9, 2020). Given that ERISA's standard of prudence requires that fiduciary conduct be judged by comparison to a person "acting in a like capacity" and engaged "in the conduct of an enterprise of a like character and with like aims," 29 U.S.C. § 1104(a)(1)(B), Plaintiff's counsel's widespread targeting of Wisconsin-based organizations' retirement plans undermines the plausibility of their claims.

1401 (U.S. filed June 19, 2020); *Loomis v. Exelon Corp.*, 658 F.3d 667 (7th Cir. 2011); *Hecker v. Deere & Co.*, 556 F.3d 575 (7th Cir. 2009).

None of Plaintiff's allegations break new ground and each has been squarely addressed and rejected by the Seventh Circuit and other courts. In light of the line of Seventh Circuit cases directly on point, Plaintiff Nitish S. Bangalore's ("Plaintiff") claims that Froedtert Health, Inc. ("Froedtert"), its Board of Directors ("Froedtert Directors"), and its Benefit Plan Committee ("Committee") (collectively "Defendants") could have taken different steps in administering the Froedtert Health, Inc. 403(b) Plan ("the Plan") must be dismissed. Plaintiff's claims against Froedtert and the Froedtert Directors must be dismissed for the further reason that none of Plaintiff's allegations plausibly claim that those Defendants had any fiduciary responsibility for the conduct complained of.

## BACKGROUND[2]

Plaintiff is a participant in the Plan, which is an individual account defined contribution plan organized under section 403(b) of the Internal Revenue Code, 26 U.S.C. § 403(b). ECF No. 19 ("Am. Compl."), ¶¶ 11, 26. So-called "403(b) plans" bear certain similarities to the more commonly known 401(k) plans, in that they both permit participants to choose how to invest their own retirement accounts, but the plans have different historical origins and are subject to different statutory and regulatory requirements.

The Plan's participants have individual accounts, which are funded through a combination of employee salary deferrals and employer contributions made by Froedtert. *Id.* ¶ 36. Participants

---

[2] Defendants' recitation of the factual background is based on the allegations in the Amended Complaint. Although numerous complaint allegations regarding the Plan and how it was administered are factually inaccurate, Defendants treat those allegations as true for the limited purpose of the instant motion. *Ashcroft v. al-Kidd*, 563 U.S. 731, 734, 742 (2011) (In evaluating "a motion to dismiss, [the court] accept[s] as true the factual allegations in [the] complaint.").

2

invest their accounts in one or more of the Plan's various investment options. *Id.* ¶¶ 62-65. Although certain investment options changed over the course of the class period, at any given time the Plan offered approximately 20 different investments. *Id.* ¶ 171, pp. 40-42; Ex. 1, 2014-2019 Form 5500 Annual Reports (Excerpts), at 14, 26, 41, 57, 87, 106. These investments included (i) approximately 15 mutual funds managed by a variety of fund providers, (ii) a "balanced fund" that invests in stocks and bonds, (iii) a "stable value fund" characterized by a guaranteed rate of return, and (iv) a full complement of "target date funds" (TDFs). *Id.* The Plan's investment lineup included funds that were actively managed, which means that an investment manager was actively trying to outperform a market or index, as well as funds that were passively managed, which attempt to track a market or index. *See, e.g.* Ex. 1, 2014-2019 Form 5500 Annual Reports (Excerpts), at 87, 105 (identifying various Vanguard index funds). The Plan offered funds providing access to large- and small-cap equities, and to foreign and domestic securities. *Id.* It also included multiple "low-cost" investment options, including some that charged less than 10 basis points (0.10%) per year. Ex. 2, 2019 Section 404(a)(5) Fee Disclosure, at 8-9.[3] Finally, throughout the class period, the Plan offered a self-directed brokerage account option for those participants who wanted the ability to invest in a wide array of funds that are not in the Plan's regular investment lineup. *See, e.g.,* Ex. 1, 2014-2019 Form 5500 Annual Reports (Excerpts), at 27, 42, 45, 59 (identifying Personal choice retirement accounts).

Although the Committee is the formal "plan administrator," (Am. Compl. ¶ 22), it outsourced a wide variety of administrative services necessary to operate the Plan to a third-party service provider or "recordkeeper." *Id.* ¶ 38. From 2014 to mid-2018, the Plan's recordkeeper was

---

[3] The Court can consider the investment disclosures provided to Plaintiff on a motion to dismiss because Plaintiff cites to and relies on them in the Amended Complaint. Am. Compl. ¶¶ 197-205. *See Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013).

Transamerica Retirement Solutions; since then, it has been Lincoln Financial Group. *Id.* ¶ 82. The service offerings of recordkeepers vary and plans "have the ability to customize the package of services they receive." ECF No. 1, Compl. ¶ 53. Recordkeepers are typically paid out of plan assets, rather than out of the general assets of the plan sponsor. Where the fees are paid out of plan assets, they are often paid pursuant to a "revenue sharing" arrangement, whereby the recordkeeper is paid a portion of the fees collected by the investment managers for the Plan's funds. Am. Compl. ¶¶ 49-53. Plaintiff's Amended Complaint contains various allegations regarding the mechanics of revenue sharing arrangements generally, but it does not allege facts regarding how ***the Plan*** actually paid for recordkeeping expenses or the Plan's specific fee arrangement.

In his Amended Complaint, Plaintiff asserts four separate claims for relief ("Counts"). In Count I, Plaintiff alleges that Defendants breached their fiduciary duties of loyalty and prudence with respect to the amount the Plan paid for recordkeeping services. *Id.* ¶¶ 218-29. In Count II, Plaintiff alleges that Defendants breached their fiduciary duties of loyalty and prudence with respect to the selection and review of the Plan's investment options. Plaintiff also alleges in Counts I and II that Defendants failed to properly disclose the Plan's recordkeeping fees and the expenses associated with each of the Plan's investment options.

Counts III and IV are ancillary to, and derivative of, Counts I and II. In Count III, Plaintiff alleges that Froedtert and the Froedtert Directors failed to fulfill their fiduciary duty to monitor the Committee with respect to the Committee's negotiation and review of the Plan's recordkeeping arrangement. In Count IV, Plaintiff alleges that Froedtert and the Froedtert Directors similarly failed to monitor the Committee with respect to the Committee's selection and review of investment options. For the reasons set forth below, Plaintiff has failed to plausibly allege that

Defendants breached any fiduciary duty under ERISA and the Amended Complaint should be dismissed with prejudice.

