UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

NITISH S. BANGALORE,

   Plaintiff,

             Case No. 20-cv-893-pp

  v.

FROEDTERT HEALTH, INC.,
THE BOARD OF DIRECTORS OF FROEDTERT HEALTH, INC.,
and FROEDTERT HEALTH, INC. BENEFIT PLAN COMMITTEE,

   Defendants.

---

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION TO DISMISS SECOND AMENDED COMPLAINT (DKT. NO. 81)**

---

On June 12, 2020, the plaintiff filed a class action complaint alleging
that the defendants had committed certain ERISA violations, including
breaches of the duty of loyalty and prudence and failure to monitor other
fiduciaries. Dkt. No. 1 at ¶4. The defendants moved to dismiss the complaint.
Dkt. No. 15. In lieu of filing a response, the plaintiff filed an amended
complaint, dkt. no. 19, which the defendants moved to dismiss, dkt. no. 22.
The court denied that motion without prejudice due to the Supreme Court's
intervening decision in Hughes v. Northwestern University, 595 U.S. 170
(2022); the Hughes Court had disapproved of a Seventh Circuit case upon
which both parties heavily relied in their briefing. Dkt. No. 41 at 3.

The defendants filed another motion to dismiss the amended complaint,
this one addressing the impact of the Hughes decision. Dkt. No. 45. After the

1

parties had briefed the renewed motion, the plaintiff moved to filed a second amended complaint based on the Seventh Circuit's decision in <u>Albert v. Oshkosh Corp.</u>, 47 F.4th 570 (7th Cir. 2022), which the plaintiff stated mandated new pleading guidance in light of <u>Hughes</u>. Dkt. No. 53 at 2. The plaintiff then withdrew that motion, dkt. no. 64, and filed a *second* motion for leave to file a second amended complaint, dkt. no. 65. The plaintiff stated this change was necessary because of the Seventh Circuit's decision in <u>Hughes</u> on remand, 63 F.4th 615 (7th Cir. 2023) (<u>Hughes II</u>), which the plaintiff argued "largely superseded" <u>Albert</u>. Dkt. No. 65 at ¶6. The court granted the plaintiff leave to amend his complaint. Dkt. No. 77.

The second amended complaint raises two duty of prudence claims and two derivative claims for failure to monitor plan fiduciaries regarding plan recordkeeping and investment management fees. Dkt. No. 78 at ¶5. On May 15, 2024, the defendants filed a motion to dismiss the second amended complaint with prejudice under Fed. R. Civ. P. 12(b)(1) and (b)(6). Dkt. No. 81. The defendants' motion has been fully briefed since July 16, 2024. Dkt. Nos. 82 (initial brief), 84 (opposition brief), 85 (reply brief). The defendants also filed two notices of supplemental authority from other courts ruling on motions to dismiss similar claims. Dkt. Nos. 86, 88.

The court held a hearing on January 7, 2025, at which it heard oral argument on the defendants' motion. Dkt. No. 87. After considering the briefing and oral argument, the court will grant in part and deny in part the defendants' motion to dismiss.

## I.    Factual Background

The following allegations are contained in the plaintiff's second amended complaint. Dkt. No. 78. The plaintiff was a participant in defendant Froedtert Health, Inc.'s (Froedtert) 403(b) defined contribution retirement plan. Id. at ¶¶1–2. Froedtert is the plan's fiduciary and has assigned the plan's administrative duties to the defendant Benefit Plan Committee and its members. Id. at ¶4. The plaintiff alleges that the defendants had a duty of prudence to plan participants, including the duty to regularly review the plan's funds to determine whether they are a "prudent investment" as well as to incur only reasonable costs and fees. Id. at ¶¶9, 11-12. The plaintiff alleges that the defendants have violated their duty of prudence by incurring excessive recordkeeping and administrative fees, failing to remove their high-cost recordkeepers and offering "needlessly expensive investment options." Id. at ¶¶16-17.

The second amended complaint alleges that Froedtert operates multiple hospitals and health centers throughout the Midwest. Id. at ¶36. The plaintiff alleges that Froedtert acted through its officers, including the defendant Board of Directors, and appointed the Benefit Plan Committee as administrator of its 403(b) plan. Id. at ¶¶37-38. The plaintiff worked for Froedtert West Bend Hospital—a subsidiary of Froedtert—from 2010 to 2020. Id. at ¶29. During that time, he participated in the defendants' plan. Id. at ¶¶29-30. The plaintiff seeks to represent a class of other participants in the defendants' plan "beginning six

3

years before the commencement of this action and running through the date of judgment," a class of an estimated 16,000 members. Id. at ¶¶ 142–43.

The plaintiff alleges that in 2021 there were approximately 15,969 participants in the defendants' plan, with $1,599,122,679 in assets under management. Id. at ¶41. The plaintiff alleges based on publicly available Form 5500 filings, that in 2021 the defendants' plan had more participants than 99.91% of other defined contribution plans and more assets than 99.89% of other defined contribution plans. Id. According to the plaintiff, this makes the defendants' plan a "mega 401(k) plan." Id. at ¶34 (defining "mega plans" as those with "more than $500 million in assets"). The plaintiff alleges that this means the defendants had "substantial bargaining power" regarding recordkeeping fees, but he asserts that the defendants failed to take advantage of this power to lower fees for participants or prudently monitor investment options. Id. at ¶40.