## ARGUMENT

In ERISA cases, a motion to dismiss is an "important mechanism for weeding out meritless claims" for fiduciary breach. *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 424 (2014). As elsewhere, a court should not "unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). Rather, to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a claim must be "plausible," meaning that it raises "more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679. In making that determination, the Court must accept well-pleaded allegations as true and draw reasonable inferences in the plaintiff's favor, but it "need not accept as true statements of law or unsupported conclusory factual allegations." *Divane*, 953 F.3d at 987. Although a plaintiff need not provide detailed factual allegations, mere conclusions and a "formulaic recitation of the elements of a cause of action" will not suffice. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## I. PLAINTIFF'S CLAIMS THAT DEFENDANTS BREACHED THEIR FIDUCIARY DUTY OF PRUDENCE SHOULD BE DISMISSED (COUNTS I AND II)

To state a claim for breach of fiduciary duty under ERISA, the plaintiff must plead and prove: "(1) that defendants are plan fiduciaries; (2) that defendants breached their fiduciary duties; and (3) that their breach caused harm to the plaintiff." *Kannapien v. Quaker Oats Co.*, 507 F.3d 629, 639 (7th Cir. 2007). When alleging a breach of the fiduciary duty of prudence specifically, a plaintiff "must plausibly allege action that was objectively unreasonable." *Divane*, 953 F.3d at 988. This requires him to show that "a prudent fiduciary in the same position could not have concluded that the alternative action would do more harm than good," that is, the path not taken must have been unambiguously better. *Id.* (quoting *Amgen Inc. v. Harris*, 136 S. Ct. 758, 760

(2016)). To meet this standard, the plaintiff must either (a) identify specific procedural deficiencies that deviated from industry standards (*i.e.*, "direct" allegations of imprudence) or (b) set forth well-pleaded "circumstantial factual allegations" from which the Court may "reasonably 'infer … that the process was flawed'" (*i.e.*, "circumstantial" allegations). *PBGC ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718, 727 (2d Cir. 2013) (quoting *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 596 (8th Cir. 2009)).

### 1. *Plaintiff's Recordkeeping Fee Allegations Are Subject to Dismissal*

Plaintiff's recordkeeping fee allegations fail to support a plausible breach of fiduciary duty claim. With respect to Plaintiff's "direct" allegations related to Defendants' process, Plaintiff's allegations are too vague and conclusory to support a well-pleaded claim, have been squarely rejected by binding Seventh Circuit precedent (not to mention the holdings of multiple other courts), and are incompatible with Plaintiff's own allegations showing Defendants were actively monitoring the recordkeeping arrangement and taking steps to control costs. Am. Compl. ¶ 82. As for Plaintiff's allegations that the Plan's fees were "excessive," the associated fee comparisons forming the basis for these allegations fail to support an inference of imprudence.[4]

#### a. Plaintiff's allegations regarding Defendants' process fail to state a claim for breach of the duty of prudence.

Despite spending paragraph after paragraph discussing the purported fiduciary standards governing the monitoring and negotiation of recordkeeping fees, Plaintiff's Amended Complaint once again fails to come close to pleading a viable breach of fiduciary duty claim based on Defendants' management of the Plan's recordkeeping arrangement. As was the case with

---

[4] Plaintiff's original complaint alleged that Defendants relied on a "revenue sharing" arrangement to pay recordkeeping fees and that this arrangement was imprudent because it resulted in excessive fees. Compl. ¶ 67. Although Plaintiff's Amended Complaint contains various allegations regarding different types of recordkeeping fee arrangements, it no longer contains any allegations regarding the type of arrangement the Plan used to pay fees, much less the prudence of any such arrangement.

Plaintiff's original complaint, Plaintiff's recordkeeping claim is premised almost entirely on vague, conclusory allegations that the Court should disregard. *Leber v. Citigroup 401(k) Plan Inv. Comm. (Leber II)*, 129 F. Supp. 3d 4, 14 (S.D.N.Y. 2015) ("To state a claim for breach of the fiduciary duty of prudence, the plaintiff must allege *non-conclusory* factual content raising a *plausible* inference of misconduct and may not rely on the vantage point of hindsight.").

In particular, without providing any factual support, Plaintiff simply concludes that Defendants "failed to regularly monitor the Plan's [recordkeeping] fees paid to covered service providers," (Am. Compl. ¶ 90), "failed to ensure that the Plan paid no more than a competitive reasonable fee for [recordkeeping] services," (*id.* ¶ 95), and "did not engage in any objectively reasonable and/or prudent efforts to ensure that the Plan paid no more than a competitive reasonable fee for [recordkeeping] services," (*id.* ¶ 97). These allegations, which merely claim Defendants' process *was* imprudent without explaining *why* or *how*, are too vague and conclusory to support a class-action lawsuit. Courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678-79.

To the extent Plaintiff's recordkeeping fee claim is premised on his allegation that Defendants *did nothing* to monitor the Plan's recordkeeping fees, that allegation cannot be reconciled with Plaintiff's admission that the Plan changed recordkeepers during the class period. Am. Compl. ¶ 82. As Plaintiff concedes, Defendants terminated the Plan's relationship with Transamerica and retained Lincoln National as the Plan's recordkeeper in 2018. *Id.* The process of transitioning a large retirement plan to a new recordkeeper is a complex undertaking and a substantial administrative feat. *See Sacerdote v. New York Univ.*, 328 F. Supp. 3d 273, 295-96 (S.D.N.Y. 2018) (discussing process of changing recordkeepers in a 403(b) plan as "complex and time-consuming"). The fact that Defendants undertook such a task in order to benefit the Plan's

participants is incompatible with Plaintiff's vague allegations that Defendants were inattentive or lax in monitoring the Plan's recordkeeping fees. *See, e.g.*, *White v. Chevron Corp.*, 2016 WL 4502808, at *14 (N.D. Cal. Aug. 29, 2016) (holding that changes to the plan's investments undercut the plausibility of allegations that fiduciaries were failing to monitor those investments).

Plaintiff's conclusory allegation that Defendants' process for monitoring recordkeeping fees was imprudent because "[d]efendants did not regularly solicit quotes and/or competitive bids from covered service providers" (Am. Compl. ¶ 99), similarly fails to support a plausible breach of fiduciary duty claim. As an initial matter, Plaintiff does not allege that Defendants *never* solicited quotes and/or competitive bids—clearly, Defendants must have engaged with the market when they evaluated and selected a new recordkeeper. Instead, he simply alleges that Defendants did not solicit quotes or bids "*regularly.*" *Id.* Without some "further factual enhancement," *Twombly*, 550 U.S. at 557, regarding how "regularly" fiduciaries are required to solicit quotes or bids, and how frequently Defendants engaged in this process, Plaintiff's allegations fail to raise a plausible inference that Defendants breached their fiduciary duties. *See Ferguson v. Ruane Cunniff & Goldfarb, Inc.*, 2019 WL 4466714, at *8 (S.D.N.Y. Sept. 18, 2019) ("Though Plaintiffs' allegation that the . . . Defendants did not seek competitive bids for Plan services is factual, it alone fails to give rise to a *reasonable* inference of imprudence.").

Putting aside the overly-vague nature of this allegation, Plaintiff's claim that Defendants failed to "regularly" solicit quotes and/or competitive bids fails for a more fundamental reason: Nothing in ERISA compels competitive bidding *at all,* much less at any particular interval. *Divane*, 953 F.3d at 990-91 (affirming dismissal of claim that defendants failed to solicit bids in an effort to find a lower-cost recordkeeper); *White*, 2016 WL 4502808, at *14 ("[N]othing in ERISA compels periodic competitive bidding."); *Ferguson*, 2019 WL 4466714, at *8 ("ERISA does not

require plan fiduciaries to obtain competitive bids from plan service providers."). Soliciting quotes or competitive bids (through a request for proposal process or otherwise) is just one way to monitor fees and negotiate a contract with a vendor. And, to the extent there is a fiduciary obligation to monitor recordkeeping fees, courts have held that plan fiduciaries have broad discretion with respect to the manner in which they fulfill this obligation. *Troudt v. Oracle Corp.*, 2019 WL 1006019, at *9 n.16 (D. Colo. Mar. 1, 2019) (holding that allegation that prudence requires regular RFPs "seems somewhat myopic" and that U.S. Department of Labor regulations regarding service provider disclosures were intended to "alleviate the need for plans to 'shop for services' at regular intervals simply to ensure that fees were reasonable"). Thus, the absence of competitive bidding or an RFP process, without more, does not support an inference of imprudence. *Divane*, 953 F.3d at 990; *accord Del Castillo v. Cmty. Child Care Council of Santa Clara County, Inc.*, 2019 WL 6841222, at *5 (N.D. Cal. Dec. 16, 2019) ("[the] absence of competitive bidding . . . without more, does not support Plaintiffs' allegations that the [defendants] acted imprudently"); *Marks v. Trader Joe's Co.*, 2020 WL 2504333, at *7 (C.D. Cal. Apr. 24, 2020) (same).