The plaintiff alleges that mega 401(k) plans like the defendants' hire a "recordkeeper" to provide various services to the plan. Id. at ¶43. He alleges that "[t]here are numerous recordkeepers in the marketplace who are *equally* capable of providing a high level of service" to the defendants' plan. Id. at ¶44 (emphasis in original). The plaintiff identifies three types of services provided by all recordkeepers: "Bundled RKA (recordkeeping and administrative)" services, "A La Carte services" and "Ad Hoc fees." Id. at ¶¶46–47, 53, 55. The plaintiff alleges that "Bundled RKA" services include recordkeeping, transaction processing, administrative services, participant communications, maintenance

4

of an employer stock fund, plan document services, plan consulting services, accounting and audit services, compliance support and testing and trustee/custodian services. Id. at ¶47. "A La Carte services" have "separate, additional fees" based on the individual plan participant's usage. Id. at ¶53. These services include loan processing, brokerage services/account maintenance, distribution services and processing qualified domestic relations orders. Id. "Ad Hoc" fees include transaction fees and "other administrative fees" incurred by the plan. Id. at ¶55. The plaintiff states that the combination of these three sets of fees equals what he calls the "total RKA fees." Id. at 57.

According to the plaintiff, recordkeeping services are "commoditized" and "essentially fungible" such that the distinguishing factor in the marketplace between recordkeepers is price. Id. at ¶¶50–52. The plaintiff alleges that the Bundled RKA fee rate is the primary consideration when plan administrators compare fees to select a recordkeeper. Id. at ¶60.

The plaintiff alleges that the defendants had a duty to engage in an "independent evaluation" of their recordkeeper's pricing, to solicit competitive bids to determine if the current recordkeeping fees are reasonable and to change recordkeepers if the fees are unreasonable. Id. at ¶¶73–74, 76, 82. The plaintiff alleges that the defendants failed to do this. Id. at ¶¶84–85. The second amended complaint alleges that the defendants improperly waited four years to replace their recordkeeper, Transamerica, due to the unreasonable recordkeeping fees charged from 2014 to 2018. Id. at ¶89. In addition, the second amended complaint alleges that Lincoln Financial, the defendants'

5

recordkeeper chosen to replace Transamerica in 2018, also has been charging unreasonable recordkeeping fees and itself should have been replaced. Id. at ¶90.

The plaintiff compares the defendants' recordkeeping fees to the recordkeeping fees incurred by allegedly "comparable plans of similar mega sizes with similar amounts of money under management." Id. at ¶91. The plaintiff asserts that the defendants' recordkeeping fees, which he places at an estimated $110 per participant in 2021, were unreasonable when compared with the recordkeeping fees of comparable plans, which ranged from $25 to $46 per participant in 2021. Id. at ¶¶87, 91. After plotting these data points on a chart, the plaintiff argues that based on the comparator plans' fees, a "reasonable fee" for the plan would have been $33 per participant in 2021. Id. at ¶94, 98.

The plaintiff alleges that the defendants' plan charged an average of $49 more per participant than it should have over the class period, a 141% increase over the "reasonable fee." Id. at ¶99. He claims that over the class period, this cost plan participants over $5 million in "unreasonable and excessive" fees. Id. at ¶103. This correlates to an overall loss of $7 million "when accounting for compounding percentages/lost market investment opportunity." Id. at ¶104. The plaintiff alleges that the defendants must have failed to conduct competitive bidding for recordkeeping services, failed to negotiate lower fees or failed to change to a cheaper recordkeeper to avoid incurring these unreasonable fees. Id. at ¶¶107-108.

Turning to investment management, the plaintiff alleges that plan fiduciaries have a "continuing and regular responsibility to select and monitor all investment options they make available to Plan participants." Id. at ¶69. The plaintiff alleges that the "primary emphasis" regarding the selection of investment options is "the skill of the portfolio manager;" he asserts that the fiduciary must consider whether the portfolio manager is "likely to outperform an appropriate benchmark." Id. at ¶72. The plaintiff alleges that the fiduciaries also must consider the fees associated with the particular fund and portfolio manager. Id. at ¶¶116-17. According to the plaintiff, "[f]unds with high fees on average perform worse than less expensive funds." Id. at ¶120. The plaintiff identifies several "prudent alternative investments" that he says the defendants could have made available to plan participants that were less expensive and provided equivalent or superior returns during the class period. Id. at ¶¶125-27. The plaintiff claims that the investment options selected by the defendants were 805.71% more expensive than the alternative options proposed. Id. at ¶129. He alleges that the defendants must have failed to engage in an objectively reasonable process when selecting funds, failed to evaluate the cost of services of portfolio managers and failed to consider similar but less costly investment options. Id. at ¶¶130, 135, 137.