Even if there were a fiduciary obligation to "regularly solicit quotes and/or competitive bids" from other recordkeepers (which there is not), Plaintiff's complaint would still fail to state a cognizable claim because it does not plausibly allege facts supporting an inference that the Plan was harmed. For one, Plaintiff does not allege any facts sufficient to support a plausible inference that a competing recordkeeper would have submitted a bid to provide the same services the Plan received for less. *Divane*, 953 F.3d at 991; *Kong v. Trader Joe's Company*, 2020 WL 5814102, at *6 (C.D. Cal Sept. 24, 2020) ("Here, Plaintiffs have failed to allege any facts from which one could infer that a competitive bidding service would have benefited the Plan. Plaintiffs have failed to allege any facts showing that the same service might have been available on the market for less.");

738288640.12 26-Oct-20 18:02

*Troudt*, 2019 WL 1006019, at *9 n.16 (D. Colo. Mar. 1, 2019) (requiring proof that less costly alternatives were available); *Marks*, 2020 WL 2504333, at *7 ("Plaintiffs' Complaint simply recites legal conclusions, and does not allege any facts suggesting that the Plan fiduciaries could have obtained less-expensive recordkeeping services elsewhere through competitive bidding."). Although Plaintiff alleges that a small number of other plans paid lower recordkeeping fees by mischaracterizing their Form 5500 disclosures, as explained below, these allegations say nothing about what the Plan could have or should have paid for recordkeeping. *See infra,* at 10-13. And even if Plaintiff had plausibly alleged that a competing recordkeeper would have submitted a lower bid, the failure to spend the time and resources required to solicit and review such a bid would only have harmed the Plan if the bid was so far below what the Plan was paying that any reasonable fiduciary would have been compelled to transition the Plan's hundreds of millions of dollars and 13,000 participants to a new recordkeeper. *Divane*, 953 F.3d at 988 (explaining that a plaintiff must show that no hypothetical prudent fiduciary would have made the same choice as the defendant; *Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 919 (8th Cir. 1994) ("Even if a trustee failed to conduct an investigation before making a decision, he is insulated from liability if a hypothetical prudent fiduciary would have made the same decision anyway.").

          b.    <u>Plaintiff's claims that the Plan's recordkeeping fees were "excessive" or "unreasonable" are implausible and fail to support a an inference of imprudence</u>

Unable to plead a plausible fiduciary breach based on any direct procedural imprudence, Plaintiff relies on implausible circumstantial allegations that the Plan's average annual recordkeeping fee between 2014 and 2018 was "excessive" and "unreasonable." Am. Compl. ¶¶ 101-08. Putting aside Plaintiff's reliance on conclusory buzzwords such as "excessive" and "unreasonable," the factual bases for his claims are fundamentally flawed and his theory of fiduciary imprudence is deficient as a matter of law.

First, Plaintiff's allegations regarding the amount the Plan allegedly paid in recordkeeping both annually and on average from 2014 to 2018 are implausible. Although Plaintiff conceals the method by which he calculated the Plan's alleged fees in the Amended Complaint, they are irreconcilable with both the information contained in the Plan's annual reports filed with the U.S. Department of Labor (*i.e.*, Form 5500) *and* Plaintiff's allegations in his original complaint. For example, in Plaintiff's original complaint, he alleges that the Plan paid $49 per participant in 2014 for recordkeeping and administrative services. Compl. ¶ 62. This $49 figure is consistent with the fees disclosed in the Plan's 2014 Form 5500. *See* Ex. 1, 2014-2019 Form 5500 Annual Reports (Excerpts), at 2, 10 (disclosing fees of $494,838 and 10,141 participants). In the Amended Complaint, however, Plaintiff now inexplicably alleges that the Plan's recordkeeping fees in 2014 were nearly *three times* higher—$139.00 per participant. Am. Compl. ¶¶ 101-02.

With respect to 2018, Plaintiff's original complaint alleged the Plan paid $451,706, (Compl. ¶ 65), which equates to $36 per participant based on the number of participants in the Plan as of that year, (*see* Ex. 1, 2014-2019 Form 5500 Annual Reports (Excerpts), at 61, 77 (disclosing fees of $451,706 (paid to Lincoln and Transamerica combined) and 12,655 participants)), but Plaintiff now claims the Plan paid twice as much in 2018—$70 per participant. Am. Compl. ¶ 101. Given these inconsistencies and the inability to reconcile Plaintiff's Amended Complaint allegations with the Form 5500s upon which he purports to rely, Plaintiff's claim that the Plan's fees were "excessive" amounts to mere "guess-work" that cannot support a reasonable inference of imprudence. *Marks*, 2020 WL 2504333, at *6 ("Plaintiffs' guess that the Plan pays $140 per participant for recordkeeping fees has 'no factual basis,' and Plaintiffs admit they do not actually know how much the recordkeeping fees are."); *White*, 2016 WL 4502808, at *18 (same).

738288640.12 26-Oct-20 18:02

Even if Plaintiff's inflated recordkeeping fee allegations were accurate (and they are not) they would still fail to plausibly support a claim that they were sufficiently "excessive" so as to suggest that Defendants' process for monitoring recordkeeping fees was flawed. In fact, both the Seventh Circuit and its district courts have held that similarly-sized plans that paid significantly higher recordkeeping fees were reasonable as a matter of law. In *Divane*, for example, the Seventh Circuit held that fees **two to three times higher** than the fees alleged here did not support an inference of imprudence. *See Divane*, 953 F.3d at 984 (holding that an allegation that the plan paid between $153-$213 per participant failed to state a claim). Similarly, in *Martin v. CareerBuilder, LLC*, the Northern District of Illinois held that fees of between $131-$222 per participant were not unreasonable. *Martin*, 2020 WL 3578022, at *4. If recordkeeping fees ranging from $131-$222 are deemed reasonable, Plaintiff's inaccurate and inflated allegations that the Plan paid, on average, $77 per participant during the class period certainly cannot support a claim.

Finally, in an attempt to demonstrate that the Plan's fees were out of the ordinary and indicative of Defendants' imprudence, Plaintiff purports to compare the Plan's alleged recordkeeping fees with several other plans. Plaintiff's attempted comparison is fatally flawed in multiple respects.