The plaintiff brings four claims against the defendants on behalf of the putative class of plan participants. First, the plaintiff alleges that the defendants breached their duty of prudence by failing to ensure that the plan's recordkeeping fees were reasonable and by failing to monitor and evaluate their

recordkeeper's performance. Id. at ¶¶155–57. Second, the plaintiff alleges that the defendants breached their duty of prudence by failing to ensure that the plan's investment options and associated fees were reasonable. Id. at ¶¶167–71. Third, the plaintiff alleges that Froedtert and the Board failed to adequately monitor and evaluate the Plan Committee responsible for selecting the plan's recordkeeper and monitoring associated recordkeeping fees. Id. at ¶178. Fourth, the plaintiff alleges that Froedtert and the Board failed to adequately monitor and evaluate the Plan Committee responsible for selecting the plan's investment funds and monitoring associated investment management fees. Id. at ¶185.

The plaintiff seeks a declaratory judgment that the defendants breached their fiduciary duties as well as an order requiring the defendants to restore all losses the plan incurred due to their breach and disgorge any profits received from the breach. He also seeks an injunction preventing the defendants from committing further breaches of fiduciary duty, and attorneys' fees and costs. Id. at 39–40.

## II.    Legal Standards

The defendants have moved to dismiss the second amended complaint under both Fed. R. Civ. P. 12(b)(1) and 12(b)(6). Rule 12(b)(1) allows a defendant to assert the defense of lack of subject-matter jurisdiction by motion. A motion to dismiss under Rule 12(b)(1) tests the jurisdictional sufficiency of the complaint. Bultasa Buddhist Temple of Chi. v. Nielsen, 878 F.3d 570, 573 (7th Cir. 2017). In evaluating a challenge to subject-matter jurisdiction, the

court first must determine whether the movant has raised a factual or a facial challenge. Silha v. ACT, Inc., 807 F.3d 169, 173 (7th Cir. 2015). A factual challenge contends that "there is in fact no subject matter jurisdiction," even if the pleadings are formally sufficient. Id. (internal quotation and citation omitted). In reviewing a factual challenge, the court may look beyond the pleadings and view any evidence submitted to determine if subject-matter jurisdiction exists. Id. In contrast, a facial challenge argues that the plaintiff has not sufficiently "alleged a basis of subject matter jurisdiction." Id. (internal quotation and citation omitted). In reviewing a facial challenge, "the court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the plaintiff." Id.

Federal courts "have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." Arbaugh v. Y&H Corp., 546 U.S. 500, 501 (2006) (citing Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 583 (1999)). And because subject-matter jurisdiction involves a federal court's power to decide a case, "it 'can never be forfeited or waived.'" Id. (quoting United States v. Cotton, 535 U.S. 625, 630 (2002)). See also Ware v. Best Buy Stores, L.P., 6 F.4th 726, 731 (7th Cir. 2021) ("'Subject-matter jurisdiction is the first issue in any case[,]' Miller v. Southwest Airlines Co., 926 F.3d 898, 902 (7th Cir. 2019)" and "'we have an independent obligation to determine that jurisdictional requirements are satisfied[,]' Knopick v. Jayco, Inc., 895 F.3d 525, 528 (7th Cir. 2018).").

9

Rule 12(b)(6) allows a party to assert by motion that the complaint fails to state a claim upon which a federal court can grant relief. "A Rule 12(b)(6) motion tests 'the legal sufficiency of the complaint,' as measured against the standards of Rule 8(a)." Gunn v. Cont'l Cas. Co., 968 F.3d 802, 806 (7th Cir. 2020) (quoting Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind., 786 F.3d 510, 526 (7th Cir. 2015)). A complaint need not include detailed factual allegations, but it must "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim is facially plausible if it "pleads factual content that allows the court to draw the reasonable inference that the defendants is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 556). In ruling on a Rule 12(b)(6) motion, the court takes "all the factual allegations in the complaint as true," Ashcroft v. Iqbal, 556 U.S. 662 (2009), and draws all reasonable inferences in the plaintiff's favor, Roberts v. City of Chicago, 817 F.3d 561, 564 (7th Cir. 2016).

To state a claim for a breach of the duty of prudence under ERISA, the plaintiff must allege "(1) that the defendant[s] [are] a plan fiduciary; (2) that the defendant[s] breached [their] fiduciary duty; and (3) that the breach resulted in harm to the plaintiff." Albert, 47 F.4th at 579 (quoting Allen v. GreatBanc Tr. Co., 835 F.3d 670, 678 (7th Cir. 2016)). To plead breach, "a plaintiff must plausibly allege fiduciary decisions outside a range of reasonableness." Hughes II, 63 F.4th at 630. "How wide that range of reasonableness is will depend on 'the circumstances . . . prevailing' at the time the fiduciary acts." Id. (quoting

Fifth Third Bancorp v. Dudenhoeffer, 573 U.S. 409, 425 (2014)). Where unreasonable recordkeeping fees serve as the basis of a claim of breach, the plaintiff must plead plausible facts showing that the defendants "incurred unreasonable recordkeeping fees and failed to take actions that would have reduced such fees." Id. at 631.