First, in order for the alleged fees of Plaintiff's comparator plans to say anything about the reasonableness of the Plan's fees, Plaintiff must provide some factual basis upon which the Court can conclude that the comparators function as a "meaningful benchmark." *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 822 (8th Cir. 2018). On this front, all Plaintiff offers is the contention that the comparator plans were allegedly "of similar sizes with similar amounts of money under management." Am. Compl. ¶ 108. But so were *hundreds* of other plans.[5] Although plan size is one

---

[5] A search of the U.S. Department of Labor's employee benefits security database for 2018 Form 5500s filed for defined contribution plans with 9,000 - 15,000 participants and $100 million to $2 billion in

738288640.12 26-Oct-20 18:02

factor that may affect recordkeeping costs, it is far from the only factor. Recordkeeping fees necessarily vary based on the type of services requested by the plan, the quality of the services, the complexity of the plan, and countless other considerations. *Ramos v. Banner Health,* 2020 WL 2553705, at *20 (D. Colo. May 20, 2020) ("When selecting a recordkeeper, plans consider services, quality of those services, and price, and must take into account the unique characteristics and needs of the plan."); *Sacerdote*, 328 F. Supp. 3d 273, 299 n.55 (S.D.N.Y. 2018) (discussing fact that fiduciary's desire for a "high touch" service model justified higher recordkeeping fees). Without any allegation that the Plan was identical to the comparator plans in these and other material respects, the fees paid by those plans say nothing about the reasonableness of the fees paid by the Plan. *Hecker*, 569 F.3d at 711 (7th Cir. 2009) (denying petition for rehearing and affirming the dismissal of the excessive fee claims was appropriate because "the complaint is silent about the services . . . participants received"); *Young v. Gen. Motors Inv. Mgmt. Corp.*, 325 F. App'x 31, 33 (2d Cir. 2009) (affirming dismissal where plaintiffs "fail[ed] to allege that the fees were excessive relative to the services rendered").

Additionally, scrutinizing the method by which Plaintiff calculated the comparator plans' recordkeeping fees further demonstrates the Plan's fees were reasonable as a matter of law. In calculating the comparators' fees, Plaintiff relies solely on the amount of "direct compensation" paid to the comparator plans' recordkeeper as listed in Schedule C of the comparator plans' Form 5500s. Ex. 3, Form 5500 Annual Reports of Comparator Plans.[6] This figure does not account for

---

assets, which appears to be the range of assets and participants identified in Plaintiff's comparator chart, identifies over 500 additional plans that could serve as comparators. Ex. 6, EBSA Search Results Spreadsheet. *See also* EBSA Form 5500 Search Website, *available at,* https://5500search.dol.gov/ (allowing user to sort and filter benefit plan Form 5500 filings by, *inter alia*, participant and asset size, type of plan, and plan year).

[6] In calculating the per participant fee for each of the comparator plans, Plaintiff divides the "direct compensation" paid to the recordkeeper by the "number of participants with account balances as of the end of the plan year." These figures are highlighted in the example Form 5500 filings attached hereto as Exhibit 3. *See* Ex. 3, Form 5500 Annual Reports of Comparator Plans, at 3, 7, 23, 31, 49, 65.

fees those plans paid to other service providers retained to provide administrative services (*e.g.*, investment advisors, legal counsel, and audit firms) or any indirect compensation or revenue sharing received by the plan's recordkeeper. Although Plaintiff never reveals how he calculated the Plan's recordkeeping fees, he surely cannot state a claim by simply tallying the different fees allegedly paid by his cherry-picked comparator plans. Indeed, when the Plan's fees are calculated using the same methodology Plaintiff employed with respect to his comparators, the Plan's recordkeeping fees come to just $36 per participant,[7] which is well within the range of fees paid by the comparators ($28-$48 per year) and exactly what he claims a "reasonable" fee would have been. *See* Am. Compl. ¶ 104 (claiming a reasonable fee would have been "around $35 per participant").

### 2. *Plaintiff's Allegations Regarding the Plan's Investment Options Are Subject to Dismissal*

Plaintiff's claims related to Defendants' management and oversight of the Plan's investment lineup rely on the same three basic categories of allegations that were in his original complaint. First, Plaintiff alleges that Defendants breached their fiduciary duty of prudence with respect to the investment share classes they selected. Am. Compl. ¶¶ 128-167. Second, Plaintiff alleges that Defendants imprudently selected actively-managed funds instead of passively-managed alternatives. Am. Compl. ¶¶ 168, 178-79. Third, Plaintiff alleges that Defendants' investment lineup included certain investments that charged higher fees compared to similar or purportedly identical alternatives. Am. Compl. ¶¶ 171-73. Although Plaintiff has tweaked his allegations with respect to *why* including certain share classes, actively-managed funds, or "higher cost" investments in the Plan were imprudent, his Amended Complaint again ignores the fact that

---

[7] *See* Ex. 1, 2014-2019 Form 5500 Annual Reports (Excerpts), at 61, 77 (disclosing fees of $451,706 and 12,655 participants).

the Seventh Circuit has time-and-again refused to impose *any* bright-line rules on plan fiduciaries, much less Plaintiff's untenable proscriptions and preferences. As one court recently put it, the Seventh Circuit's decisions in *Divane*, *Loomis*, and *Hecker* represent "a line of Seventh Circuit cases preventing courts from paternalistically interfering with Plans' slates of funds." *Martin*, 2020 WL 3578022, at *3-4.

<blockquote>
a.    <u>Plaintiff lacks standing to challenge investment options in which he did not invest</u>
</blockquote>

As a threshold matter, Plaintiff's allegations with respect to the majority of the Plan's investment options identified in the Amended Complaint can be dismissed pursuant to Fed. R. Civ. P. 12(b)(1) for want of jurisdiction. For this Court to have jurisdiction over Plaintiff's claims, Plaintiff must demonstrate that he has Article III standing, which requires that he allege a particularized injury that would be redressed by the requested judicial relief. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016). Absent an individualized injury in fact, a plan participant cannot assert representative standing based on injuries to the plan. *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1620 (2020). Where a plaintiff challenges the prudence of investments included in a defined contribution plan, he can only plausibly allege a "particularized injury" with respect to those investments in his individual plan account. *Wilcox v. Georgetown Univ.*, 2019 WL 132281, at *8-10 (D.D.C. Jan. 8, 2019). ("Since Mr. Wilcox did not invest in the TIAA Real Estate Account, he has no standing to complain about its performance because he [] has no injury to show."); *Patterson v. Morgan Stanley*, 2019 WL 4934834, at *5 (S.D.N.Y. Oct. 7, 2019) ("Losses incurred by funds in which Plaintiffs did not invest cannot have impaired the value of Plaintiffs' individual accounts").