## III. Analysis

In their motion, the defendants advance several arguments: (1) the comparator plans identified in the complaint are not sufficiently comparable in size and assets to the defendants' plan; (2) the plaintiff failed to allege that the comparator plans received materially similar recordkeeping services as the defendants' plan; (3) the complaint compares only a *subset* of fees charged by the comparator plans to the *total* fees charged by the defendants' plan; (4) the complaint makes only conclusory allegations that the defendants' process of selecting a recordkeeper was imprudent; (5) the complaint identifies inapposite comparator funds to support the plaintiff's excessive investment management fees claim; (6) there are no allegations support a claim against Froedtert or the Board of Directors; (7) the derivative failure to monitor claims must be dismissed if the duty of prudence claims are dismissed; and (8) the plaintiff lacks standing to pursue injunctive relief. Dkt. No. 82.

A. Excessive Recordkeeping Fees

1. *Parties' Arguments*

The defendants argue that the court must dismiss the second amended complaint because the comparator plans the plaintiff has identified are not

sufficiently comparable to the defendants' plan to serve as a meaningful benchmark of reasonable recordkeeping fees. Dkt. No. 82 at 17. The defendants point to recent district court decisions finding that comparator plans identified in the complaint were too different from the defendants' plan in number of participants or assets under management. Id. at 17–18 (citing Mator v. Wesco Distrib. Inc., Case No. 21-CV-403, 2022 WL 3566108, at *8 (W.D. Pa. Aug. 18, 2022), vacated and remanded, 102 F.4th 172 (3d Cir. 2024); Probst v. Eli Lilly & Co., Case No. 22-CV-1106, 2023 WL 1782611, at *11 (S.D. Ind. Feb. 3, 2023); Laabs v. Faith Techs., Inc., Case No. 20-CV-1534, 2023 WL 9321358, at *6 (E.D. Wis. Aug. 30, 2023), report and recommendation adopted, 2024 WL 218418 (E.D. Wis. Jan. 19, 2024)). The defendants argue that in Laabs, the court rejected comparators where the largest plan "had nearly eleven-and-a-half times as many participants as the smallest plan." Id. at 18 (quoting Laabs, 2023 WL 9321358, at *6). According to the defendants, the comparator plans here are substantially different enough in terms of participants and assets that they are not comparable to the defendants' plan. Id. at 18-19. The defendants argue that the court must dismiss the second amended complaint because absent a meaningful benchmark from comparator plans, there are no allegations supporting an inference that the defendants' recordkeeping fees were unreasonable. Id. at 19.

Next, the defendants argue that the plaintiff has not sufficiently alleged that the recordkeeping fees were excessive "relative to the services rendered." Id. at 20 (quoting Hughes II, 63 F.4th at 631–32). The second amended

complaint alleges that recordkeeping services are "fungible" and essentially standardized; the defendants argue that the plaintiff must explain how the quality and type of recordkeeping services provided by the defendants' recordkeepers and those of the comparator plans are of the same level and quality. Id. at 21–22. The defendants contend that conclusory allegations that such services are fungible are insufficient. Id. (citing Mateya v. Cook Grp. Inc., Case No. 22-CV-1271, 2023 WL 4608536, at *3 (S.D. Ind. June 16, 2023); Lard v. Marmon Holdings, Inc., Case No. 22-CV-4332, 2023 WL 6198805, at *4 (N.D. Ill. 2009)). Pointing to the publicly available Form 5500 for each comparator plan, which the defendants attached to their motion to dismiss, the defendants claim that the coding on those forms shows that the recordkeepers for the comparator plans provided a different suite of recordkeeping services than the defendants' recordkeepers. Id. at 23-24.

The defendants also take issue with how the plaintiff has calculated the recordkeeping fees identified in the second amended complaint. Id. at 24. The defendants argue that the plaintiff "fails to explain how exactly his estimates of recordkeeping fees are derived, such as whether they included direct fees, indirect asset-based fees, or both," and allege that he compares fees over different time periods. Id. at 24-25. The defendants reason that the plaintiff is not making a "like-to-like comparison" of recordkeeping fees sufficient to "support an inference of imprudence. Id. at 26 (citing Fritton v. Taylor Corp., Case No. 22-CV-415, 2022 WL 17584416, at *5–8 (D. Minn. Dec. 12, 2022)). The defendants take issue with the fact that the plaintiff's calculations have

varied from the original complaint to the first amended complaint and now the second amended complaint, suggesting that the calculations are not mathematically reliable over time. Id. at 27.

The defendants also argue that Hughes II requires the plaintiff to identify specific facts in the complaint supporting his claims that the defendants did not monitor recordkeeping fees, timely negotiate lower fees or solicit bids from other recordkeepers. Id. at 29. They argue that the plaintiff's allegations are undermined by the fact that the defendants switched to a new recordkeeper in the middle of the putative class period, suggesting that the defendants did engage in some kind of review process. Id. at 29-30.

The plaintiff responds that because the defendants' plan has more participants and assets than 99.91% of other defined-contribution plans, finding comparator plans is exceptionally difficult. Dkt. No. 84 at 16. According to the plaintiff, setting too high a standard for comparators would create a pleading hurdle for both exceptionally large and exceptionally small plans. Id. The plaintiff contends that unlike in Laabs and another case from this district, Guyes v. Nestle USA, Inc., Case No. 20-CV-1560, 2023 WL 9321363 (E.D. Wis. Aug. 23, 2023), report and recommendation adopted, 2024 WL 218420 (E.D. Wis. Jan. 19, 2024), where the differential in size was much greater, he has provided "relatively close matches given the Plan's exceptional size." Id. at 16–17 (quoting Dionicio v. U.S. Bancorp, Case No. 23-CV-26, 2024 WL 1216519, at *3 (D. Minn. Mar. 21, 2024)). The plaintiff argues that the comparator plans

14

are among the "closest 0.17%" to the defendants' plan based on publicly available data. Id. at 17.