In the Amended Complaint, Plaintiff challenges nearly all of the Plan's investment options offered during the class period as imprudent for one reason or another. But Plaintiff personally

invested in just *eight* of the more than 30 investment options that he is now challenging.[8] For example, Plaintiff claims that every single one of the Plan's target date funds are imprudent, but he was not—and could not have been—injured by those funds because he never invested in any of them. *See* ECF No. 16-4, Plaintiff's Account Statements and Investment Allocations. Because the outcome of Plaintiff's challenge to the investment options that he never invested in will have no effect on the balance of his individual account, Plaintiff lacks Article III standing to challenge those investment options. *Thole*, 140 S. Ct. at 1622 ("Winning or losing this suit would not change the plaintiffs' monthly pension benefits. The plaintiffs have no concrete stake in this dispute and therefore lack Article III standing.").

        b.      <u>Plaintiff's challenge to the Plan's share classes fails to state a claim</u>

Although Plaintiff's Amended Complaint alleges that Defendants breached their duty of prudence by failing to select different share classes for certain of the Plan's investment options, Plaintiff's share class theory is fundamentally different from—and in fact, inconsistent with—with the theory in his original complaint. Whereas Plaintiff originally alleged that Defendants acted imprudently by failing to offer the share class with the *lowest* total cost to the Plan's participants, he now alleges that Defendants acted imprudently by not offering the share class with the lowest

---

[8] Specifically, Plaintiff's account statements show that he invested only in the following eight funds that are being challenged: Transamerica Money Market Account (TFGXX), Vanguard Institutional Index (VINIX), Columbia Small Cap Value Fund (NSVAX), American Funds EuroPacific Growth R5 Fund (RERGX), Metropolitan West Total Return Bond Fund (MWTIX), Fidelity Contrafund (FCNKX), TFLIC Guaranteed Pooled Fund, and Lincoln Stable Value Account. *Id.* "Such evidence [addressed to the jurisdictional question] is properly considered at the dismissal stage when the question raised is one of subject matter jurisdiction." *United Transp. Union v. Gateway W. Ry. Co.*, 78 F.3d 1208, 1210 (7th Cir. 1996); *Bilow v. Much Shelist Freed Denenberg Ament & Eiger, P.C.*, 67 F. Supp. 2d 955, 960 (N.D. Ill. 1999) ("[W]hen considering a motion to dismiss for lack of subject matter jurisdiction, we may entertain evidentiary materials addressed to the jurisdictional question.").

"Net Investment Expense to the Plan,"[9] regardless of that share class's total cost. Plaintiff's half-baked theory fails on multiple fronts.

As an initial matter, Plaintiff's about-face highlights the precarious position of plan administrators charged with balancing the divergent "best interests" of thousands of plan participants while simultaneously ensuring that a retirement plan is efficiently operated. For example, Plaintiff claimed in his original complaint that Defendants breached their duty of prudence by offering the Ivy Mid Cap Growth Fund (*Class I*) because its total expense ratio was 1.00%, whereas the Ivy Mid Cap Growth Fund (*Class N*) had a total expense ratio of 0.79%. Compl. ¶ 72. However, once Plaintiff learned upon seeing Defendants' motion to dismiss that the Plan ***did in fact*** offer the Ivy Mid Cap Growth Fund (*Class N*), Plaintiff dropped his theory that a fiduciary is required to offer the fund with the lowest expense ratio in favor of an entirely new argument. Specifically, Plaintiff now alleges that a fiduciary is required to compute the "Net Investment Expense to Plans" for all fund options and must choose the share class with the lowest net fee, even if the total fee is higher. As a result, Plaintiff now alleges that Defendants should have ***dropped*** Class N—which he previously said Defendants should have ***selected***— and replaced it with *Class Y*, which has the ***highest*** total expense ratio (1.19%) of the three share classes. Am. Compl. ¶¶ 136-37. Plaintiff's shifting allegations highlight the fiduciary tightrope plan administrators are required to traverse and why the Seventh Circuit has instructed that fiduciaries must not be seated "on a razor's edge" by the courts when making decisions regarding plan

---

[9] Plaintiff's "Net Investment Fee to Retirement Plans" is a concept/metric of his own creation. This is not a figure contained in any fee disclosures or investment prospectuses. Although not entirely clear from Plaintiff's allegations, the "Net Investment Expense to Retirement Plans" appears to be equal to the total expense ratio of a share class less any portion of that total expense ratio that is allocated to revenue sharing. Am. Compl. ¶¶ 136-37.

738288640.12 26-Oct-20 18:02

administration. *White v. Marshall & Ilsley Corp.*, 714 F.3d 980, 987 (7th Cir. 2013), *abrogated on other grounds by Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409 (2014).

In light of the complexity inherent in choosing share classes and the various considerations that are relevant to that decision, the Seventh Circuit has consistently rejected plaintiffs' claims challenging the types of share classes selected. *See Loomis*, 658 F.3d at 671-72; *Divane*, 2018 WL 2388118, at *3 (observing that "retail expense ratios" often "cover record-keeping" costs), *aff'd*, 953 F.3d 980; *Martin*, 2020 WL 3578022, at *4 ("*Divane* clarified that a fund's failure to invest in institutional as opposed to retail funds does not give rise to an inference of imprudence when a plan offers cheaper alternatives."). Other courts have followed suit. *See White v. Chevron Corp.*, 2017 WL 2352137, at *14 (N.D. Cal. May 31, 2017), aff'd, 752 F. App'x 453 (9th Cir. 2018) ("[A]mple authority holds that merely alleging that a plan offered retail rather than institutional share classes is insufficient to carry a claim for fiduciary breach.").

The decision as to whether a particular share class's fee structure is appropriate for a particular retirement plan is a matter that courts have determined is best left to the discretion of the plan fiduciaries responsible for administration of the plan as a whole rather than individual plan participants with divergent interests and little insight into the plan's administrative requirements. *See Leimkuehler v. American United Life Ins. Co.*, 713 F.3d 905, 912 (7th Cir. 2013) ("True, some share classes are more expensive than others, but the cheapest option may not inevitably be the best option. There is also no particular reason to think [the defendants] would not seek to make up the revenue it missed by offering cheaper share classes by charging higher direct fees[.]"). As Plaintiff's shifting theory itself demonstrates, whether a particular share class (or investment generally) is appropriate depends on a variety of factors and does not lend itself to hard-and-fast rules. What might initially appear to be the best option may not be so when other

18

factors, such as the availability and timing of revenue credits and restrictions on fund availability, are taken into account. *See Divane*, 953 F.3d at 989 (holding that plaintiffs cannot state a breach of fiduciary duty claim by merely "criticiz[ing] what may be a rational decision for a business to make [] when implementing an employee benefits program").

Even if the Court were to entertain Plaintiff's effort to second-guess Defendants' share class decisions, the theory Plaintiff advances is premised on multiple unfounded assumptions. First, Plaintiff's contention that the most appropriate share class in every instance is the share class with the lowest "Net Investment Expense to Retirement Plans," assumes that any and all revenue sharing associated with a share class is necessarily credited back to the Plan's participants, rather than used to compensate the recordkeeper. Am. Compl. ¶¶ 49-53. Plaintiff tellingly fails to offer any factual support for this completely baseless assumption; an assumption that the Seventh Circuit has suggested is unfounded. *See Leimkuehler*, 713 F.3d at 912 (noting that if a recordkeeper forgoes revenue sharing, it will make up for the lost revenue by imposing direct fees). As Plaintiff himself acknowledges, revenue sharing payments are fees collected by the investment fund manager that are passed on to the Plan's recordkeeper to cover the cost of administering the Plan. Am. Compl. ¶ 51. Thus, the existence of a lower "Net Investment Expense to the Plan" would not result in lower costs for participants absent a separate agreement to that effect. As is the case with most investment funds and share classes, the total expense ratio is what matters to participants, not differences among the various components of the expense ratio, such as the amount allocated to revenue sharing. *Hecker*, 556 F.3d at 586 ("The total fee, not the internal, post-collection distribution of the fee, is the critical figure for someone interested in the cost.").