The plaintiff argues that he sufficiently has alleged that the recordkeeping fees charged were excessive compared to the services rendered. Id. at 18. He contends that he need not identify the particular services used by the defendants' plan and the comparator plans. Id. at 19 (quoting Guyes, 2023 WL 9321363, at *4). The plaintiff asserts that his allegations that each recordkeeper's services are fungible and commoditized are sufficient to establish what the other plans' recordkeeping fees are for comparable services. Id. at 19–20.

The plaintiff also argues that he relied not on Form 5500 disclosures, but §404(a)(5) participant disclosure forms. Id. at 20. The plaintiff says that the calculations the defendants draw from the Form 5500 disclosures are not the calculations that support his claims in the second amended complaint. Id. at 20–21. The plaintiff argues that the proper data source (Form 5500 or §404(a)(5) disclosures) is a factual dispute that cannot be resolved on a motion to dismiss. Id. at 18 n.7 (citing Mazza v. Pactiv Evergreen Servs. Inc., Case No. 22-CV-5052, 2023 WL 3558156, at *4 (N.D. Ill. May 18, 2023)). The plaintiff argues that if the court accepts as true his allegations that all recordkeepers provide basically the same services and yet the defendants paid "unreasonably" higher fees than comparable plans, he has sufficiently plead facts to infer that the defendants violated their duty of prudence. Id. at 22.

At oral argument, both parties addressed this court's recent decision in Shaw v. Quad/Graphics Inc., No. 20-cv-1645, Dkt. No. 56, (E.D. Wis.) (transcript of oral ruling), which addressed similar recordkeeping claims. The defendants distinguished Shaw, arguing that the defendant in Shaw was paying "substantially" more for recordkeeping fees than the comparators in that case—about four times more. Dkt. No. 89 (audio of motion hearing). The defendants argue that in the instant case, the difference in average fees is much smaller. Focusing on plan years 2014 through 2016, they assert that the second amended complaint alleges that the defendants paid $54 to $57 for recordkeeping. Id. (citing Dkt. No. 78 at ¶87). Looking at the plan participants for those years, the defendants point to four of the plaintiff's comparators that are closest in size. Id. (citing Dkt. No. 78 at ¶91). The defendants argue that they were paying only an approximate twenty-five percent premium based on that comparison. Id. The defendants argue that there is no inference that the defendants acted imprudently in selecting their recordkeeper or exercised discretion outside the range of reasonableness. Id. The defendants also contend that the difference in size between the comparator plans and the defendant plan in Shaw is much smaller than that same difference in this case. Id.

The plaintiff responded that Shaw is "100% on point." Id. The plaintiff argues that the allegations in the second amended complaint in this case are "very similar" to the allegations in Shaw, compelling a similar result. Id. The plaintiff argues that the difference in participant size between the comparators

16

and the defendant plan in Shaw was a difference of three times in size, which is the same as the difference here. Id.

      2.   *Analysis*

The plaintiff may create an inference of unreasonable fees by pleading examples of comparator plans with lower recordkeeping fees. Hughes II, 63 F.4th at 632. The defendants' first argument challenges whether the plans cited by the plaintiff are actually comparable to their own plan. The court finds at the pleading stage that the plans are sufficiently comparable to the defendants' plan.

The largest plan, the Nissan Employee 401(k) Plan, has about three times the participants of the smallest plan, the Kirkland & Ellis LLP Defined Contribution 401(k) Savings Plan. In Albert, the Seventh Circuit approved a set of comparator plans where the total participants ranged from 10,000 to 16,000, a 1.6 times difference in total participants. Albert, 47 F.4th at 579. But other courts in this circuit have accepted comparator plans where the largest plan was up to three times larger than the smallest plan in terms of total participants. Glick v. ThedaCare, Inc., Case No. 20-CV-1236, 2023 WL 9327209, at *3, 6 (E.D. Wis. July 20, 2023), report and recommendation adopted, 2024 WL 233370 (E.D. Wis. Jan. 22, 2024) (largest plan three times larger than smallest plan); Russell v. Ill. Tool Works, Inc., Case No. 22-CV-2492, 2024 WL 2892837, at *2 (N.D. Ill. June 10, 2024) (two times larger). By way of comparison, the courts in Guyes and Laabs rejected plans where the largest plan was more than six times and eleven and a half times larger

17

respectively than the smallest plan in participant size. Guyes, 2023 WL 9321363, at *5; Laabs, 2023 WL 9321358, at *6; see also Cotter v. Matthews Int'l Corp., Case No. 20-CV-1054, 2023 WL 9321285, at *5 (E.D. Wis. Aug. 9, 2023), report and recommendation adopted, 2024 WL 218417 (E.D. Wis. Jan. 19, 2024) (rejecting comparators where the largest plan was nineteen times larger than the smallest plan).