Second, Plaintiff's novel argument that the prudent share class is always the one with the lowest "Net Investment Fee to the Plans" ignores the fact that many share classes have additional

fee components beyond the investment management fee and revenue sharing fees. Using the American Beacon Large Cap Value Fund as an example, (Am. Compl. ¶¶ 136-37), the "Class A" share class Plaintiff prefers has a "Net Investment Expense to the Plans" that is 0.03% lower than the "Investor" share class the Plan offered, but the Class A shares also include a sales charge of up to 5.75% and a "Distribution and/or Service (12b-1) Fee" of 0.25%. Ex. 4, American Beacon Large Cap Value Prospectus, at 7. By contrast, the "Investor" share class did not include either of those charges. Thus, Plaintiff's unsupported assertions that certain share classes have the lowest cost to participants fail to consider all of the relevant fees and cannot support an inference that Defendants acted imprudently by not choosing the share classes preferred by Plaintiff.

c.     <u>Plaintiff's allegations that the Plan improperly included actively-managed investments fail to state a claim</u>

Plaintiff's Amended Complaint repeats his claim from the original complaint that Defendants breached their fiduciary duties by offering actively-managed investment options over passively-managed alternatives. Am. Compl. ¶¶ 168, 178-79. As discussed in Defendants' first motion to dismiss, this claim is foreclosed by binding Seventh Circuit precedent. *See Loomis*, 658 F.3d at 673 (holding that actively-managed investments are appropriate options to include in investment lineup); *accord Divane v. Northwestern Univ.*, 2018 WL 2388118, at *6 (N.D. Ill. May 25, 2018), *aff'd*, 953 F.3d 980. It is well established that actively-managed and passively-managed investments "have different aims, different risks, and different potential rewards that cater to different investors." *Martin v. CareerBuilder, LLC*, 2020 WL 3578022, at *4 (N.D. Ill. July 1, 2020) (*citing Davis v. Washington Univ. in St. Louis*, 960 F.3d 478, 485 (8th Cir. 2020)). While Plaintiff apparently believes that passive management is always preferred, "analysts continue to debate whether active or passive management is a better approach." *See Davis*, 960 F.3d at 485 (citing Dan M. McGill et al., *Fundamentals of Private Pensions*, 788–89 (8th ed. 2005)). The

20

Seventh Circuit has likewise recognized that the relative prudence of active versus passive management is far from clear.

For this reason, the Seventh Circuit has rejected claims that including particular investment options or investment strategies, such as an active-management strategy, in a fund lineup is evidence of imprudence. *Loomis*, 658 F.3d at 670-73. For the courts to pass judgment on the most appropriate investment strategy for retirees at the behest of an individual participant would be "paternalistic." *Martin*, 2020 WL 3578022, at *3-4. Instead, the Seventh Circuit has appropriately focused on whether the plan "offer[s] a . . . mix of investments," *Hecker*, 566 F.3d at 586, and whether the investments span a "range of investment options" at different levels of costs, *Divane*, 953 F.3d at 992. Not only does such an approach better reflect the fiduciary duties explicitly enumerated by ERISA, *see* 29 U.S.C. § 1104(a)(1)(C) ("[A] fiduciary shall discharge his duties with respect to a plan . . . by diversifying the investments of the plan so as to minimize the risk of large losses"), but where an investment lineup includes a range of options, participants cannot reasonably claim the inclusion of certain purportedly imprudent alternatives caused them harm. *Divane*, 953 F.3d at 991 ("[T]he types of funds plaintiffs wanted (low-cost index funds) were and are available to them, eliminating any claim that plan participants were forced to stomach an unappetizing menu.") (internal citation omitted). As further explained below, (*infra*, at 23-24), the Plan offered such a "mix" and "range" of investments.

        d.    <u>Plaintiff's allegations that the Plan improperly included investment options that were more expensive than purported comparators fails to state a claim</u>

Finally, Plaintiff alleges that Defendants imprudently managed the Plan's investment lineup by comparing the costs of certain of the Plan's investment options to those of purportedly prudent "lower cost" alternatives. Plaintiffs' conclusory allegations fail to plausibly state a claim.

First, the Seventh Circuit has repeatedly refused to infer that a defendant acted imprudently simply because certain investment options ***could*** have been swapped out for lower-cost alternatives. As the Seventh Circuit explained in *Hecker*, and later affirmed in *Loomis* and *Divane*, when evaluating the prudence of a plan fiduciary, the fact that some investment options could have been replaced with lower-cost alternatives is "beside the point." *Hecker*, 556 F.3d at 586. What matters is how the investment lineup as a whole, and the process used to select and monitor those investments, compares to that of similarly-situated fiduciaries, all of whom "have latitude to value investment features other than price (and, indeed, are required to do so)." *White*, 2016 WL 4502808, at *10. As the Seventh Circuit has explained, "nothing in ERISA requires [a] fiduciary to scour the market to find and offer the cheapest possible fund (which might, of course, be plagued by other problems)." *Hecker*, 556 F.3d at 586. *See also Meiners*, 898 F.3d at 823-24 ("[T]he existence of a cheaper fund does not mean that a particular fund is too expensive *in the market generally* or that it is otherwise an imprudent choice."). Against this controlling legal backdrop, Plaintiff's challenge to the Plan's investment fees rings hollow.

Second, Plaintiff's cost comparisons fail to support an inference that Defendants' process for selecting and monitoring investment options was imprudent because Plaintiff fails to provide any nonconclusory allegations suggesting that the purportedly prudent alternatives are "meaningful benchmark[s]." *Meiners*, 898 F.3d at 822. For one, each of the alternatives Plaintiff identifies are index funds, which Plaintiff improperly compares to actively-managed investment options. As discussed above, passively-managed and actively-managed investments "have different aims, different risks, and different potential rewards that cater to different investors." *Martin*, 2020 WL 3578022, at *4. In light of such differences, "allegations that passively managed funds are available as alternatives to actively managed funds . . . do not suffice to demonstrate

imprudence." *See Davis v. Salesforce.com, Inc.*, 2020 WL 5893405, *3 (N.D. Cal. Oct. 5, 2020). In addition, each of the purportedly prudent alternatives that Plaintiff identifies are institutional class shares, which provide no revenue sharing to the recordkeeper to cover the Plan's recordkeeping costs. Had Defendants selected each of these investment options, the recordkeeper would have likely imposed direct charges on participants' accounts, thereby eliminating any cost savings associated with the purportedly prudent alternatives identified by Plaintiff. *See Leimkuehler*, 713 F.3d at 912 ("True, some share classes are more expensive than others, but the cheapest option may not inevitably be the best option. There is also no particular reason to think [the defendants] would not seek to make up the revenue it missed by offering cheaper share classes by charging higher direct fees[.]"). Finally, Plaintiff tellingly does not allege anything with respect to the performance of the lower-cost alternatives relative to the Plan's investment options. Certainly, the retention of allegedly higher cost investments over lower cost alternatives is not indicative of an imprudent decision-making process when the net investment returns (*i.e.*, investment returns net of fees) of the former consistently and significantly outperformed those of the latter.[10]

Third, Plaintiff's challenge of the Plan's allegedly "high fee" investments also fails given the prudent range of investment alternatives available in the Plan. *See Loomis*, 658 F.3d at 670 (discussing *Hecker* and noting that, "[b]y offering a wide range of options . . . Deere's plan