Turning to the amount of assets under management, the comparator plan with the most assets, the Phillips 66 Savings Plan, has nine and a half times the assets of the smallest plan, the Cornerstone Building Brands 401(k) Profit Sharing Plan. The Albert court approved a set of comparator plans where the total assets ranged from $355 million to $2.1 billion, a six times difference in total asset size. 47 F.4th at 579. Other courts have approved even greater differences in asset size. Glick, 2023 WL 9327209, at *3, 6 (largest plan had eleven times more assets under management than smallest plan); Remied v. NorthShore Univ. HealthSystem, Case No. 22-CV-2578, 2024 WL 3251331, at *9 (N.D. Ill. July 1, 2024) (254 times larger).

The comparator plans listed in the second amended complaint are sufficiently comparable in terms of both participant size and assets under management, especially given the plaintiff's allegations in the second amended complaint that in 2021, the defendants' plan was larger than 99.91% of all defined contribution plans in the United States. Taking that allegation as true (as the court must at the pleadings stage), it would be relatively difficult to find plans even closer in size and assets under management to the defendants'

18

plan. The complaint sufficiently identifies comparable plans with lower recordkeeping fees than the defendants' plan.

This is consistent with this court's decision in <u>Shaw</u>. No. 20-cv-1645, Dkt. No. 56. There, the court compared the allegations in the complaint to <u>Albert</u> and other district court cases in this circuit and found that the ranges of participant size and assets under management between the defendant's plan and the comparator plans listed there were sufficiently comparable. <u>Id.</u> at 25–29. The largest plan in <u>Shaw</u> had nearly double the participants of the smallest plan; the court determined that decisions in the Seventh Circuit had approved comparator plans where the largest plan was up to three times larger. <u>Id.</u> at 25–26. Here, the largest comparator plan is about three times larger than the smallest comparator plan in terms of participants, within the range of reasonableness the court identified in <u>Shaw</u>. Turning to assets, the court accepted comparators where the largest plan had about six times more assets under management than the smallest plan, as other courts in this circuit approved comparators with up to a 254 times difference in asset size. <u>Id.</u> at 27–28 (citing <u>Remied</u>, 2024 WL 3251331, at *9). The nine and a half times difference here is within the range of reasonableness identified in <u>Shaw</u>.

Regarding the defendants' arguments about the plaintiff's calculation of the recordkeeping fees, it is not appropriate for the court to consider disputes over the plaintiff's calculations and their source documents on a motion to dismiss. The defendants attached to their motion a 210-page appendix of materials, arguing that because the plaintiff had referenced the data contained

19

in those documents, the documents could be considered on a motion to dismiss as "central" to the complaint. Although the Seventh Circuit has held that the court may consider similar documents on a motion to dismiss without converting the motion to one for summary judgment, Hecker v. Deere & Co., 556 F.3d 575, 582–83 (7th Cir. 2009), as the court hinted during oral argument, it is not convinced that the motion to dismiss stage is the proper time to weed through those documents to check the plaintiff's math. See Twombly, 550 U.S. at 556 ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable."). Other courts in this circuit have rejected attacks on the plaintiff's calculations of recordkeeping fees at the motion to dismiss stage. Tolomeo v. R.R. Donnelley & Sons, Case No. 20-CV-7158, 2023 WL 3455301 (N.D. Ill. May 15, 2023) (rejecting challenge to calculation of comparator plan's fees based on which services were included in the calculation as improper at the pleading stage); Lucero v. Credit Union Ret. Plan Ass'n, Case No. 22-CV-208, 2023 WL 2424787, at *4–5 (W.D. Wis. Mar. 9, 2023) (same); see also Glick, 2023 WL 9327209 at *5–6 (rejecting challenge to the plaintiff's inconsistent inclusion of indirect compensation when calculating recordkeeping fees). This court itself previously rejected consideration of such an appendix in Shaw. No. 20-cv-1645, Dkt. No. 56 at 20–23.

Here, the complaint alleges that the bundled RKA fees paid by the comparator plans were for "a materially identical level and quality of Bundled RKA services" as the defendants' plan received. Dkt. No. 40-1 at ¶84. To pick

through the Form 5500s submitted by the defendants at this stage to question whether the plaintiff included the exact fees paid by the defendants and the comparator plans for the exact same services would equate to the court considering the truth of the allegations in the second amended complaint. The court must accept the plaintiff's allegations as true at this stage of the proceedings. The court must accept that the fees paid by the comparator plans were for services that were "materially the same level and quality" as the services the defendants' plan received. Id. at ¶85. Whether that is in fact the case will be determined at a later stage in the litigation.

The defendants' arguments at the motion hearing are also unavailing. They attempted to compare their average recordkeeping fees from 2014 to 2016 with the comparator funds' average recordkeeping fees in 2021 to argue that the defendants were not paying substantially higher recordkeeping fees. This is an apples to oranges comparison. It is not clear if recordkeeping fees on average were consistent between 2014 and 2021 or if there were other factors such as inflation or the number of recordkeepers in the marketplace influencing how much a plan might pay its recordkeeper. And even if the defendants' plan was paying a reasonable fee in 2017, that is irrelevant to whether the defendants were paying a reasonable fee between then and 2021. Comparing only the fees paid in 2021 (the only year for which the court has the comparator plans' recordkeeping fees), the defendants paid a recordkeeping fee between 2.3 and 4.4 times higher than every comparator fund. The court is satisfied that at the pleading stage, this supports the plaintiff's allegation that

21

defendants' plan recordkeeping fees were "substantially" higher than the comparator plans' fees.