---

[10] Although evaluating the comparative performance of two investments necessarily depends upon the time period compared and the point in time in which the comparison is made, a number of the allegedly imprudent investment options offered by the Plan consistently and significantly outperformed Plaintiff's alleged lower-cost "prudent" alternatives. For example, as of the most recent prospectus, the T. Rowe Price 2015 Fund (TRRGX) had 1-year, 5-year, and 10-year returns of 17.40%, 6.35%, and 7.86%, respectively. The Vanguard Target Retirement 2015 Fund (VTXVX) proposed by Plaintiff, by contrast, had 1-year, 5-year, and 10-year returns of just 14.81%, 5.59%, and 7.25%. *See* Ex. 7, 2019 Fund Prospectuses, at 10 (T. Rowe Price performance), 25 (Vanguard performance). An investment of $10,000 in the Plan's T. Rowe Price fund in 2010 would have grown to $20,711, whereas an identical investment in the alternative Vanguard fund identified by Plaintiff would be worth just $19,753.

complied with ERISA's fiduciary duties."). As discussed above, the Plan offered over a dozen mutual funds, a stable value fund, a money market fund, and a full complement of target date funds. *See supra*, at 2-3. The Plan's lineup included investment options with fees below 0.10% per year as well as multiple index or passively-managed options. *Id.* In addition, the Plan's participants had access to hundreds of other investments through a self-directed brokerage account. *Id.* The Seventh Circuit has repeatedly held that investment lineups strikingly similar to the Plan's are incompatible with an inference of imprudence. *See Divane*, 953 F.3d at 992 (decision to include actively-managed funds alongside index funds was not evidence of imprudence); *Loomis*, 658 F.3d at 673-74 (fiduciary does not act imprudently by providing a range of options and then "leav[ing] choice to the people who have the most interest in the outcome"); *Hecker*, 556 F.3d at 586 (no breach of fiduciary duty where plan participants could choose to invest in 26 investment options and more than 2,500 mutual funds through a brokerage window). If Plaintiff had wanted to invest in only "low cost" funds—as appears to be his preference based on his complaint allegations—he had multiple options to choose from and was not "forced to stomach an unappetizing menu." *Divane*, 953 F.3d at 991.

All told, given the myriad differences between the Plan's funds and Plaintiff's alleged alternatives, along with the availability of "low cost" investment options to the Plan's participants, there is no basis upon which to conclude that the fee differentials Plaintiff identifies are attributable to Defendant's imprudence, as opposed to the result of rational decision-making regarding how to construct a diversified investment line-up. *Divane*, 953 F.3d at 989 ("Rather than compare Northwestern's actions to those of a 'hypothetical prudent fiduciary,' plaintiffs criticize what may be a rational decision for a business to make (and, indeed, several do) when implementing an employee benefits program.").

## II. PLAINTIFF'S "DUTY OF LOYALTY" CLAIMS LACKS ANY REQUISITE FACTS (COUNTS I AND II)

The Court should also dismiss Counts I and II of the Amended Complaint to the extent it they are premised on a purported violation of ERISA's duty of loyalty. It is well established that ERISA's duty of loyalty is separate and distinct from the duty of prudence, and allegations related to the latter cannot be repackaged and repleaded under the guise of the former. *See Martin*, 2020 WL 3578022, at *6 (collecting cases). To state a plausible breach of the duty of loyalty, a plaintiff must set forth separate and distinct allegations of actual self-dealing or disloyal conduct. *See*, *e.g.*, *Loomis*, 658 F.3d at 671 (dismissing duty of loyalty claim where complaint failed to allege facts sufficient to support showing that defendant selected investments "to enrich itself at participants' expense"); *Martin*, 2020 WL 3578022, at *6 (same); *Daugherty v. Univ. of Chicago*, 2017 WL 4227942, at *9 (N.D. Ill. Sept. 22, 2017) (same). Plaintiff's Amended Complaint is devoid of any allegation that Defendants engaged in self-dealing or conduct that was intended to benefit anyone other than the Plan's beneficiaries. Because Plaintiff's duty of loyalty claim merely piggybacks on his allegations of imprudence, it should be dismissed. *See Sacerdote v. New York Univ.*, 2017 WL 3701482, at *5 (S.D.N.Y. Aug. 25, 2017) ("[A] plaintiff must do more than simply recast purported breaches of the duty of prudence as disloyal acts.").

## III. PLAINTIFF'S DUTY OF DISCLOSURE CLAIMS SHOULD BE DISMISSED (COUNTS I AND II)

Plaintiff's Amended Complaint also tacks on a new claim that Defendants allegedly breached their fiduciary duties by purportedly failing to properly disclose various fee components and other information related to the services provided to by recordkeepers. Am. Compl. ¶¶ 197-208. Specifically, Plaintiff alleges that Defendants failed to disclose "the fees charged to Participants," a "description of what services are provided to warrant these fees," the manner in which "the fee charged to the participant was calculated," the "revenue sharing rate" for each

investment option, and the amount of any revenue sharing payments that were credited back to the Plan. *Id.*. Without this information, Plaintiff alleges that he was unable to make "informed decisions" regarding his investment options. *Id.* ¶ 200. Plaintiff's disclosure claim ignores the law.

As an initial matter, Plaintiff's non-disclosure claim neglects the fact that ERISA contains various specific requirements regarding the fee information that plan administrators are required to disclose to plan participants. *See* 29 U.S.C. § 1104(c). These provisions do not require Defendants to disclose the specific information Plaintiff is seeking. For example, the Department of Labor has explained that "administrative charges do not need to be broken out into service-by-service detail on the quarterly statement." *See* 75 Fed. Reg. 64,910, 64,914 n.8 (Oct. 20, 2010). Furthermore, although regulations have been proposed that would require disclosure of revenue sharing, *see* 71 Fed. Reg. 41,392, 41, 393-94 (July 21, 2006), these regulations were not adopted. *See Hecker v. Deere & Co.*, 496 F. Supp. 2d 967, 973 (W.D. Wis. 2007) (discussing proposed regulatory changes to include revenue sharing disclosures). Plaintiff cannot expand the scope of ERISA's disclosure scheme by simply reframing the alleged non-disclosures as fiduciary breaches. *Id.*

In addition, Plaintiff's claim that Defendants' failure to disclose the various fee components constitutes a breach of fiduciary duty has been rejected by the Seventh Circuit. In *Hecker*, the Seventh Circuit addressed allegations indistinguishable from Plaintiff's allegations here. Specifically, the plaintiffs in *Hecker* claimed that the defendants breached their fiduciary duties by not disclosing the revenue sharing arrangement used to compensate the Plan's recordkeeper, the amount of those revenue sharing payments, or how those payments were calculated. *Hecker*, 556 F.3d at 585. In dismissing the plaintiffs' claims, the Seventh Circuit held that this information was not material and did not need to be disclosed because all that mattered

was the total fee amount, not how those fees would be allocated and distributed. *Hecker*, 556 F.3d at 586 ("The total fee, not the internal, post-collection distribution of the fee, is the critical figure for someone interested in the cost."). Other courts have correctly followed suit and held that participants are not entitled to a particular "breakdown" of plan fees. *See Terraza v. Safeway, Inc.*, 241 F. Supp. 3d 1057, 1073 (N.D. Cal. 2017) ("Nor are fiduciaries . . . required to disclose the 'breakdown' of the gross expense ratio associated with each investment option—e.g. the percentage of the total fee that ultimately goes to the trustee as opposed to the record-keeper"), *Jacobs v. Verizon Communications, Inc.*, 2017 WL 8809714, at *12 (S.D.N.Y. Sept. 28, 2017) (holding that plan administrator "need not itemize or identify the specific plan administrative expenses being paid from the total annual operating expenses").