Because the complaint asserts that recordkeeping services are fungible and that the comparator plans received services of a materially identical level and quality, the higher fees paid by the defendants for the same services creates an inference of unreasonableness. Hughes II, 63 F.4th at 633 (plaintiff sufficiently alleged that defendants breached of the duty of prudence where comparator plans with lower recordkeeping fees demonstrated that "the market is competitive with equally capable recordkeepers who can provide comparable services for less"). The additional factual allegations that the defendants demand regarding the defendants' process are not required at this stage of the litigation. An allegation that the defendants paid higher fees for the same services is enough to create an inference of imprudence at the pleading stage. Id. at 632–33.

The plaintiff has sufficiently plead his claim for breach of the duty of prudence based on excessive recordkeeping fees. The court will deny the defendants' motion to dismiss Count I of the second amended complaint.

B.  Excessive Investment Management Fees

1.  *Parties' Arguments*

Turning to the plaintiff's excessive investment management fees claim, the defendants argue that the mere existence of lower-cost investment options is insufficient to establish a claim of imprudence. Dkt. No. 82 at 30 (citing Hecker, 556 F.3d at 586). The defendants argue that the plaintiff must show

22

that the cheaper funds have comparable qualities such as "similar operations or investment strategies." Id. (quoting Bekker v. Neuberger Berman Grp., Case No. 16-CV-6123, 2018 WL 4636841, at *7 (S.D.N.Y. Sept. 27, 2018)). They argue that providing only *one* lower-cost comparator for each challenged fund is insufficient, especially when combined with the absence of allegations that the comparator funds have the same qualities. Id. at 31. According to the defendants, conclusory allegations that the funds are the "same" or even that they are in the same Morningstar category are insufficient. Id. at 31-32 (citing Evans v. Associated Banc-Corp, Case No. 21-C-60, 2022 WL 4638092, at *7 (E.D. Wis. Sept. 30, 2022); Riley v. Olin Corp., Case No. 21-CV-1328, 2023 WL 371872, at *3–6 (E.D. Mo. Jan. 24, 2023)). Further, the defendants argue that comparing actively managed funds to passively managed funds is improper in this circuit. Id. at 33 (citing Albert, 47 F.4th at 581). The defendants contend that these comparisons cannot support an inference of imprudence. Id. at 34.

According to the plaintiff, his allegations are sufficient to establish a meaningful benchmark. Dkt. No. 84 at 22. Citing Russell, the plaintiff argues that comparison between funds in the same Morningstar category *is* sufficient to establish that the two funds are comparable. Id. at 23–24. The plaintiff also argues that even if the court does not consider the three passively-managed comparators, that is not enough to defeat the inference of unreasonably high investment fees entirely and dismiss this claim because even three examples can be sufficient to state a viable duty of prudence claim. Id. at 24–25.

2. *Analysis*

The second amended complaint fails to state a duty of prudence claim as to excessive investment management fees. Persuasive case law suggests that the plaintiff must identify more than one lower-cost fund to demonstrate that the defendant chose excessively expensive investment funds. See, *e.g.*, Remied, 2024 WL 3251331, at *13 (no meaningful basis of comparison when the plaintiff provided "one (and only one) other fund that had lower expense ratios"); Lard, 2023 WL 6198805, at *4–5 (two comparator funds were insufficient to plead imprudence). Rather, the plaintiff needs to show that there were *several* comparable funds available to the defendant at a lower cost. See, *e.g.*, Gaines v. BDO USA, LLP, 663 F. Supp. 3d 821, 829–30 (N.D. Ill. 2023) (plaintiff provided five comparators for each challenged fund).

Likewise, the plaintiff has made too few allegations regarding the qualities of each fund to allow the court to determine whether they truly are comparable. "A raw allegation that the other investments have the 'same investment approach and similar investment histories' isn't good enough." Remied, 2024 WL 3251331, at *14. The fact that the comparator funds are in the same Morningstar category, standing alone, isn't enough. See id.; Lard, 2023 WL 6198805, at *4–5 (plaintiff must plead facts "such as investment strategy, management style, or risk profile" to establish a fair comparison). Here, the second amended complaint pleads only that the cheaper funds are "comparable" and have the "same investment style." Dkt. No. 78 at ¶137. That

is not enough to state a violation of the duty of prudence based on excessive investment management fees.

The court will dismiss Count II of the second amended complaint. Because the plaintiff already has had three chances to plead this claim, the court will dismiss Count II with prejudice. See Agnew v. Nat'l Collegiate Athletic Ass'n, 683 F.3d 328, 347-48 (7th Cir. 2012) (affirming dismissal with prejudice where the plaintiff had three opportunities to plead a viable claim and failed to do so).