Finally, in addition to having no fiduciary obligation to provide Plaintiff the fee "breakdown" that he now demands, Plaintiff has also failed to plausibly allege any harm as a result of the non-disclosure. *Kannapien*, 507 F.3d at 639 (holding that plaintiff must allege a breach that **caused** actual harm). Plaintiff does not allege that he suffered any losses as a result of not having the information Defendants allegedly failed to disclose, nor does Plaintiff allege that he relied on the allegedly incomplete disclosures when he made his investment decisions. Indeed, Plaintiff alleged in his original complaint that ***someone else*** chose his investments for him. Compl. ¶ 94 ("Plaintiff did not individually select funds for his 403(b) Plan, but instead selected an approach based on risk and then his portfolio was constructed by Defendants, with the help of the recordkeeper and/or consultants."). Because Plaintiff has not, and cannot, allege a legally cognizable harm attributable to Defendants' purported lack of disclosure (that is, he cannot allege he actually relied on the allegedly deficient disclosures when choosing investments), his disclosure claims must be dismissed.

27

## IV. PLAINTIFF'S CLAIMS AGAINST FROEDTERT AND THE FROEDTERT DIRECTORS SHOULD BE DISMISSED (COUNTS I-IV)

Each of Plaintiff's claims against Froedtert and the Froedtert Directors should be dismissed in their entirety. With respect to Counts I and II, which, as discussed above, allege breaches of the fiduciary duty of prudence and duty of loyalty, Plaintiff does not and cannot adequately plead that Froedtert or the Froedtert Directors were fiduciaries with respect to the alleged conduct. As for Counts III and IV, which allege that Froedtert and the Froedtert Directors failed to fulfill their duty to monitor, Plaintiff fails to set forth nonconclusory allegations regarding any specific monitoring failure.

### A. Plaintiff Fails to State a Duty of Prudence or Loyalty Claim Against Froedtert or the Froedtert Directors (Counts I and II)

In order to state a breach of fiduciary duty claim, a plaintiff must plead facts sufficient to support a finding that the defendant was acting as a fiduciary with respect to the conduct alleged. *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000) ("In every case charging breach of ERISA fiduciary duty, . . . the threshold question is . . . whether [the defendant] was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint."). Here, Plaintiff does not plead any facts related to the actions of either Froedtert or the Froedtert Directors beyond alleging that Froedtert is the plan sponsor and that it acted through the Froedtert Directors. Am. Compl. ¶ 19. Plaintiff instead relies on vague and general allegations that "Defendants" breached their fiduciary duties with respect to the review of the recordkeeping arrangement and selection of investment options. *Id.* ¶¶ 222-26. Such group pleading allegations, which fail to distinguish between any of the three defendant-entities, cannot state a plausible claim with respect to the fiduciary status of Froedtert or the Froedtert Directors. *West Michigan Debt Collection, Inc. v. Weber*, 2018 WL 454069, at *3 (N.D. Ill. January 17, 2018) (dismissing claim where defendants

were simply "lumped together" and plaintiff did not allege any specific wrongdoing by any particular defendant).

Plaintiff is also ***unable to*** plausibly allege that Froedtert or the Froedtert Directors were acting as fiduciaries with respect to monitoring the recordkeeping fees or selecting the investment options, because the plan document expressly delegated responsibility for those actions to the Committee. Specifically, the plan document delegates "responsibil[ity] for the administration and operation of the Plan" to the Plan Administrator, which under the Plan's adoption agreement is the Committee. <u>Ex. 5</u>, 2018 Plan Document and Adoption Agreement, at 19, 121. Because an ERISA fiduciary is permitted to delegate responsibility for plan administration to third-parties, and is not liable for the manner in which they fulfill those responsibilities, *Lingis v. Motorola, Inc.*, 649 F. Supp. 2d 861, 881-82 (N.D. Ill. 2009), Plaintiff cannot plausibly allege that Froedtert or the Froedtert Directors were fiduciaries with respect to the conduct set forth in Counts I or II.

### B. <u>Plaintiff Fails to State a Claim for Breach of the Duty to Monitor (Counts III and IV)</u>

Finally, Plaintiff has failed to plausibly allege that Froedtert or the Froedtert Directors breached their duty to monitor. As a threshold matter, it is settled law that an ERISA duty to monitor claim is derivative of a fiduciary breach claim. Without an underlying breach by the agent or appointee subject to monitoring, there can be no failure to monitor. *Howell v. Motorola, Inc.*, 633 F.3d 552, 572-73 (7th Cir. 2011); *Martin*, 2020 WL 3578022, at *6. Because Plaintiff has failed to plausibly allege any actionable breach of fiduciary duty, *see supra,* his duty to monitor claim necessarily fails.

Even assuming Plaintiff could plead an actionable breach of fiduciary duty—he cannot— his failure to monitor claim should still be dismissed. As the Seventh Circuit has explained, a plan fiduciary does not violate its duty to monitor simply because it failed to prevent an alleged breach

of fiduciary duty. *Howell*, 633 F.3d at 573 (explaining that the duty to monitor does not "require every appointing Board member to review all business decisions of Plan administrators"). Rather, a monitoring fiduciary must simply exercise the appropriate degree of oversight warranted under the circumstances. *Id.* Thus, to state a valid monitoring claim, a plaintiff must identify some defect in the monitoring process and show that the defect resulted in harm. Vague allegations "only in the most general terms that the [defendants] breached their duty to monitor" fail to state a claim. *Neil v. Zell*, 677 F. Supp. 2d 1010, 1024 (N.D. Ill. 2009), *as amended* (Mar. 11, 2010).

Plaintiff fails to plead any facts in the Amended Complaint plausibly suggesting a deficient monitoring process or any resulting harm. Plaintiff simply alleges that "Defendants" (apparently, Froedtert Health and the Froedtert Directors) had the authority to appoint and remove members of the Committee and a duty to monitor their performance. Am. Compl. ¶ 252. He then alleges in conclusory fashion—and without proffering any well-pleaded facts—that Defendants "[f]ail[ed] to monitor and evaluate the performance of the [Committee] or have a system in place for doing so," and "[f]ail[ed] to monitor the process by which Plan recordkeepers were evaluated." Am. Compl. ¶¶ 248, 255. Such allegations, which simply recite the basic elements of a duty to monitor claim, fail to satisfy *Twombly* and *Iqbal* and must be dismissed.

## CONCLUSION

For the above reasons, Plaintiff has failed to plausibly allege any legally cognizable claim against Defendants. Because Plaintiff has already had the opportunity to amend his complaint in response to Defendants' original motion to dismiss, this Court should dismiss the Amended Complaint with prejudice.

Dated: October 26, 2020

Respectfully submitted,

*/s/ Nancy G. Ross*

Nancy G. Ross
Brian D. Netter
Richard E. Nowak
Mayer Brown LLP
71 South Wacker Drive
Chicago, Illinois 60606
(312) 782-0600
nross@mayerbrown.com
bnetter@mayerbrown.com
rnowak@mayerbrown.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on October 26, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which shall send notification of such filing to all counsel of record.

*/s/ Nancy G. Ross*
Nancy G. Ross