C.    Failure to Monitor

The parties seemed to agree in briefing that the plaintiff's failure to monitor claims are derivative of his underlying duty of prudence claims. Dkt. Nos. 82 at 36, 84 at 25. But at oral argument, the defendant argued that even if the plaintiff's duty of prudence claims survived, his failure to monitor claims still might fail due to pleading deficiencies. Dkt. No. 89. The defendants argue that there are not enough allegations in the second amended complaint about what the defendants did or did not do to monitor their employees to infer any failure to monitor on the defendants' part. Id. The plaintiff objects, arguing that courts across the country have "unanimously" found that where a duty of prudence claim is alleged, a failure to monitor claim follows. Id.

"[D]uty to monitor claims rise or fall with [] duty of prudence and duty of loyalty claims." Albert, 47 F.4th at 583 (citing Rogers v. Baxter Int'l Inc., 710 F. Supp. 2d 722, 740 (N.D. Ill. 2010)); see also Remied, 2024 WL 3251331 at *14 (denying motion to dismiss failure to monitor claim where the plaintiff stated a

viable duty of prudence claim). In <u>Gaines v. BDO USA, LLP</u>, 663 F. Supp. 3d 821, 832 n.4 (N.D. Ill. 2023), a defendant argued that a plaintiff was required to plead the defendant's "specific knowledge" of imprudent acts by its plan fiduciaries to state a claim for failure to monitor. The court stated that the only case the defendant cited for this proposition had observed that "[c]ourts have been unwilling to delineate and probe the scope of defendants' monitoring duties on motions to dismiss[] and have permitted such claims to proceed forward to discovery." <u>Id.</u> (quoting <u>Velazquez v. Mass. Fin. Servs. Co.</u>, 320 F. Supp. 3d 252, 260 (D. Mass. 2018)). That court denied the defendant's motion to dismiss the failure to monitor claim. <u>Id.</u> at 832.

This court was not able to locate a post-<u>Hughes</u> case in this circuit where a court denied a motion to dismiss a plaintiff's duty of prudence claim based on excessive recordkeeping fees yet granted a motion to dismiss a derivative failure to monitor claim. Of the post-<u>Hughes</u> cases in this circuit, all have allowed a derivative failure to monitor claim to proceed where the underlying breach of the duty of prudence claim survives. <u>See</u>, <u>e.g.</u>, <u>Glick</u>, 2023 WL 9327209, at *7; <u>Mazza</u>, 2023 WL 3558156, at *4; <u>Remied</u>, 2024 WL 3251331 at *14; <u>Russell</u>, 2024 WL 2892837, at *4; <u>Nohara v. Prevea Clinic Inc.</u>, Case No. 20-CV-1079, 2023 WL 9327202, at *5 (E.D. Wis. July 21, 2023), <u>report and recommendation adopted</u>, 2024 WL 233373 (E.D. Wis. Jan. 22, 2024). And <u>Gaines</u> and <u>Velazquez</u>, though not binding, confirm that the court should reject the defendants' argument and allow the failure to monitor claim to proceed, as

does <u>Albert</u>'s statement that such claims "rise and fall" together. 47 F.4th at 583.

Because the court has concluded that the plaintiff's duty of prudence claim regarding excessive recordkeeping fees survives the motion to dismiss, the court will deny the motion to dismiss as to the derivative failure to monitor claim (Count III of the second amended complaint). Conversely, because the court is dismissing the plaintiff's duty of prudence claim regarding excessive investment management fees, the court will grant the motion to dismiss as to the associated failure to monitor claim (Count IV of the second amended complaint).

D. <u>Claims Against Froedtert and the Board of Directors</u>

The defendants also argue that the court should dismiss the duty of prudence claims against Froedtert and the Board of Directors because they are not plan fiduciaries. Dkt. No. 82 at 34–35. The plaintiff did not oppose this argument in his brief and clarified at oral argument that he is not pursuing duty of prudence claims against Froedtert and the Board of Directors, only failure to monitor claims. The court will grant the defendants' motion to dismiss the duty of prudence claims against Froedtert and the Board of Directors.

E. <u>Injunctive Relief</u>

The defendants contend that the court should dismiss the plaintiff's request for injunctive relief because he no longer is a plan participant and faces no risk of ongoing harm. Dkt. No. 82 at 37. The plaintiff did not respond to this

27

argument in his brief and conceded at oral argument that he was not pursuing injunctive relief because he is a past plan participant. The court will dismiss the plaintiff's request for injunctive relief from the second amended complaint.

## IV. Conclusion

The court **GRANTS IN PART** and **DENIES IN PART** the defendants' motion to dismiss the second amended complaint. Dkt. No. 81.

The court **GRANTS** the defendants' motion as to, and **DISMISSES WITH PREJUDICE,** Count I against Froedtert Health, Inc. and the Board of Directors of Froedtert Health, Inc. only, Counts II and IV in their entirety and the plaintiff's request for injunctive relief.

The court **DENIES** the defendants' motion to dismiss Count I as to the Froedtert Health, Inc. Benefit Plan Committee and Count III against Froedtert Health, Inc. and the Board of Directors of Froedtert Health, Inc.

The court will issue a separate order setting dates for the parties to submit a joint Rule 26(f) plan and for the defendant to answer the second amended complaint.

Dated in Milwaukee, Wisconsin this 14th day of July, 2025.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**

28